UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION


TOM RETZLAFF                    )
          Plaintiff,           )
                               )
v.                             )     NO. 5:08-CV-00170-OLG
                               )
LYNDA YVONNE DE LA VINA,       )
DIANE BAKER WALZ, KYLE         )
MERLETTE SNYDER,               )
KATHERINE ANNE POPE,           )
          Defendants.          )

---

VIDEOTAPED DEPOSITION OF TOM RETZLAFF
September 24, 2008

---

BE IT REMEMBERED that the videotaped

deposition of TOM RETZLAFF was reported by Lydia L.

Edwards, Certified Shorthand Reporter, by machine

shorthand on September 24, 2008, at the Office of the

Attorney General of Texas, located at 3460 North east

Parkway, San Antonio, Texas, between the times of

10:32 o'clock a.m. and 3:30 o'clock p.m., after which

time the deposition was reduced to writing and set

forth as follows:

EXHIBIT

**H**

Tom Retzlaff   09-24-2008                    Page 2 of 84

**Panel 2:**

```
1          A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
        Tom Retzlaff, Pro Se
4       P.O. Box 92
        San Antonio, Texas  78291
5
6  FOR THE DEFENDANT:
        Lars Hagen
7       Assistant Attorney General
        P.O. Box 12548
8       Capitol Station
        Austin, Texas  78711-2548
9       (512) 463-2120
10
   ALSO PRESENT:
11      Gail Jensen (UTSA Counsel)
        Louis D. Martinez
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Panel 4:**

| DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|
| **Exhibit A** | | |
| Deposition Notice | 5 | |
| **Exhibit B** | | |
| Medical Records Release | 106 | 110 |
| **Exhibit C** | | |
| 1-28-08 Letter | 111 | 111 |
| **Exhibit D** | | |
| 3-17-08 Letter | 112 | 112 |
| **Exhibit E** | | |
| 3-21-08 Letter | 113 | 113 |
| **Exhibit F** | | |
| Decision Letter | 134 | 134 |
| **Exhibit G** | | |
| 11-20-07 emails | 154 | 154 |
| **Exhibit H** | | |
| 2/24-25/08 emails | 164 | 166 |

```
1          I N D E X   O F   E X H I B I T S
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Panel 3:**

```
1      T A B L E   O F   C O N T E N T S
2  APPEARANCES - - - - - - - - - - - - 2
3  INDEX OF EXHIBITS - - - - - - - - - 4
4  TOM RETZLAFF
        Examination by Mr. Hagen - - - - - - 6
5
   CHANGE OF VIDEOTAPES - - - - - - 49, 106, 161
6
   DEPOSITION AMENDMENT SHEETS - - - - - - 215
7
   WITNESS SIGNATURE PAGE  - - - - - - - 219
8
   REPORTER'S CERTIFICATE PAGE   - - - - - 220
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Panel 5:**

```
1       (Before the deposition commenced, an
2       instrument was marked for
3       identification as Exhibit A.)
4       THE VIDEOGRAPHER:  This is the
5  videotaped deposition of Tom Retzlaff.  This is the
6  beginning of Tape 1.  Today's date is September 24th,
7  2008.  We are on the record at 10:32.
8       MR. HAGEN:  Okay.  This is a
9  Defendants' deposition.  I think Louis Martinez who
10 is here wanted to make a clarifying statement about
11 his role in today's deposition, I think.
12      MR. MARTINEZ:  I think as well.  For
13 the purposes of the record, I would like to state
14 that while I was the attorney of record in the state
15 court case filed in the County Court at Law No. 10 in
16 Bexar County, Texas, Cause No. 336249, once this case
17 was removed, due to the fact that I don't have a
18 federal license, I don't consider myself to be the
19 attorney of record in this case.  Although I have not
20 been formally removed from this case, I, for purposes
21 of the record, wanted to clarify that.  Mr. Retzlaff
22 will be proceeding pro se in this deposition.  I'm
23 here as another party present, but will not be
24 representing him.
25      THE REPORTER:  Would you raise your
```

6

1  right hand?
2         (At this time, the witness was placed
3         under oath by Lydia L. Edwards, Court
4         Reporter.)
5
6             TOM RETZLAFF
7  was called as a witness for the Defendants and, after
8  having been duly sworn to tell the truth, testified
9  as follows:
10            EXAMINATION
11 BY MR. HAGEN:
12    Q.  Before we go into deposition and discovery
13 mode, Mr. Retzlaff, first of all, I just want to ask
14 you if you've had your deposition ever taken before?
15    A.  Yeah.
16    Q.  You have?  How many times?
17    A.  I don't know.
18    Q.  Can you estimate?  Was it zero to five times
19 or five to ten times or ten or more times?
20    A.  I don't know, five times maybe.
21    Q.  Okay.  In relationship to those depositions,
22 each time you're sworn to tell the truth.  You
23 understand that, correct?
24    A.  Yes.
25    Q.  You understand there's a federal penalty for

7

1  not telling the truth while giving testimony in
2  federal cases, correct?
3     A.  No.
4     Q.  Okay.
5     A.  I know there's a state penalty, but --
6     Q.  Okay.  Just to make you aware, there's a
7  statute -- federal statute that requires you to tell
8  the truth in the course of giving deposition
9  testimony and that there's a penalty for that.  I'll
10 represent that fact to you and ask you to, of course,
11 abide by what you've already sworn to do, which is to
12 tell the truth and answer the questions I have for
13 you.
14    A.  Okay.
15    Q.  Another guideline that I always try to remind
16 witnesses about is the fact that you are to answer
17 with words and not nodding your head so that the
18 court reporter can record actually what your
19 responses are.  Do you agree to do that?
20    A.  Yes.
21    Q.  Also, if you need a break, just let me know.
22 We can take some time.  You can stand up and stretch.
23 I notice that you have what appears to be an injured
24 arm today.  We don't want any blood clots forming.
25 If you want to stretch your legs, stretch your arms

8

1  and move around, let me know, okay?
2     A.  Well, I'm taking morphine.  So I might need
3  to just rest and close my eyes for a bit if I get too
4  tired.
5     Q.  Okay.  Is there any reason that you believe
6  that that's going to interfere with your telling
7  truthful answers to questions I ask you here today?
8     A.  I am not a medical doctor.  I do not know
9  what the effect of morphine and other drugs have on
10 the body.
11    Q.  Are you taking the position that because
12 you're taking morphine as a painkiller you cannot
13 testify today?
14    A.  I'm here today.  I don't know.  You know, I'm
15 not a doctor.  I'm taking morphine and several other
16 medications as well.
17    Q.  Okay.  Has any doctor advised you not to
18 participate in legal proceedings since you've been
19 taking morphine?
20    A.  I've never asked a doctor whether I should
21 participate.  So --
22    Q.  You haven't been given that restriction so
23 far?
24    A.  No.  I've never -- the issue has never come
25 up.

9

1     Q.  Okay.  But for clarification you haven't been
2  given that restriction so far, just for my
3  understanding?
4     A.  No.  I never asked for one.  I suppose if I
5  could ask for one I'd probably get it, but --
6     Q.  Okay.  You haven't asked for one, and none
7  has been prescribed to you so far.
8     A.  Correct.
9     Q.  Do I understand that right?
10    A.  Correct.
11    Q.  Okay.  How long have you been on morphine due
12 to this injury?
13    A.  Well, I've been taking morphine on and off
14 for two or three years.  I've got a herniated disk in
15 my back as well as two in my neck.  I was in a
16 motorcycle accident a couple of years ago.  And then
17 with regards to my arm here, I broke it pretty badly
18 and have two steel plates along with 10 or 12 screws
19 in the arm holding it together.
20    Q.  When did that injury happen?
21    A.  The injury happened about a year and a half
22 ago.  I've had three surgeries on it.  They did the
23 surgery -- I think it was like maybe nine months ago.
24 And then I reinjured it again when I was riding my
25 motorcycle doing something I shouldn't have been

10

1  doing.  So --
2     Q.  When did you most recently reinjure it?
3     A.  Yesterday.
4     Q.  Okay.  You had -- the last time we had a
5  deposition setting, we -- you had a -- you set a
6  doctor's appointment --
7     A.  Yes.
8     Q.  -- that conflicted with the deposition
9  setting?
10    A.  Yes.
11    Q.  And also you said that you had a court
12  setting --
13    A.  Yes.
14    Q.  -- that interfered with this deposition
15  setting.  Do you remember that?
16    A.  Yes.  I had a doctor's appointment at the
17  Pain Clinic at the hospital.
18    Q.  And when I say "this deposition," I'm talking
19  about the deposition setting earlier this month --
20    A.  Right.
21    Q.  -- that you-all wanted canceled, correct?
22    A.  Right.
23    Q.  Okay.  What was the reason for that doctor
24  appointment?
25    A.  Well, I was at the Pain Clinic.  They did a

11

1  surgical procedure on my neck because of the pain
2  from the vertebrae.
3     Q.  Okay.  Were you on morphine that day?
4     A.  I don't know what drugs they injected me with
5  then.
6     Q.  Okay.  Am I correct that you had a medical --
7  this medical appointment in the morning of that
8  September day?
9     A.  Yes.
10    Q.  And then in the afternoon of that September
11  day you had a court hearing in state court, correct?
12    A.  Yeah.  I think the court hearing, yeah, was
13  like at 2:00 o'clock or something like that, yeah.
14    Q.  Okay.  So in spite of -- I mean, you went to
15  your medical appointment in the morning, and you were
16  injected with some drugs for pain?
17    A.  Yeah.  They -- they injected -- well, they
18  ran a metal tube or something into my neck right up
19  to where the nerves are at, and then they injected
20  some chemicals on there to, I guess, reduce the
21  swelling and make the pain go away.
22    Q.  Okay.  And your testimony is that later in
23  that day then you appeared for your court hearing?
24    A.  Yeah.
25    Q.  Okay.

12

1     A.  Yeah.  The morphine that I take are little
2  pills that they give me.  I got a prescription for
3  morphine as well as Lortab, Vicodin, a bunch of other
4  stuff.
5     Q.  Okay.  And just for my information, you've
6  been taking, you said, morphine pills --
7     A.  Yeah.
8     Q.  -- off and on for about two or three years
9  now?
10    A.  Yeah.  I got 60 milligram pills and 30
11  milligram pills.
12    Q.  Okay.  And fair to say you've been taking
13  these morphine pills around the time that you've had
14  court hearings --
15    A.  No, I don't.
16    Q.  -- in the last two or three years, correct?
17    A.  No, I don't.
18    Q.  Oh, you haven't.  So let's go back to the
19  earlier-this-month, September, deposition setting.
20  You received a course of painkillers in the morning,
21  correct?
22    A.  Well --
23    Q.  That was your testimony.  Do I have -- do I
24  misunderstand --
25    A.  I know exactly what it was that they gave.

13

1  They did -- I know there was some lidocaine involved,
2  and then they put something inside that, some kind of
3  steroid kind of stuff, I think; and they were trying
4  to locate which particular nerve was causing the
5  particular problem.  And when I go back, I think
6  they're going to like do an electrolysis kind of
7  thing where they burn out that nerve.
8     Q.  So going back to that day of September where
9  in the morning you went in for this procedure and to
10  receive those drugs, remember --
11    A.  (Nods affirmatively.)
12    Q.  -- that afternoon, then, you appeared in
13  court -- in state court for a motions hearing,
14  correct?
15    A.  Yes, just for some brief argument on a motion
16  to recuse.
17    Q.  And that was your motion, correct?
18    A.  Yes.
19    Q.  -- on that case?  Okay.  And just for
20  clarification, was that a motion to recuse Judge
21  Crouch --
22    A.  Yes.
23    Q.  -- in a state court case where she had
24  entered an order that barred you from filing further
25  litigation --

Tom Retzlaff   09-24-2008                    Page 5 of 84

14

1    A.  Actually that's --
2    Q.  -- in courts?
3    A.  -- not true.
4    Q.  Okay.  I'm just asking.  Was it --
5    A.  Yeah.
6    Q.  -- a motion to recuse her about an order
7  where she restricted you in some fashion?
8    A.  No.  It was a motion to recuse based on her
9  having a secret, ex-parte, off-the-record meeting
10  with opposing counsel in the case.
11    Q.  And this is -- okay.  I understand that --
12    A.  That's what the motion --
13    Q.  -- that's the basis of your --
14    A.  That's what the --
15    Q.  -- motion to recuse her.  And what I'm
16  talking about is the motion -- or the order that she
17  put in place in relationship to that case.  That was
18  an order that restricted some of your filings and
19  also made further restrictions upon you, correct?
20    A.  Yeah.  That was a two-day order --
21    Q.  Okay.
22    A.  -- a temporary two-day order.
23    Q.  And she since then has announced an intention
24  to make that a permanent order, correct?
25    A.  Well --

15

1    Q.  And that gave rise to your motion to recuse
2  her?
3    A.  No.
4    Q.  Do I understand --
5    A.  No.  I don't know what she is -- what she
6  intends to do.  I have not spoken with Judge Crouch
7  for -- I don't know.  The last time we were in court,
8  I think it was in June sometime.
9    Q.  Okay.
10    A.  So I don't know what it is that she's
11  planning on doing or anything like that.
12    Q.  What was the outcome of the hearing that you
13  had in the September day when we were first set to
14  take your deposition here?  What was the outcome of
15  that motion to recuse?
16    A.  How is that relevant to this stuff?
17    Q.  Are you refusing to answer that question
18  about --
19    A.  I'm just curious as to how it's relevant.  I
20  don't want to spend, you know, all day here just
21  answering questions willy-nilly.  I mean, we're here
22  about a lawsuit that I filed against Lynda De La Vina
23  and some others.
24    Q.  Okay.  But will you bear with me?  And if you
25  have an objection to relevance, you can make it a

16

1  relevance objection.  Feel free to do that.  But you
2  also have to understand that under the rules I'm able
3  to ask a wide range of questions.  If it's reasonably
4  calculated to lead to the discovery --
5    A.  Sure.
6    Q.  -- of admissible evidence, then I can ask it,
7  and you have to answer truthfully --
8    A.  Well, or I can --
9    Q.  -- on the status of it.  So I may ask --
10    A.  -- or I could stop the deposition and move
11  for a protective order.
12    Q.  Okay.  Going back to my question for you,
13  what was the outcome of that motion to recuse?
14    A.  The outcome of the hearing is that the
15  recusal motion was denied.
16    Q.  Okay.  And do you know the status of Judge
17  Crouch's order restricting your litigation
18  activities?
19    A.  There is no status of it.
20    Q.  Okay.  So I should talk -- what cases was
21  that order entered in?
22    A.  I don't know what the case number was.
23    Q.  What was the name of the case?  Who were you
24  suing?
25    A.  GoAmerica Communications Company.

17

1    Q.  That was the defendant?
2    A.  Yes.
3    Q.  Okay.  Were there other defendants that you
4  added to that case?
5    A.  Yeah.  But I don't remember what their names
6  were.  The main company was GoAmerica and then some
7  of the people that worked at GoAmerica.
8    Q.  Did you file that case in 2008?
9    A.  Yeah, I think so.
10    Q.  Okay.  I think I know the case that you're
11  talking about.  Now, coming back to the questions
12  that I was asking you about your state here today,
13  any reason to believe that you, you know, cannot give
14  truthful answers in response to questions that I'm
15  asking you?
16    A.  No.  But sometimes my recollection might not
17  be off.
18    Q.  My not be off or --
19    A.  Or might not be, you know, as it should be.
20    Q.  Okay.  Would you let me know if you're having
21  that kind of difficulty?
22    A.  Well, I'm not a medical doctor, and it's just
23  like asking a person who's drinking whether or not
24  they're drunk.  You know, all drunks think that
25  they're fine and safe to drive, but when looked at

Tom Retzlaff   09-24-2008      Page 6 of 84

18

1 objectively from a third-person point of drunk, you
2 know, then you can obviously tell that even though
3 the guy might think, "Yeah, I'm safe to drive, he
4 probably isn't.
5     Q.  Okay.  Who treated you in relationship to
6 your -- what you're saying was your injury yesterday?
7     A.  I haven't seen a doctor yet.  I'm going there
8 tomorrow.  I'm getting a -- I got a CT scan scheduled
9 at 2:30 tomorrow.
10     Q.  Did anyone prescribed the brace that you're
11 wearing right now?
12     A.  Well, yeah.  I got this from the VA.
13     Q.  Okay.  Was that something that you got
14 yesterday or that you've had over time?
15     A.  No.  I've had it over time --
16     Q.  So you --
17     A.  -- for different times when there's been
18 injuries to the arm.
19     Q.  So --
20     A.  The whole joint is just kind of held together
21 by screws and things line that.  And, you know, when
22 there's problem with it from putting too much stress
23 on it or lifting too much or something like that --
24     Q.  When did you have the surgery that resulted
25 in the hardware in your right arm?

19

1     A.  Well, like I said, there's been three
2 surgeries.
3     Q.  When is the last one?
4     A.  The last one was in December, about nine
5 months ago.
6     Q.  December, 2007?
7     A.  Yeah.
8     Q.  Okay.  Now, when did you begin wearing your
9 brace again, yesterday after you reinjured it?
10     A.  After I rode on my motorcycle.
11     Q.  Did I understand correctly you said that
12 happened yesterday?
13     A.  Uh-huh.
14     Q.  Okay.  What happened yesterday?
15     A.  I took a sharp turn.
16     Q.  Did you fall?
17     A.  No, almost falled.
18     Q.  Okay.  And then today you put the brace on?
19     A.  No.  Last night I did.
20     Q.  Last night you put the brace on?
21     A.  In addition to taking some medicine and
22 putting some ice on it.
23     Q.  Okay.  And how are you feeling now?
24     A.  It hurts a bit.
25     Q.  Okay.

20

1     A.  I feel warm and fuzzy.
2     Q.  Okay.  Who prescribed the -- did you call
3 it -- what kind of medication?
4     A.  Morphine.
5     Q.  Who prescribed that for you?
6     A.  The VA.
7     Q.  And what doctor?
8     A.  Dr. Whitten.
9     Q.  And where is he located?
10     A.  At the VA.
11     Q.  Where?
12     A.  Here in San Antonio.
13     Q.  Okay.  And what's the address of the VA in
14 San Antonio?
15     A.  I don't know what the address is.  It's in
16 the Medical Center.
17     Q.  Dr. Whitten is a medical doctor?
18     A.  Yes.
19     Q.  Is he your primary care person at the Medical
20 Center?
21     A.  Yes.
22     Q.  Okay.  And when do you believe he last
23 prescribed you morphine?
24     A.  Let's see.  It was refilled maybe three weeks
25 ago.

21

1     Q.  And that was for the purpose of treating what
2 pain?
3     A.  Correct.
4     Q.  What pain --
5     A.  Pain.
6     Q.  -- did he prescribe that for?
7     A.  For pain.
8     Q.  What part of your body?
9     A.  Well, I have pains in my neck.  I have pains
10 in my back.  I have pains in my arm.
11     Q.  Okay.
12     A.  Because of the pains in my arm, I can't sleep
13 well at night.  So I take something different to help
14 me sleep at night.
15     Q.  Okay.
16     A.  You know, I can feel the hardware moving and
17 rubbing in my arm at times.  And it just drives me
18 nuts, and it hurts like hell.  Other times it's okay.
19     Q.  Okay.
20     A.  But sometimes if I do too much with it it --
21 and I've seen the hardware that they have in there
22 because during one of the surgeries they had to
23 remove all of the hardware and put some new stuff in,
24 and I asked them to save the old stuff so I could
25 look at it.

Tom Retzlaff    09-24-2008

22

1    Q.  Okay.
2    A.  And it looks like an erector set materials,
3  is really what it is.  And, you know, I swear to God
4  I can hear it bending and creaking, but the doctors
5  say it's not.  But I can -- I can feel it.
6    Q.  Okay.  A couple of other questions about the
7  origins of these pains:  You said you've had a few
8  motorcycle accidents?
9    A.  One.
10    Q.  Okay, one.  That gave rise to the surgery
11  that originally installed the hardware in your right
12  arm?
13    A.  No, no.
14    Q.  Okay.
15    A.  No.  The motorcycle accident was before the
16  arm injury.
17    Q.  Okay.  When was the motorcycle accident?
18    A.  I think it was in March or April of 2005.
19    Q.  Okay.
20    A.  And really, again, these are just like
21  irrelevant, and I'm pretty much going to stop
22  answering these questions because they don't have
23  anything to do with this case.  It just sounds more
24  like a fishing expedition to me, and, you know,
25  making inquiries of my personal, private medical

23

1  background just doesn't seem applicable to this.
2    Q.  Well, Mr. Retzlaff, you have to understand
3  that part of what I'm doing here is asking you
4  questions that relate to your ability to testify here
5  today, and by getting a chronology of what the
6  injuries are and when they occurred, we can assess
7  better -- a reader of the transcript can better
8  assess your capability to testify accurately under
9  oath here today.  So --
10    A.  Well, a three-year-old motorcycle accident
11  certainly doesn't have --
12    Q.  That's why I'm asking you when it happened.
13  So it happened in March of 2005?
14    A.  Right.
15    Q.  And, then, since then you've suffered an
16  injury that has caused the installation of hardware
17  in your right arm?
18    A.  Yes.
19    Q.  Okay.  When did that happen?
20    A.  That happened on Thanksgiving of 2006.  I was
21  arm wrestling.
22    Q.  Okay.  And then you ended up having surgery
23  as a result of that injury?
24    A.  Yeah, and then a couple of months later
25  surgery again.

24

1    Q.  And that was also in 2006 or early 2007?
2    A.  Yeah.
3    Q.  Okay.
4    A.  And then a few months later a surgery again.
5    Q.  Okay.  So the last surgery you had was in
6  2007 for your right --
7    A.  Yeah, December.
8    Q.  -- arm?
9    A.  December, yeah.
10    Q.  Okay.  December, 2007 was the last surgery
11  that you had?
12    A.  Yes.
13    Q.  Okay.  Who performed these surgeries?  Was it
14  Dr. Whitten or --
15    A.  No.  He's not a surgeon.
16    Q.  Okay.
17    A.  He's just a guy -- you know, you get a cough,
18  and you go to his office and that kind of thing.
19  These surgeons were at the VA Hospital.
20    Q.  Okay.  Do you remember the name of your
21  surgeon?
22    A.  Not a clue because there's like 20 or 30 guys
23  each time.
24    Q.  Okay.  What is Dr. Whitten's first name?
25    A.  I think it's Glenn.

25

1    Q.  Okay.
2    A.  But I'm not sure.
3    Q.  All right.
4    A.  But each time when they do these surgeries,
5  there's like -- there's just a wad of people, and the
6  surgeries take five or six hours.
7    Q.  Okay.
8    A.  And so I don't know who all is coming and
9  going.
10    Q.  And you testified that you saw Dr. Whitten
11  earlier this month on the day that we originally set
12  to have your deposition?
13    A.  No.
14    Q.  What doctor did you --
15    A.  No.  That was at The Pain Clinic.
16    Q.  Okay, The Pain Clinic.  And where is The Pain
17  Clinic?
18    A.  At the University Hospital right next to the
19  VA Center.
20    Q.  And who did you see there?
21    A.  I don't know.  There's some Indian dude who
22  runs The Pain Clinic.  His son is on that TV show,
23  Heroes.
24    Q.  Okay.  And, then, since then you haven't seen
25  a doctor?  Since earlier in September when we

Tom Retzlaff  09-24-2008          Page 8 of 84

26

1 originally set your deposition, you haven't seen any
2 doctor --
3     A. A medical doctor?
4     Q. -- or medical provider?
5     A. No, I don't think.  You mean since two weeks
6 ago?
7     Q. Since the day that we -- that you appeared in
8 court to move to recuse Judge Crouch, number one, and
9 on that same day the day that you went to The Pain
10 Clinic next to University Hospital.
11     A. Yeah.  I don't think so.
12     Q. Okay.  You sound unsure about that?
13     A. Well, I mean, I've got lots of different
14 appointments going on at lots of different times --
15     Q. Okay.  And then --
16     A. -- on many different things.
17     Q. -- you're saying that your intention is to go
18 to a doctor tomorrow?
19     A. Well, I have an appointment tomorrow.
20     Q. Okay.  And that's to see who?
21     A. That's to get a CT scan done.
22     Q. Okay.  Where?
23     A. At the VA.
24     Q. So that's an appointment that you have with
25 Dr. Whitten?

27

1     A. No.  Whitten is just -- he's just the GP guy.
2 He doesn't run the machines.  He doesn't interpret
3 the results or do anything like that.
4     Q. Okay.  In terms of who you have your
5 appointment with tomorrow, as far as you know where
6 do you go?  Who do you see?
7     A. Well, it'll be at the X-ray Department.  So
8 I'll show up there and see whoever is there to see.
9     Q. A radiologist of some sort?
10     A. I don't know.
11     Q. Okay.  Well, you made the appointment with
12 somebody.  And the question is who --
13     A. No.  Actually I didn't make the appointment.
14 The appointment was made for me.
15     Q. Okay.  By Dr. Whitten?
16     A. Yes.
17     Q. Okay.
18     A. They -- they -- you know, they -- I don't
19 know how their system works, but you get a call or a
20 letter in the mail or whatever --
21     Q. Okay.
22     A. -- telling you to show up.
23     Q. You in light of --
24     A. In fact, I got to get a blood test, too,
25 today.  I forgot.

28

1     Q. Okay.  In light of this history, you let me
2 know if you are for some reason not able to testify
3 today because of a drug that you believe you're
4 taking, okay?
5     A. I'll do my best.
6     Q. Okay.  Would you tell us your social security
7 number?
8     A. No.
9     Q. You're refusing to answer that question?
10     A. Yeah.
11     Q. Okay.  What is your address -- your home
12 address?
13     A. P.O. Box 92, San Antonio  78291-0092.
14     Q. Where do you live?
15     A. That's my address.
16     Q. What is your -- where do you live in San
17 Antonio?
18     A. I'm not giving that.
19     Q. You're not providing the Defendants with your
20 social security number or where you live in San
21 Antonio?
22     A. Correct.
23     Q. Who do you live with?
24     A. Myself.
25     Q. You live alone?

29

1     A. At times.
2     Q. Do you live with anyone -- share your
3 residence with anyone now?
4     A. Not right at this exact moment.
5     Q. Okay.  When did you last share your residence
6 with another person, and who was that person or
7 people?
8     A. Why is that relevant?
9     Q. These are ordinary civil discovery requests.
10     A. Well, it's not ordinary to me, and I'm not
11 going to answer them.
12     Q. Okay.  Are you married?
13     A. No.
14     Q. Have you been married?
15     A. Yes.
16     Q. And what was your wife's name?
17     A. Again, that's -- listen, you want to start
18 asking me questions.
19     Q. Mr. Retzlaff, I'm sorry.  Look, these are
20 questions I ask of every single, solitary civil
21 plaintiff in a case where they've sued the people I
22 represent.
23     A. Okay.
24     Q. They're within bounds.  They're?
25     A. Well, you say that.  I don't think they are.

Tom Retzlaff   09-24-2008

---

30

1    Q.  That's fine.  But I'm telling you they're
2  within bounds, and they're not for any improper
3  purpose on my part.  And if you want to continue to
4  refuse questions -- proper questions that we have
5  about you and about your claims ultimately --
6    A.  Well, you haven't asked anything about my
7  claims.
8    Q.  First I'm asking you questions -- background
9  information, basic questions about who you are and
10 your circumstances.  These are ordinary questions.  I
11 will continue these questions.
12   A.  Okay.
13   Q.  If you want to continue to refuse these
14 questions, I suppose you can elect to improperly do
15 that, but, you know, you're just delaying the course
16 of getting through a proper course of civil
17 discovery.  So I'm going to go ahead -- first I'm
18 going to object to your question -- your answers to
19 these proper questions as nonresponsive.
20         And then I'm going to reask, have you
21 ever been married?
22   A.  Okay.  See, now, it's your position that
23 they're proper.
24   Q.  I'm not going to debate you.
25   A.  Okay.

---

31

1         MR. HAGEN:  I'll object as
2  nonresponsive.
3    Q.  (BY MR. HAGEN)  Go ahead.  And the question
4  is, what is the name of your former wife, your
5  ex-wife?
6    A.  And, again, that's not relevant.
7    Q.  Okay.  So you're refusing to answer that
8  question?
9    A.  Yes.
10   Q.  Okay.  You've answered that you have been
11 married in the past, correct?
12   A.  Yes.
13   Q.  Okay.  Do you have children?
14   A.  Yes.
15   Q.  Okay.  What are their names?
16   A.  That's not relevant either.
17   Q.  Who do they live with?
18   A.  One lives on their own, and one lives with
19 the mother.
20   Q.  Okay.  What are their ages?
21   A.  That's not relevant to this either.
22   Q.  In terms of your income, what is your current
23 source of income?
24   A.  Student loans.
25   Q.  Is that the only source of income that you

---

32

1  have?
2    A.  Yeah, pretty much.
3    Q.  How -- well, pretty much.  What else?
4    A.  Well, sometimes I might find a scratch-off
5  ticket where I'll get lucky.
6    Q.  Okay.  So you get student loan money and buy
7  lottery tickets with it?
8    A.  No.  I just --
9    Q.  Okay.  Then what is the source of the income
10 that you use to buy lottery tickets?
11   A.  Student loans.
12   Q.  Okay.  And what else?
13   A.  And the only time I buy a lottery ticket is
14 if the jackpot is over 50 million dollars.
15   Q.  Okay.  So --
16   A.  And I buy one ticket.
17   Q.  So what are all of your sources of income?
18   A.  Well, sometimes my family is nice enough to
19 loan me some money.
20   Q.  Okay.  And in terms of the income that you do
21 have, how much and how often do you receive it in the
22 form of student loans?
23   A.  Once in the fall, once in the spring.
24   Q.  Okay.  When is the last time that you
25 received a disbursement of student loan money?

---

33

1    A.  This fall.
2    Q.  Okay.  Are you enrolled in school?
3    A.  Yes.
4    Q.  Where are you enrolled?
5    A.  Not relevant.
6    Q.  Are you refusing to answer the question about
7  where you're enrolled in school?
8    A.  Yeah.
9    Q.  How much did you receive in the form of a
10 student loan disbursement this fall?
11   A.  I'm not going to answer that either.
12   Q.  How much money do you receive as gifts or
13 loans from your family?
14   A.  I'm not sure because I don't keep track.
15   Q.  Okay.  Is it on an annual basis or monthly
16 basis even as, you know, 500 bucks a month?
17   A.  It's not --
18   Q.  Is it --
19   A.  -- on a monthly basis.  It's just whenever.
20   Q.  How much is it?
21   A.  There's no set amount.
22   Q.  How much do you remember last receiving as
23 in the form of a gift or loan from your family?
24   A.  I think 1,500.
25   Q.  Okay.  When did that happen?

34

1    A. I'm not sure.
2    Q. Who gave it to you?
3    A. My father.
4    Q. Does -- what is his name?
5    A. Robert.
6    Q. Retzlaff is his --
7    A. Yes.
8    Q. -- last name?  Does he live in San Antonio?
9    A. No.
10   Q. Where does he live?
11   A. It doesn't matter.  It's not relevant.  This
12 isn't a fishing expedition, okay?
13   Q. Mr. Retzlaff, I have seen several lawsuits
14 that you have filed claiming poverty status for
15 excusing yourself from filing a fee associated with
16 your lawsuit.  Are you aware of that?
17   A. Yes.
18   Q. You've done that many times, haven't you?
19   A. I wouldn't say many times.
20   Q. You've done it five times in relationship to
21 UTSA -- at least five times in relationship to UTSA
22 or its officials, correct?
23   A. Yes.
24   Q. You've done it at least five times since
25 November of 2007, correct?

35

1    A. I don't think so.
2    Q. Okay.  Well, the record speaks for itself,
3 and we can look to that in terms of your state court
4 litigation.
5    A. Okay.
6    Q. But you've also done it in relationship to
7 the state court case that you brought against Li-Dan
8 Xu, X-u --
9    A. I guess.
10   Q. -- correct?  A defendant that you sued,
11 Danielle Xu, in one of these cases, correct?
12   A. Oh.  Yeah, I guess.
13   Q. Okay.  So my question for you is, what are
14 all the sources of your income?
15   A. Okay.
16   Q. So answer the question.
17   A. Well, again, I don't think that that's
18 relevant to the claims in this case.
19   Q. Okay.  So you're refusing to answer the
20 question about what your income sources are.  Just
21 for my benefit and information, for the Court's
22 benefit and information, is that the position you're
23 taking?
24   A. Well, I get student loans.  I occasionally
25 get some money loaned to me from my father.

36

1    Q. What is your father's name?
2    A. I told you his name --
3    Q. Okay.  Where does --
4    A. -- is Robert.
5    Q. Robert Retzlaff.  Where does Robert Retzlaff
6 live?
7    A. He lives in Rochester, Minnesota.
8    Q. Okay.  You said the last amount of money he
9 gave you was $1,500; is that correct?
10   A. I think so.
11   Q. Okay.  When did he give that to you?
12   A. I'm not sure exactly when it was.  I think it
13 was to help out with some rent or something a couple
14 of months ago.
15   Q. Okay.
16   A. I can't recall.
17   Q. Before the $1,500, where -- how much did he
18 lend you --
19   A. I don't recall.
20   Q. -- the time before?
21   A. I don't recall.
22   Q. He's given you over $20,000 in recent years?
23   A. In my lifetime?
24   Q. In the last four -- say, two years?
25   A. I don't know.

37

1    Q. Okay.  Estimate how much you received --
2    A. I can't estimate because I haven't been
3 keeping track.
4    Q. Okay.  You just receive it and that's it?
5    A. I guess.
6    Q. Okay.  That's interesting.  The reason I'm
7 pressing you on that is, you call it loans, right?
8 Loans mean you pay it back.
9    A. Yes.
10   Q. You haven't paid any of this back, right?
11 You haven't been keeping track of it, you said,
12 right?
13   A. Well, my father certainly does keep track of
14 it --
15   Q. Okay.
16   A. -- because he certainly likes to bring it up
17 whenever we talk.  But --
18   Q. So how much would you estimate you've taken
19 from your father in the last two years and have not
20 yet paid back?
21   A. Oh, I do not know.  I do not know.
22   Q. You have no idea?
23   A. I don't know.
24   Q. Okay.
25   A. You know, I know that I signed a promissory

38

1  note for him for $50,000 at one point many years ago.
2    Q.  Okay.  What other sources of income do you
3  have?
4    A.  But as far as how much that he's loaned me
5  altogether, I can't really say.
6    Q.  Okay.  What other sources of income do you
7  have?
8    A.  Nothing really.
9    Q.  Okay.  Nothing really.  I'm asking you about
10  that "really" part.  What else --
11    A.  Well, if --
12    Q.  -- do you have in the way of income?
13    A.  -- if I can pick up an odd job every now and
14  then, I do so, but in my situation, it's sort of
15  difficult to find a job for several reasons.  One is,
16  I have a felony conviction from 12 years ago.  In
17  addition, I've got physical disabilities.
18    Q.  Okay.  Let me ask you about the employment
19  that you've had in recent months or years.  When is
20  the last time you were employed?
21    A.  Maybe two years ago or three years ago.
22    Q.  Since two years ago, you haven't had the odd
23  job that you just testified --
24    A.  And it was with --
25    Q.  -- that you took?  Excuse me.

39

1    A.  Yeah.
2    Q.  The -- when is the last time you've had the
3  odd job that you testified to taking?
4    A.  I'm not sure.
5    Q.  You don't remember working since two years
6  ago?
7    A.  Well, I have done some work since then.
8    Q.  What's the work that you've done?
9    A.  You know, answering phones at a local
10  business or doing emails or just odd jobs around the
11  office.
12    Q.  Okay.  So at the local business, what
13  business did you work for?
14    A.  I'm not going to give that out.
15    Q.  Okay.  In terms of creating emails, where did
16  you create emails as an odd job?
17    A.  Well, no.  I mean, just writing.  I mean,
18  emails come in, and then responses need to be made or
19  organizing files, that kind of thing.
20    Q.  Who did you perform that work for?
21    A.  Okay.  I'm not going to give that out.
22    Q.  Is that in the office environment that you
23  made reference to?
24    A.  Yes.
25    Q.  Okay.  What office did you work for?

40

1    A.  I'm not going to give that out.
2        MR. HAGEN:  And I'm objecting to all
3  those responses as nonresponsive.
4        THE WITNESS:  Okay.
5    Q.  (BY MR. HAGEN)  Where do you bank?
6    A.  I'm not going to give that out.
7    Q.  Do you have any hobbies?
8    A.  I like to play computer games.
9    Q.  Do you play golf?
10    A.  Yes.
11    Q.  Okay.  And how often do you play golf?
12    A.  I haven't played golf in over a year.
13    Q.  Where did you play golf last?
14    A.  At La Cantera.
15    Q.  And who did you play golf with?
16    A.  I don't know who the people were with.
17    Q.  Did you play golf at La Cantera in 2007?
18    A.  I'm not sure.  I might have once.  I think I
19  might have once, but I'm not sure.
20    Q.  Where else have you played golf?
21    A.  That's the only place.
22    Q.  So you play golf, but you've golfed only one
23  time in 2007?
24    A.  Well, I've got a bum arm.
25    Q.  Okay.  I'm talking about in 2007.  You said

41

1  you played golf --
2    A.  Right.
3    Q.  -- at La Cantera, right?
4    A.  Right.
5    Q.  So where else have you played golf?
6    A.  That's it.
7    Q.  You're testifying you've golfed one time in
8  your life?
9    A.  No.
10    Q.  Okay.  Where else have you played golf?
11    A.  I mean, in the entire 42 years of my life,
12  you want to know --
13    Q.  Let's look at the last three years.  When
14  have you --
15    A.  When I do golf, it's only at La Cantera.
16    Q.  Okay.  So how many times have you golfed at
17  La Cantera?
18    A.  Maybe four or five times --
19    Q.  Okay.
20    A.  -- in the last four or five years.
21    Q.  Okay.  What is the green fee at La Cantera?
22    A.  I don't know.
23    Q.  You paid a green fee to golf there, right?
24    A.  Yeah, but I don't know what it is.
25    Q.  You don't know what it is.  Okay.  Did you

42

1  play golf in a tournament at Oak Hills in 2007?
2     A.  No.  I was at La Cantera.
3     Q.  Okay.  You played in a tournament there in
4  2007?
5     A.  Yeah.
6     Q.  Have you played any other tournaments in
7  recent years?
8     A.  No.
9     Q.  What was the tournament that you
10 played at La Cantera in 2007?
11    A.  Well, it was with a local church group, and I
12 think it was to raise some money for a youth group or
13 something like that.
14    Q.  Okay.  What church?
15    A.  You just said it, Oak Hills.
16    Q.  Okay.  That was the name of the church?
17    A.  Yeah.
18    Q.  Okay.  And are you a member there, or why
19 were you golfing?
20    A.  No.  I was just told about the event and
21 decided to show up.
22    Q.  Okay.
23    A.  I hadn't golfed in a while and wanted to do
24 it.  My dad had gotten me some new drivers, but I
25 never had a chance to use them.

43

1     Q.  Okay.  And your testimony is, you haven't
2  golfed since 2007?
3     A.  No.  I never said that.
4     Q.  Okay.  When did you last golf in 2008?
5     A.  I don't think I have golfed in 2008, but I'm
6  not sure, though.
7     Q.  You may have golfed in 2008?
8     A.  I may have, but I don't recollect it.
9     Q.  Okay.
10    A.  I don't think I have, but I don't know.
11    Q.  Let me ask you, in terms of your civil
12 litigation history, how many civil lawsuits have you
13 filed?
14    A.  I don't know.
15    Q.  Estimating?
16    A.  I don't know, more than 10.
17    Q.  Did I understand from what you told Judge
18 Rios one time, that we had an appearance before her,
19 that it was more than 60?
20    A.  I don't think it's been that many, no.
21    Q.  We can go get the transcript.
22    A.  No.  I'm just saying I don't think it's that
23 many.  In fact, I'm pretty sure it's not --
24    Q.  I can go get the transcript.
25    A.  No.  I'm not saying that.

44

1     Q.  Okay.  So estimate for me --
2     A.  I didn't say it, but what I'm saying, though,
3  is, it's -- I don't believe it's been more than 60.
4     Q.  Okay.  How many do you believe it's been?
5  And, you know, we can check records for this, too.
6  But --
7     A.  Really?
8     Q.  -- what's your best case estimate of how many
9  that you've filed?
10    A.  In my whole life?
11    Q.  Yes.
12    A.  Even when represented by counsel?
13    Q.  Yes.
14    A.  And I'm not going to count appeals of cases.
15    Q.  No.  How many court filings --
16    A.  Right.
17    Q.  -- lawsuits, have you filed in civil
18 litigation in district court proceedings?
19    A.  Just district court?
20    Q.  State court level, Bexar County Court at Law
21 and all similar levels of courts?
22    A.  I don't know, maybe 25.
23    Q.  Okay.  And so why did you tell Judge Rios
24 that you filed more than 50?
25    A.  I don't know.  I don't recollect the

45

1  contents -- context of the conversation then.
2     Q.  Do you remember that Judge Rios asked you how
3  many lawsuits you filed?
4     A.  Not really.
5     Q.  Okay.  Do you --
6     A.  I don't really remember it.
7     Q.  Do you remember that you said something well
8  in excess of 50?  You gave a range that was more to
9  the tune of --
10    A.  What does this have to --
11    Q.  -- 60 to 80.  These are ordinary questions
12 that are asked --
13    A.  Okay.  But, see, I don't have all day to sit
14 here, and I'm not going to sit here all day.  I've
15 got other things to do with my life.
16    Q.  Okay.  Let me ask you, then, how many do you
17 believe you've filed over time?
18    A.  I told you.  I think about maybe 25.
19    Q.  Okay.  So you believe that you've filed 25
20 lawsuits against -- in civil courts against people or
21 institutions?
22    A.  Maybe.
23    Q.  Okay.  And where are those lawsuits filed?
24    A.  Well, here in Bexar County and then in Bell
25 County and then --

46

1   Q.  Who did you sue in Bell County?
2   A.  Oh, I don't remember.  There were several --
3 several things going on.
4   Q.  Okay.
5   A.  I don't know.  This is 15 years ago.  I don't
6 really recall offhand.
7   Q.  Nothing more recent, you're testifying, in
8 Bell County?
9   A.  No.  There hasn't been any recent lawsuits in
10 Bell County at all.
11   Q.  Okay.  So Bell County, Bexar County.  Where
12 else?
13   A.  Well, let me ask my counsel here a question.
14   Q.  Well, he is not your counsel.
15   A.  Okay.  Well, let me ask --
16   Q.  He's been --
17   A.  -- my good friend --
18   Q.  He's been --
19   A.  -- a question, then.
20   Q.  He's been -- if you want legal advice, then
21 we're taking the position that he's your counsel in
22 this case.
23   A.  Okay.  Do you want accurate answers or not?
24   Q.  And if he wants to confer this way with you,
25 then Mr. Martinez can be your counsel at today's

47

1 deposition, and we'll -- we will proceed accordingly.
2   A.  But who are you to dictate how he runs his
3 business in life?
4   Q.  If he is not -- if you're going to confer
5 with him and he is not your counsel and he's taken
6 the position that he's not your counsel, then we're
7 going to invite Mr. Martinez to leave the deposition.
8   A.  Well, you can invite whatever you want.
9 Okay.  And you can dictate whatever you want, but
10 that doesn't mean I'm going to play along with it.
11   Q.  Okay.  Mr. Martinez has some decision-making
12 to do here, I think.
13        MR. HAGEN:  If you're going to give him
14 legal counsel, Mr. Martinez --
15        THE WITNESS:  Well, I wasn't asking for
16 legal --
17        MR. HAGEN:  This, first of all, is just
18 something that we're having to do for the record.
19        THE WITNESS:  Okay.
20        MR. HAGEN:  And it's a position I'm
21 taking in light of the direction --
22        THE WITNESS:  Sure.
23        MR. HAGEN:  -- you're going here, and
24 you're --
25        THE WITNESS:  Well, it's not a

48

1 question --
2        MR. HAGEN:  -- delaying the discovery
3 that the Defendants are doing and that they're
4 entitled to.  So let me just take this position for
5 the record, and then you can --
6        THE WITNESS:  Sure.
7        MR. HAGEN:  -- make your mutual or
8 separate decisions.
9        If you're going to confer and give
10 legal counsel on this, Mr. Martinez, then we are
11 assuming that you're going to be counsel of record at
12 this deposition.  If you're not going to give him
13 legal counsel at this time but -- or if you are,
14 rather, going to give him legal counsel at this time
15 but insist that you're not going to serve as his
16 counsel for today's deposition, we're going to ask
17 that you leave the deposition so there's not anymore
18 of this, okay?
19        THE WITNESS:  Well, do you want correct
20 answers from me or not.
21        MR. HAGEN:  And in light of that, if
22 you want to take five minutes to talk between
23 yourselves about what you want to do here, that's
24 fine.  But when we return, you're either going to be
25 his counsel and you're going to speak and object and

49

1 perform as counsel in the case for him, or if you're
2 going to, you know, give him legal advice in the
3 course of today's discovery proceedings, we're going
4 to invite you to leave because you've taken the
5 deposition that you're not his counsel, okay, so we
6 don't have continual interruption and things like
7 that.
8        MR. MARTINEZ:  And, Mr. Hagen, I
9 appreciate your position, I appreciate your concerns,
10 and I'd appreciate that courtesy of a five-minute
11 break.
12        THE VIDEOGRAPHER:  We are off the
13 record at 11:15.
14        (BRIEF RECESS)
15        THE VIDEOGRAPHER:  This is the
16 beginning of Tape No. 2.  We are back on the record
17 at 11:24.
18        MR. HAGEN:  So we took a break so that
19 you could chat with Mr. Martinez who I think -- the
20 Plaintiff is you, Mr. Retzlaff.
21        And you, Mr. Martinez, taking the
22 position he's not representing you here today, do you
23 want to change the nature of that relationship or
24 not?  Do you want to declare that you are now
25 representing Mr. Retzlaff, Mr. Martinez, for the

50

1 purpose of today's deposition or not?
2        MR. MARTINEZ:  No.  To reiterate, I
3 don't have a federal license.  So I don't want to
4 violate any rules of the federal bar.
5        MR. HAGEN:  Okay.
6        MR. MARTINEZ:  I don't want to put
7 myself in a legal bind, and I don't want to -- you
8 know, I don't want to intrude on those concerns.
9        MR. HAGEN:  Okay.
10        MR. MARTINEZ:  It is my position that
11 once this case was removed that I could not act as
12 counsel in this case because I don't have leave of
13 the court to practice in federal court.
14     Q.  (BY MR. HAGEN)  Okay.  Mr. Retzlaff, were you
15 seeking legal advice during the break from
16 Mr. Martinez?
17     A.  I'm not going to talk about what he and I
18 talked about.
19     Q.  I'm not asking you to talk about what you
20 talked about.  I'm just asking you, did you seek
21 legal advice and communicate legal advice with him?
22     A.  I'm not going to answer that question.
23        MR. HAGEN:  Okay.  Mr. Martinez, if
24 it -- so that there are not other interruptions and
25 in light of the one interruption that you we've had

51

1 here and in light of the past agreements and
2 understandings that we've had and in light of the
3 fact that, you know, by standards were not brought to
4 our attention as other people who intended to attend
5 this deposition as for parties or for lawyers and the
6 folks who are recording the deposition, we're going
7 to ask that you leave the deposition.  And that's the
8 Defendants' request.
9        THE WITNESS:  And on what basis are you
10 making that request under the rules.
11        MR. HAGEN:  There's been nothing
12 brought to my attention that you intended to have
13 anybody other than the parties at this deposition or
14 your counsel.  He's neither one.
15        THE WITNESS:  Or employees of the
16 party?
17        MR. HAGEN:  He's neither one.
18        THE WITNESS:  Or employees of the
19 party?
20        MR. HAGEN:  He is not your attorney.
21 We've established that.
22        THE WITNESS:  Or employees --
23        MR. HAGEN:  And he's not a party in --
24        THE WITNESS:  -- of the party?
25        MR. HAGEN:  He is not a party to the

52

1 case.  He is not your counsel.  So we're asking
2 Martinez for the --
3        THE WITNESS:  He is my employee.
4        MR. HAGEN:  For the sake of making this
5 go faster and so that there are not additional
6 unnecessary interruptions, we are asking Mr. Martinez
7 to leave.
8        THE WITNESS:  Well, an employee of the
9 party is certainly allowed to be present.  I don't
10 see anything in the rules here that says they're not.
11        MR. HAGEN:  Mr. Retzlaff, you have sued
12 the Defendants as a person, not as an employer.
13 Okay.  This is a personal suit that stems from your
14 relationship to UTSA as a past student there.  You're
15 contriving some interpretation out of somewhere, and
16 it does not make sense.  So we're asking Mr. Martinez
17 to make a call.
18        THE WITNESS:  Okay.
19        MR. HAGEN:  We're asking you to leave.
20 By the way, if you want to retrospectively move to
21 become a member of the Western District for the
22 purpose of representing him, we are not going to
23 stand in your way.  We would not oppose that.  We
24 would not oppose any retrospective application or pro
25 hac vice.  We would not oppose anything to bar your

53

1 entry legitimately into this federal -- now-federal
2 case.  First, let me make that a hundred percent
3 understood.
4        MR. MARTINEZ:  Okay.
5        MR. HAGEN:  However, you have never
6 made a declaration that you intend to do that or want
7 to do that, and on the other hand, you have expressed
8 your reservations about participating as his counsel
9 now for the first time in light of its posture in
10 federal court.  So because you're not representing
11 him in this federal litigation in light of your
12 licensing status, we're asking you to leave.  And in
13 light of past occurrences here at this deposition and
14 the interference and problem it's caused in terms
15 of --
16        THE WITNESS:  He's my employee.
17        MR. HAGEN:  -- of, you know,
18 unnecessary interruptions and what I anticipate could
19 be many more interruptions of that sort, we're asking
20 you to excuse yourself from the deposition.
21        MR. MARTINEZ:  You know, I am hesitant
22 to do that given the fact that I am still receiving
23 correspondence, and the Court in its last order
24 saw -- you know, had the opinion that Mr. Retzlaff is
25 represented by counsel.

54

1        MR. HAGEN:  Do you want to make
2  objections in the case?
3        MR. MARTINEZ:  I have no desire to make
4  objections.
5        MR. HAGEN:  Okay.  Then there cannot be
6  further interruptions for the purpose of Mr. Retzlaff
7  conferring with you as counsel.
8        MR. MARTINEZ:  And there will -- I can
9  guarantee that I will not participate in any further
10  interruptions.
11        MR. HAGEN:  Okay.
12        MR. MARTINEZ:  I will not be making
13  objections.
14        MR. HAGEN:  Okay.
15        MR. MARTINEZ:  But given -- in light of
16  the order that the Court just promulgated, I think
17  it's out of an abundance and in light of that order
18  that I believe it's in everyone's best interest that
19  I stay here in case there's any problems in the
20  future.
21        MR. HAGEN:  Okay.  So you will not
22  entertain more questions from --
23        MR. MARTINEZ:  I will --
24        MR. HAGEN:  -- Mr. Retzlaff --
25        MR. MARTINEZ:  I will not.

55

1        MR. HAGEN:  -- in the case, correct?
2        MR. MARTINEZ:  Correct.
3        MR. HAGEN:  Okay.  So with that
4  understanding and reconfirmation, let's go ahead and
5  proceed with the deposition.
6    Q.  (BY MR. HAGEN)  We were on the topic of past
7  civil litigation history; is that right,
8  Mr. Retzlaff?
9    A.  Yeah.
10    Q.  And you now estimate that you've brought some
11  25 civil lawsuits against people over time, correct?
12    A.  Approximately.
13    Q.  Okay.  And let me stop and ask you, is there
14  something that's distracting you that's in your lap?
15    A.  Yeah, there is.
16    Q.  What is that?
17    A.  It's a text message that I got from a female
18  friend of mine, and I'm just writing her back about
19  what we're going to do tonight.
20    Q.  Okay.  Do you need a couple more minutes to
21  finish up --
22    A.  No.
23    Q.  -- your text message?
24    A.  No.  Go ahead and ask your question.
25    Q.  Well, I'll tell you what.  I'll let you

56

1  finish your text message so that we can continue in
2  the course of this civil discovery and finish it in a
3  timely way so that you're not distracted and so that
4  you're able to concentrate and give truthful answers.
5  Let's give it five more minutes.
6    A.  Just go ahead and ask your question.
7    Q.  Mr. Retzlaff, I'm not going to inquire while
8  you're doing something else like sending text
9  messages.  So I'm going to give you five minutes to
10  finish what you're doing, and we'll resume.  Let's go
11  off the record.
12        THE VIDEOGRAPHER:  We are off the
13  record at 11:30.
14        (BRIEF RECESS)
15        THE VIDEOGRAPHER:  We are back on the
16  record at 11:35.  And just to make clear on the
17  record, phone cells -- cell phones do cause
18  interference with these mikes.  So if you're getting
19  a text message, phone calls, I can pick it up.  So
20  please try to limit those.  Thank you.
21        MR. MARTINEZ:  I'll turn my phone off,
22  airplane mode.
23    Q.  (BY MR. HAGEN)  Okay.  Mr. Retzlaff, we just
24  took a break so you could finish your text-messaging.
25  Are you done with that?

57

1    A.  Sure.
2    Q.  Okay.  Can we have an agreement that if you
3  need to send text messages again that you'd ask to
4  take a break so that we can do that and complete this
5  discovery undistracted by text-messaging and cell
6  phone calls?
7    A.  Yes.  That's fine.
8    Q.  Okay.  We were talking about your civil
9  litigation history.  Have you received any
10  compensation as a result of that litigation?
11    A.  Yes.
12    Q.  Okay.  And in what forms?
13    A.  I can't say.
14    Q.  Did you receive settlements?
15    A.  Well, there were confidential agreements
16  signed.  So I cannot --
17    Q.  That's fine.  The question is, did you settle
18  some of these lawsuits that you've brought?
19    A.  Yes.
20    Q.  Did you receive money as a result?  And I'm
21  not talking about any particular lawsuit.
22    A.  Sure.
23    Q.  I'm just asking, have you --
24    A.  Again, I can't answer.
25    Q.  Have you received money as a result of the

58

1  settlements pursuant to the lawsuits that you've
2  testified you've brought?
3      A. I cannot answer that.
4      Q. Okay. You cannot or will not?
5      A. I can't/will not because of the
6  confidentiality agreements that were made.
7      Q. Okay. So you will not answer when you last
8  received any settlement money under one or more of
9  these lawsuits?
10     A. Yes.
11     Q. Okay. You're refusing to answer that
12  question, too?
13     A. Yes, because there was a confidential
14  settlement agreement.
15     Q. Okay. And I'm not asking about the lawsuit,
16  mind you. I'm just asking --
17     A. Well, it sounds like it.
18     Q. No. I'm asking -- without reference to any
19  particular lawsuit, I'm asking you about settlement
20  money that you received under one or more of these
21  lawsuits that you've brought. Do you understand that
22  generic question?
23     A. Not really. I just better not answer it
24  because I don't want to violate any agreement or a
25  court order.

59

1      Q. Okay. So you're not going to testify about
2  when it was that you last received money or other
3  proceeds from one or more of these lawsuits that you
4  brought?
5      A. Correct.
6      Q. You will not answer that?
7      A. Correct.
8      Q. In terms of the people that you've sued in
9  the past, I'm familiar with some of them. Respecting
10  the Bell County lawsuits that you brought, who did
11  you sue in those lawsuits?
12     A. I -- this is 15 years ago. I don't really
13  recollect. I mean, it's not like I kept track of
14  names and things like that.
15     Q. You said that you were once married but no
16  longer married. You're divorced --
17     A. Yes.
18     Q. -- correct? And you refused to give the name
19  of your ex-wife, correct?
20     A. Yeah.
21     Q. You want to stick by that?
22     A. No. Her name is Denise.
23     Q. Okay. Now you want to tell me her name?
24     A. Yeah.
25     Q. Okay.

60

1      A. Denise Retzlaff.
2      Q. All right. Have you ever sued her?
3      A. Yeah, over some property that turned up
4  missing.
5      Q. Okay. And how long ago did you sue Denise
6  Retzlaff, your ex-wife --
7      A. It was like --
8      Q. -- for missing property?
9      A. It was like 10 years ago, I think. I'm not
10  sure. It was a long time ago.
11     Q. Are you still in touch with Denise Retzlaff?
12     A. Yes.
13     Q. And where does she live?
14     A. Well, I don't really want to answer. See,
15  some of these questions here I don't want to answer,
16  not because of the civil case, but because, you know,
17  the UTSA police has threatened me with investigations
18  about various, nonspecific sort of things. So, you
19  know, I certainly realize that answers here can be
20  used there. So I'm just going to exercise my right
21  to remain silent about that.
22     Q. About where your ex-wife lives?
23     A. Yes.
24     Q. Okay.
25     A. Yes, you know, because right now you're

61

1  basically acting as an agent for the university and
2  for the university police department.
3      Q. Mr. Retzlaff, for clarification, I am the
4  attorney for people you have sued. It's a federal
5  lawsuit. You have claimed a lot of violations of a
6  lot of laws against the people I represent.
7      A. No, I haven't.
8      Q. I get to ask you questions because of your
9  lawsuit. Do you understand that?
10     A. I understand that.
11     Q. Okay.
12     A. But --
13     Q. Fair enough. Let's go on with the
14  deposition.
15     A. Okay.
16     Q. Have you ever seen a psychologist or a
17  psychiatrist?
18     A. Yes.
19     Q. When is the last time?
20     A. I'm supposed to see one today, but because we
21  have this thing --
22     Q. Okay. Who is your psychologist or your
23  psychiatrist?
24     A. It's at the VA.
25     Q. What's the name of the VA psychologist or

62

1  psychiatrist?
2     A.  Dr. Getzsinger.
3     Q.  And how long have you seen Dr. Getzsinger?
4  For how many years or months?
5     A.  I think it's like seven or eight months, but
6  I'm not sure.
7     Q.  Okay.  And did --
8     A.  There's another one down there, too, I see,
9  but I don't remember his name.
10    Q.  Did your primary care physician recommend
11 that you see Dr. Getzsinger?
12    A.  I asked him for a referral.
13    Q.  Okay.  And why did you ask him for a
14 referral?
15    A.  That's none of your business.  That's --
16    Q.  Has he -- has Dr. Getzsinger or another VA
17 psychologist or psychiatrist diagnosed you with any
18 mental condition?
19    A.  I don't know what they write in their pieces
20 of paper.  I haven't seen them.
21    Q.  Has your psychologist or psychiatrist ever
22 told you a diagnosis of any sort associated with that
23 treatment?
24    A.  Depression.
25    Q.  Anything else?

63

1     A.  Not that I can think of.
2     Q.  Are you taking any psychiatric medication?
3     A.  Yes.
4     Q.  What are you taking?
5     A.  Lorazepam and something.  I can't pronounce
6  it.  It starts with like f-l-o-x, but I can't
7  pronounce it.
8     Q.  Okay.  And what does Lorazepam treat?
9     A.  I don't know.  I'm not a medical doctor.
10    Q.  Okay.  Do you have any understanding about
11 why you're taking Lorazepam?
12    A.  Well, it helps with like anxiety and stuff.
13    Q.  Okay.  And this other drug that begins, you
14 think, f-l-o-x?
15    A.  Yeah.
16    Q.  What do you understand --
17    A.  Floxinide [sic].
18    Q.  Okay.
19    A.  I'm not sure about that.
20    Q.  Floxinide [sic]?
21    A.  I don't know.  I -- that -- I don't know.  I
22 just know it starts with the letter F, and it's got
23 an l and an x in it.  But, you know --
24    Q.  Okay.  What do you understand that is to
25 treat?

64

1     A.  It's to help with depression.
2     Q.  Any other psychological-psychiatric type
3  medication?
4     A.  No.
5     Q.  Have you ever had a medical or -- I'm sorry.
6  Have you ever had a psychiatric evaluation?
7     A.  Well, I think every time you see those people
8  they're evaluating you.
9     Q.  Right.  Have you ever had a report prepared
10 under an evaluation stating some conclusions or
11 diagnosis?
12    A.  I don't think I've ever done one of those at
13 the VA.
14    Q.  Okay.  Have you ever had one of those done
15 somewhere else?
16    A.  Not that I can recall.
17    Q.  Did any -- I thought I noticed that a
18 court -- a criminal court had ordered you to undergo
19 psychiatric evaluation.  Am I mistaken about that?
20    A.  Well, if it was from a criminal case, I
21 wouldn't really -- 15 years ago -- God, 12 years
22 ago -- 12 years ago.
23    Q.  Okay.  Did you have a psychiatric --
24    A.  I'm thinking that during the divorce case I
25 think we both -- both of us had evaluations done.

65

1     Q.  Let me ask you, was a condition of your
2  probation or parole ever that you undergo a
3  psychiatric evaluation?
4     A.  Yeah, there was.  But I never did it.
5     Q.  Okay.  Did you get excused from that
6  condition, or was that just something that you never
7  got done?
8     A.  It's just something I never got done because
9  it was their responsibility to make it happen if they
10 felt that it needed to happen.
11    Q.  Okay.  Have you ever had any other occasion
12 to go and have a psychiatric evaluation?  You said
13 your divorce?
14    A.  Yeah.  I'm not sure if in prison -- I think
15 part of the intake there they do an evaluation and
16 stuff.
17    Q.  Okay.  What year was that?
18    A.  '97 or '98, I think.
19    Q.  Here's an authorization for release of
20 medical records that comes into play in connection
21 with claims that you've stated in your lawsuit that's
22 now in federal court.  I'm going to hand this to you
23 and ask that at the conclusion of the deposition we,
24 you know, make the authorization.  Do you have any
25 objection to that?

Tom Retzlaff    09-24-2008              Page 18 of 84

66

1    A. I don't know.  I haven't read it yet.
2    Q. Okay.
3    A. So I don't know.
4    Q. Here's a copy of what's being presented you.
5    A. Okay.
6    Q. And at some interval, we'll give you a chance
7  to read it and consider it, and you can make a
8  decision about it.  Now, with respect to -- and like
9  I said at some interval during the deposition you can
10 review it all you want.  I just want to make it clear
11 that it's been presented to you, and I may mark it as
12 an exhibit for the deposition.
13   A. I don't think I can really sign this -- okay.
14 I'm sorry.  I didn't mean to cover that -- because it
15 seems overly broad.  In addition, I don't think the
16 VA would accept it anyways.
17   Q. Okay.  Have you made a decision already that
18 you're not going to --
19   A. No.
20   Q. -- release your records under that
21 authorization?
22   A. No.  I haven't made a decision yet.
23   Q. Okay.  At some interval in the deposition at
24 a break, you can look at it --
25   A. I don't know if I'll make --

67

1    Q. You can look at it, make a decision, and if
2  you don't -- if you're refusing to authorize it, we
3  can mark it as an exhibit for the deposition and go
4  on from there.
5    A. Yeah.  I don't know if I'd make a deposition
6  during the deposition because I want to sit and study
7  it and research the law on it and things like that.
8  So -- and I'm just not going to sign a piece of paper
9  just because you throw it in front of me and ask me
10 to sign it.
11   Q. Sure.  That's fine.  And, Mr. Retzlaff, it is
12 you that have put damages relevant to medical
13 conditions into issue in this lawsuit, and I can
14 identify for you where in your lawsuit you do that.
15   A. No.  I just -- I did look and I saw.
16   Q. Okay.
17   A. Yeah.
18   Q. You --
19   A. You asked for mental anguish --
20   Q. Right.
21   A. -- mental anguish --
22   Q. You are making claims for mental anguish --
23   A. Correct.
24   Q. -- and similar.  So you put that into issue,
25 and that's why I have to ask you for --

68

1    A. No.  I understand.
2    Q. -- your authorization to gain medical
3  records, okay?
4    A. I understand.
5    Q. That's all --
6    A. I just don't see how mental anguish damages
7  have anything to do with --
8    Q. Your medical records?
9    A. No.
10   Q. It has a lot to do with it, but, again --
11   A. That's not what I was going to say.
12   Q. Again, you can take some time at a break to
13 read it all you want to --
14   A. What it has to do with --
15   Q. -- and come back on the record and tell me
16 your answer?
17   A. -- my cholesterol -- listen.
18       THE REPORTER: I can't take but one at
19 a time.
20       MR. HAGEN: Mr. Retzlaff --
21       THE WITNESS: Yeah.
22       MR. HAGEN: -- we have a court reporter
23 asking us to speak one at a time.
24       THE WITNESS: Sure.  I thought I was
25 speaking first.

69

1        MR. HAGEN: It's Defendants'
2  deposition, and I'm telling you what I'm asking you
3  to do with that.  That's all I want to do.
4        THE WITNESS: Sure.
5    Q. (BY MR. HAGEN)  Okay.  So let's move on with
6  the deposition.  Can we agree to do that?
7    A. Well, I want to respond with this.
8    Q. You can respond after -- you've said that you
9  needed to take time to read it.  So we'll do that
10 during a break.  Are you okay with that --
11   A. Well --
12   Q. -- or you want to do that now?
13   A. -- I want to respond now, is that I don't see
14 what mental anguish damages have to do with my
15 cholesterol reports, you know, because basically
16 that's what you're asking about here --
17   Q. Okay.  And we can --
18   A. -- with overly broad things like that, you
19 know, or with, you know, X-rays of my broken arm and
20 stuff like that.  What does that have to do with
21 mental anguish, the upset that I felt from -- from
22 being defamed and stuff like that?  You know, what
23 does that cholesterol level have to do with that, you
24 know?  That's what I'm saying.  It's overly broad.
25 It asks for everything.

70

1    Q.  Okay.  So after a break, you can tell us
2  specifically what part of that you're objecting to
3  and if we can find common ground on it.  Is that
4  acceptable?
5    A.  Sure.
6    Q.  Okay.  Let's move on.  We talked about your
7  civil litigation history.  I have to ask you about
8  your criminal litigation history and in particular,
9  you know, actions that the State has brought against
10  you to prosecute you.  You've served for periods of
11  time incarcerated by the Texas Department of Criminal
12  Justice.  Do I understand that correctly?
13    A.  Just one period of time.
14    Q.  What stretch of time?  What month of what
15  year to what month of what year were you
16  incarcerated?
17    A.  It was like '97 to 2004 when I filed that
18  lawsuit against the Parole Board and was released.
19    Q.  Okay.  So do you remember the month of '97
20  that you went in?
21    A.  No.
22    Q.  Was it Huntsville?
23    A.  I guess.
24    Q.  You don't know where you were confined?
25    A.  Well, that's where you go to first.  I don't

71

1  know where it was that I went to first.
2    Q.  Okay.  So --
3    A.  You know, they take you to like a central
4  praise, and then from there you get moved to many
5  other different places.
6    Q.  Okay.  How -- you said you went in in 1997,
7  and then you --
8    A.  '97 or  '98, yeah.
9    Q.  And you were released in 2004?
10    A.  Yeah.
11    Q.  Okay.  With respect to that period of
12  confinement, why were you in jail during that -- or
13  in prison during that time?
14    A.  For unlawfully carrying a weapon in a
15  prohibited place.
16    Q.  And what were the circumstances of that --
17    A.  There was a camping knife in the locked glove
18  box of my car.  It was five and three-quarters of an
19  inch long.
20    Q.  And where were you at with that knife?
21    A.  The car was parked.  I was outside of the car
22  fixing to pick up my kids from school.  And,
23  ridiculously enough, three months after this thing
24  the law changed where if you have a knife in the
25  glove box of your car you're good to go.  It's not an

72

1  offense.
2    Q.  What school were you at?
3    A.  I don't remember the name of it.
4    Q.  This was a weapon-in-a-school-zone
5  conviction?
6    A.  I don't think that's what it was called, but,
7  in essence, yeah.
8    Q.  Okay.  Where were they in school?
9    A.  Well, they were -- school was ending, and I
10  was picking them up.
11    Q.  What --
12    A.  So I don't know where they were at.
13    Q.  What community were they in school?
14    A.  Oh this was in Temple.
15    Q.  Okay.
16    A.  Temple, Texas.
17    Q.  So Temple ISD?
18    A.  I guess.
19    Q.  What was the name of their school?
20    A.  I don't remember.
21    Q.  You don't -- was it elementary school, middle
22  school, was it high school?
23    A.  It was elementary.
24    Q.  And so you were arrested.  Were you on
25  probation in 1997?

73

1    A.  I was on probation because of that.
2    Q.  Okay.  Well, what got you put away from '97
3  to 2004?
4    A.  Well, they claimed that I --
5    Q.  -- in addition to the fact that --
6    A.  Sure.
7    Q.  -- you were convicted of this weapons charge
8  in a school zone?
9    A.  Well, that's -- the UCW charge is what I was
10  on probation for.  But then the probation was
11  revoked, and that's what I was sent to prison for.
12    Q.  Okay.  So --
13    A.  So there wasn't like there was a new charge
14  or anything like that.  It was just a continuation of
15  the --
16    Q.  So what revoked your probation?  What
17  offense?
18    A.  Well, there wasn't a new offense.
19    Q.  Okay.  What condition --
20    A.  There was some technical --
21    Q.  Why did you go to jail --
22    A.  There was some -- some --
23    Q.  -- in '97 or '98?
24    A.  I don't recall exactly, but I believe it was
25  some sort of technical violations.  I missed a

74

1 meeting.  There was -- I don't know -- several things
2 that they had down there.  I don't recall exactly
3 because it was a long time ago.
4      Q.  Did you have in March of 1997 a charge and
5 conviction of tampering with evidence or a government
6 record?
7      A.  I'm not sure.
8      Q.  Okay.
9      A.  I'm not sure of the date.
10      Q.  Well, did you in March -- well, in 1997 at
11 any time, did you have that sort of charge and
12 conviction?
13      A.  Yeah.  I think so.
14      Q.  Is that what sent you to --
15      A.  No.
16      Q.  -- prison?
17      A.  No.
18      Q.  Okay.  What sent you to prison?
19      A.  The prison was because of the revocation of
20 the probation.  The misdemeanor charge that you
21 mentioned, that was -- that was before or after.  I
22 don't know, but it had nothing to do with the
23 probation revocation.
24      Q.  Okay.  So what revoked your probation that
25 caused you to go to jail from '97 to 2004?

75

1      A.  Asked and answered.
2      Q.  Well, what is the answer?
3      A.  I believe I told you it's because of some
4 technical violations.  I believe one of them dealt
5 with missing a meeting.
6      Q.  Okay.
7      A.  But I can't say for sure because it was a
8 very long time ago, and it's not something that I've
9 really thought about since then.
10      Q.  So your testimony here today under oath is
11 that you were on probation for this
12 weapons-in-a-school-zone conviction and that you
13 missed a probation meeting with a probation parole --
14 or parole officer, and that caused you to go to
15 prison from 1997 to 2004?
16      A.  No.
17      Q.  Is that your testimony?
18      A.  No.
19      Q.  Then --
20      A.  That's not what I said.
21      Q.  -- what is the cause of your --
22      A.  I don't recall.
23      Q.  Okay.  You don't remember what got you in
24 prison from '97 to 2004?
25      A.  It was a probation revocation.

76

1      Q.  Okay.  And why specifically was --
2      A.  I don't recall what the specifics were.
3      Q.  Okay.  Did you have -- in 1994 did you have a
4 charge brought against you for fleeing a police
5 officer?
6      A.  I think so.
7      Q.  Okay.  And did you have in 1995 a charge
8 brought against you for harassing communication?
9      A.  Yeah.  But that was dismissed.
10      Q.  Did you -- were you fined $500 and some court
11 costs and got six months of deferral?
12      A.  I don't remember that.  I know it was like it
13 dropped to a Class C and it was dismissed.
14      Q.  Okay.  And who was the harassing
15 communication to?
16      A.  Oh, it was an ex-girlfriend.
17      Q.  In 1995 were you on a couple of other
18 occasions also charged with harassment?
19      A.  No.
20      Q.  Okay.  In --
21      A.  I don't believe so.
22      Q.  In 1996 did you get charged with sexual
23 assault?
24      A.  No.
25      Q.  You've never been charged with sexual

77

1 assault?
2      A.  Well, my wife made the claim.  This wasn't in
3 '96, though.
4      Q.  Okay.
5      A.  But my wife made the claim during the
6 divorce, I think, in '98 or something like that.  She
7 made the claim, and it was a false claim.  And the
8 lawsuit that I had about the missing property was
9 also for defamation for that, and I won a judgment
10 against her.  In addition, the matter --
11      Q.  Was that a default judgment?
12      A.  I don't know what the default judgment is.
13 There was a court hearing on it, and the judge
14 awarded me damages.
15      Q.  Did she appear --
16      A.  I got a judgment --
17      Q.  Did she appear?  Did she appear?  Did she
18 defend herself in that, case or did she not appear
19 and you took default judgment?
20      A.  I don't know if she appeared or not.  I was
21 in jail at the time.
22      Q.  Okay.
23      A.  So I don't know why she did or whether she
24 appeared or not.  I was in jail at the time -- in
25 prison at the time.

78

1    Q. Okay.
2    A. But a judgment is a judgment, and it's a
3  final judgment.
4    Q. All right.
5    A. In addition, the matter that you speak of is
6  pending expungement.
7    Q. Okay. Is that the sexual assault charge that
8  was brought against you?
9    A. Yes.
10   Q. Okay. And your contention is that your wife
11 brought that against you?
12   A. Yeah. She did as leverage in the child
13 custody case.
14   Q. Okay. Did the State bring that charge
15 against you after looking at it?
16   A. No. They didn't look at it. They just
17 brought the charge.
18   Q. So the State did bring the charge?
19   A. Yes, which was dismissed.
20   Q. With respect to default judgments, you've
21 claimed that you don't know what a default judgment
22 is, correct?
23   A. I didn't say that.
24   Q. Okay.
25   A. You asked me about her, whether she was there

79

1  or not. I don't know. I was in prison.
2    Q. Okay. Do you know what a default judgment
3  is?
4    A. Yes, I did.
5    Q. In fact, you've taken default judgments
6  against people before, haven't you?
7    A. If they don't show up in court, sure.
8    Q. Right. Like you took a default judgment, I
9  guess, against in a different state court lawsuit
10 against Liu -- or Liu Family Foundation, took a
11 default judgment against those entities or those
12 people, correct?
13   A. Yes.
14   Q. Okay. So you know what a default judgment
15 is?
16   A. Yes.
17   Q. Okay.
18   A. And I know it's as legitimate as a regular
19 judgment.
20   Q. In 1997 did you come up on a charge of
21 selling or distributing or displaying harmful
22 material to a minor? Was that charge brought against
23 you?
24   A. Yeah. But I don't think it was in '97.
25   Q. Okay. What year --

80

1    A. I'm not sure.
2    Q. -- do you think it was?
3    A. I'm not sure.
4    Q. Okay. What were the circumstances of that?
5    A. It was not relevant to this case.
6    Q. Okay. You're not going to answer the
7  question?
8    A. Not really --
9    Q. Okay.
10   A. -- because Rule 609, rule of evidence, I'll
11 make my objection based on that.
12   Q. In 1997 we talked already about tampering
13 with a government record. Do you remember that?
14   A. I remember the charge, but that's about it.
15   Q. What was that charge for?
16   A. I don't know.
17   Q. You don't remember?
18   A. Not really.
19   Q. Well, there's a difference between not
20 remembering and not really remembering. Which is it?
21 What do you remember about --
22   A. Well, I don't think that there's a
23 difference. You are putting words in my mouth.
24 Okay. I don't recall. This was 12 years ago. I
25 don't recall.

81

1    Q. Okay. You don't remember anything about why
2  the State brought tampering with evidence charges
3  against you?
4    A. Not really, no. I don't recall, 12 years
5  ago. It's not something that I prefer to dwell upon
6  in my life, my past mistakes like that, and it's
7  something that I've really put out of my mind.
8    Q. Okay. I guess we can check, you know, the
9  court records and opinions on the topic --
10   A. It doesn't matter. It's not admissible
11 anyways under Rule 609.
12   Q. I'm asking you questions about your --
13   A. Sure.
14   Q. -- criminal litigation history.
15   A. And if I don't recall, I don't recall.
16   Q. They are -- again, I'll repeat. They are
17 legitimate questions.
18   A. No, they're not --
19   Q. Okay.
20   A. -- because they're not even admissible.
21   Q. You can take that position, and that's for
22 the Court --
23   A. I mean, it says right here in the rule book.
24   Q. Mr. Retzlaff, that's for someone other than
25 you to decide?

82

1    A.  Why is that?
2    Q.  And --
3    A.  Is it for you to decide?
4    Q.  No.
5    A.  Sounds like it.
6    Q.  I'm not deciding it, but I'm not going to
7  bicker with you.  I'm going to get through this basic
8  discovery --
9    A.  Okay.
10    Q.  -- sort of deposition questions.  So going
11  forward with state charges that have been brought
12  against you over time, were you charged in the past
13  with burglary of a habitation?
14    A.  Yeah.  That's also part of the expungement,
15  though.
16    Q.  And what were the circumstances of that
17  burglary?
18    A.  I don't really know.  I was accused of taking
19  something from a hospital room.
20    Q.  Okay.
21    A.  And the charge was never filed, I don't
22  believe.  I think there was a report done.  Filed --
23  yeah, I guess filed, but it was dismissed.
24    Q.  So --
25    A.  And it's part of the expungement.

83

1    Q.  So the accusation was that you stole
2  something from a hospital?
3    A.  Yeah, hospital room.  That's what the
4  accusation was.
5    Q.  Okay.
6    A.  Yeah.
7    Q.  And the State brought that charge against
8  you.  Do I understand that much?
9    A.  Yeah.  And then the State dismissed it.
10    Q.  What hospital was it?
11    A.  Scott & White Hospital.
12    Q.  Okay.  In Temple?
13    A.  Yeah.
14    Q.  Okay.  Were you charged with assaulting a
15  family member?
16    A.  Yeah.  I think so.
17    Q.  Okay.  And what were the --
18    A.  Oh, yeah, yeah -- no.  That's -- I remember
19  now.  That's at -- my wife did that again.
20    Q.  What were the circumstances of the --
21    A.  No assault took place.
22    Q.  -- assault charge?  Okay.  You were
23  charged --
24    A.  It was just brought up during the divorce.
25  I'm sorry.

84

1    Q.  Were you charged with bodily injury -- doing
2  her bodily injury in this assault?
3    A.  Yes.  I was.
4    Q.  And how was that dealt with by the State?
5  They charged you with it.  And then what happened?
6    A.  Yeah.  I think that one got dismissed.  I'm
7  not sure.  There were some that I pled guilty for
8  time served on because there wasn't any reason not
9  to, and there were some that were dismissed.
10    Q.  Okay, time served.  Do you mean that you were
11  in county jail for some of these periods of time?
12    A.  Yeah.
13    Q.  Okay.  So we established you were in jail
14  from '97 through 2004 through the Texas Department of
15  Criminal Justice --
16    A.  Well, no.  I'm --
17    Q.  -- correct?
18    A.  I'm sorry.  I didn't mean to interrupt.  I'm
19  also including time that I was in the county jail for
20  that.  As a condition of the probation, I had to do
21  like 180 days in the county jail.
22    Q.  Okay.
23    A.  So I was including that as well.  So --
24    Q.  Well, what year were you in county jail, and
25  what county was it?

85

1    A.  1997, and it was Bell County.
2    Q.  And then your statement is that you were
3  transferred to the TDCJ?
4    A.  Correct.
5    Q.  Were you in county jail before 1997?
6    A.  Just for like a brief arrest or something.
7    Q.  Okay.  And what year was that?
8    A.  I think that was in '96 -- '95.
9    Q.  Okay.  And for what offense was --
10    A.  I think that was that harassing communication
11  thing that you mentioned.
12    Q.  Okay.  And what county jail were you in?
13    A.  The same one.
14    Q.  In Bell County?
15    A.  Yeah.
16    Q.  Was -- did the State bring theft charges
17  against you in 1997?
18    A.  Yeah.
19    Q.  And for what theft was that?
20    A.  Some library books, they claimed.
21    Q.  And were you convicted for those thefts?
22    A.  I pled to time served.
23    Q.  Okay.  You pled guilty and were given time
24  served earlier?
25    A.  Yeah.

86

1    Q.  Okay.  So in that time frame, did you go to
2  jail for the theft -- county jail for the theft of
3  library books?
4    A.  No, no.  I was already in the jail for the
5  180 days as my probation.  Okay.  So --
6    Q.  On what offense?
7    A.  For the probation for the UCW offense.
8    Q.  Okay.
9    A.  Okay.  One of the conditions of probation was
10  to do 180 days in the county jail, and so when these
11  misdemeanors came up, a lot of them I just pled to
12  time served on because I was already sitting there
13  getting credit.  So there wasn't any reason not to.
14  And they dismissed a bunch, and I pled guilty to -- I
15  don't know -- maybe three or four misdemeanors.
16    Q.  Okay.  Including the theft charge?
17    A.  Yeah.  I think that was one of them.
18    Q.  And that was for the library books?
19    A.  Yeah.
20    Q.  Okay.  And then there was -- in relationship
21  to the library book charge, there was a tampering
22  charge brought against you, correct?
23    A.  Yeah.  I thought we talked about that.
24    Q.  Yeah.  But you couldn't remember anything
25  about it, remember?  So now does that refresh your

87

1  memory about the library books and the tampering
2  charge --
3    A.  Yeah.
4    Q.  -- in relationship --
5    A.  Yeah.
6    Q.  -- to the library books?
7    A.  Yeah.
8    Q.  What was the tampering charge?
9    A.  Yeah, the checkout slips for the library
10  books.
11    Q.  Okay.  You doctored those in a way to --
12    A.  Well, that's what they claimed.  But in
13  actuality they had already been filled out, and I was
14  in jail at the time, so I -- when they found the
15  library slips.
16    Q.  Okay.  You were convicted for tampering
17  with --
18    A.  No, I wasn't.
19    Q.  -- evidence?
20    A.  No, no.
21    Q.  Let's see.  Was the library that you were
22  accused of stealing from in Bell County?
23    A.  Yes.
24    Q.  Okay.  And what community library were you
25  stealing from there?

88

1    A.  This was in Belton.
2    Q.  And these offenses occurred in the 1997 time
3  frame?
4    A.  I think so, '97-'98.
5    Q.  Were --
6    A.  I'm not sure.
7    Q.  Did the State charge you with violation of a
8  protective order in that time frame, also?
9    A.  Yeah.  But I think that one was dismissed.
10    Q.  What was the protective order in place
11  against you?
12    A.  It was in the divorce case.
13    Q.  So your ex-wife had brought a protective
14  order against you --
15    A.  Uh-huh.
16    Q.  -- and got protection from you, correct?
17    A.  We were still having sex.  So I guess she
18  didn't need protection all that much.
19    Q.  Okay.  The State -- then the State accused
20  you of violating that protective order, correct?
21    A.  Yes.
22    Q.  You had another charge for burglary of a
23  habitation, did you not?
24    A.  No.
25    Q.  Okay.  You're saying there was just one of

89

1  those?
2    A.  Just the one.
3    Q.  And that was a burglary of the hospital
4  habitation?
5    A.  Well, yeah.  That's what they claimed.
6    Q.  No other burglary, you're saying?
7    A.  No.
8    Q.  Okay.
9    A.  Your information is not correct.
10    Q.  And later, in fact, in August of 1997, were
11  you accused of a sexual assault?
12    A.  No.  We already talked about that one.
13    Q.  Okay.  In nineteen ninety- -- your
14  recollection is, in 1997 or 1998 you went into the
15  TDCJ prison system, right?
16    A.  Yeah.  It was either late '97 or '98.  I
17  think in '98 maybe.
18    Q.  Okay.  And then you were released in 2004?
19    A.  Yeah.
20    Q.  And why -- was that an early release?
21    A.  Well, that was because of the lawsuit that --
22    Q.  I'm just asking, first of all --
23    A.  I think it was a court-ordered release.
24    Q.  Okay.  But was it shorter than the period of
25  time the Court originally ordered --

Tom Retzlaff    09-24-2008         Page 24 of 84

90

1    A.  Yes.
2    Q.  -- you to go in for?
3    A.  Yes, yes.
4    Q.  Was it a 10-year period of time you were to
5  serve beginning in 1997 or '98?
6    A.  No.  I think it was -- I think it was eight
7  years.
8    Q.  Okay.  You got out early in 1994 from what
9  was originally ordered; is that right?
10   A.  Yes.
11   Q.  And that is because of a legal argument you
12 made about your situation; is that right?
13   A.  Well, it was because I won a writ of habeas
14 corpus --
15   Q.  Okay.
16   A.  -- that turned the prison system upside-down
17 and resulted in the release of many thousands of
18 individuals.
19   Q.  Okay.  Were you represented in that case?
20   A.  No, I was not.
21   Q.  You started as a student at UTSA in what
22 year?
23   A.  The fall of 2004.
24   Q.  Oh, I'm sorry.  Before I ask you about your
25 student status at UTSA, did TDCJ assign you -- and

91

1  you're yawning right now?
2    A.  Yes.
3    Q.  Do you need a short break?
4    A.  No.  I'm just about ready to take a nap for
5  the afternoon.
6    Q.  Let's see here.  We're about at noon.  What
7  we can do is just go through a couple more quick
8  questions about some background information, and
9  we'll break for a short lunch.  And then we'll come
10 back and finish up this afternoon.  Is that
11 agreeable?
12   A.  Why don't I just go home and go to bed?
13   Q.  Well, are you --
14   A.  Let's just keep going.
15   Q.  Okay.  Well, we do have to take a lunch break
16 for other people's benefit, the court reporter,
17 videographer, counsel, that kind of thing.  But I
18 will try and bring an end to this because I see that
19 you may be getting a little tired and need a break,
20 need some food.
21   A.  No.  It's not food.  It's just the medicine.
22   Q.  Okay.  Quickly, then, did TDCJ assign you a
23 prisoner number --
24   A.  Uh-huh.
25   Q.  -- or identification?  What was --

92

1    A.  Yes.
2    Q.  -- that code?
3    A.  819427.
4    Q.  And did you serve time in the U.S. military?
5    A.  Yes.
6    Q.  Okay.  What was your service branch?
7    A.  Army.
8    Q.  And what was your identification code for
9  U.S. Army purposes?
10   A.  I don't think they did serial numbers back
11 then.  I think it was just your name and date of
12 birth.
13   Q.  Okay.  Well, give me the basics, then, in
14 terms of identifying information for U.S. Army at
15 that time.  What is your date of birth, what is your
16 full name that you used in the U.S. Army, and what
17 was your rank during that time?
18   A.  Well, my birth date is 3-14-66, which you
19 already know, and you also have my name, Thomas
20 Retzlaff.
21   Q.  Okay.  I asked you your social security
22 number.
23   A.  Right.
24   Q.  Earlier you refused to give that.  Do you
25 want to stand by that?  That's an ordinary question.

93

1    A.  Yeah.  But this day and age with identity
2  theft and all that jazz, it's not really an ordinary
3  question.
4    Q.  Well, look, the federal court system, and
5  including the Western District, has in place a
6  provision that you redact some of this identifying
7  information from anything before it's made public,
8  before it's filed.  I apply that rule, follow that
9  rule and intend to follow that rule in this case to
10 the extent that anything that is publicly filed.
11       Under that circumstance, would you
12 please provide your social security number?  That's
13 clearly an acceptable request that I'm --
14   A.  No.  If a judge tells me to, then I will give
15 it to you.
16   Q.  So I have to go -- Defendants who are sued in
17 this case have to go to Judge Garcia.  We have to ask
18 them to force you to provide identifying information
19 about yourself like your social security number.  Is
20 that the position you're taking?
21   A.  You have to ask him if he wants me to divulge
22 my social security number.
23   Q.  Okay.  What about your address here in San
24 Antonio, where you live, not your P.O. box, your
25 address?

94

1    A.  I understand again that, too.  I have -- I
2  have concerns for my physical safety reasons.
3    Q.  You have concerns about your physical safety.
4  Do I understand that correct?
5    A.  Yes.
6    Q.  Okay.  All right.  So you're worried about
7  what, you know, a drive-by one of the Defendants
8  in this case?
9    A.  I didn't say that.
10    Q.  Okay.  So we have to go to Judge Garcia to
11  get a basic piece of information, i.e., where you
12  live.  Is that it?
13    A.  Yes.
14    Q.  Okay.
15    A.  Otherwise, I'll ask for a protective order.
16    Q.  Okay.  Let's see.  Let's go on, then.  And
17  you said your contention is U.S. government did not
18  give serial numbers out to people who served in the
19  U.S. Army --
20    A.  I don't think they did at --
21    Q.  -- during the period of your service.  Is
22  that your --
23    A.  I don't think they did at the time.
24    Q.  Is that your contention?
25    A.  Right.  I think the serial number was just

95

1  the social security number.
2    Q.  Okay.  And you refuse to give that out?
3    A.  Right.
4    Q.  And we can search and see if this happens to
5  also be in student files or student records.  Maybe I
6  can find it thataway in the event we need it, but,
7  again, these are standard questions that are asked in
8  civil discovery matters.
9    Q.  Okay.  Well, I've been the victim of identity
10  theft before in the past.  Just like if I were to ask
11  you what your social security number is, I'm sure you
12  would be reluctant to divulge that, as anybody would.
13    Q.  In relation to what you say was your U.S.
14  Army service, when was the period that you were on
15  active duty, U.S. Army, if you were?
16    A.  I've been on active duty in the military.
17  Anything more than that, I'll take the Fifth.  I'm
18  remaining silent on that.
19    Q.  Okay.  You're not stating when it was that
20  you supposedly served active duty, U.S. Army?
21    A.  I've already stated my position.
22    Q.  You're taking the Fifth Amendment in that?
23    A.  Yes --
24    Q.  Okay.
25    A.  -- simply because of statements made to me by

96

1  UTSA officials.
2    Q.  Okay.  What statements are those?
3    A.  Well, statements by Captain Kiley and Chief
4  Hernandez that they're still investigating me for
5  things that they haven't really specified for and
6  that they're looking at me for possible fraud or
7  something like that.  So I know that you are here as
8  an agent for the university and that my answers given
9  here will be given to the UTSA Police Department.
10  And so it places me in a tricky situation here of why
11  I have to answer truthfully there are some questions
12  that I just simply cannot answer.
13    Q.  Okay.  So you're taking the Fifth Amendment
14  in answer to the question about when you served in
15  the U.S. Army?
16    A.  Yes.
17    Q.  Okay.
18    A.  But it was active duty, and I do have an
19  honorable discharge.
20    Q.  Are you sure about that, that it's an
21  honorable discharge, or is it a standard discharge?
22    A.  Yes.  I have an honorable discharge.
23    Q.  Okay.  But you will not answer when it was
24  that you served; is that correct?
25    A.  I'm not going to answer anything more on the

97

1  subject.
2    Q.  Okay.  You understand, Mr. Retzlaff, that a
3  reason that you were excelled from UTSA was that you
4  represented you served in the U.S. Army during the
5  time when you were, in fact, in the custody of the
6  Texas Department of Criminal Justice, correct?
7    A.  I understand that is what they say.
8    Q.  Okay.  And do I understand correctly that you
9  admit that you misstated or misrepresented the time
10  frame during which you were supposedly serving active
11  Army, that, in fact, you were in the custody of the
12  TDCJ?  Do I understand that correctly?
13    A.  I don't know where you're understanding that
14  from, but I'm taking the Fifth on that as well.
15    Q.  Okay.  With the following probably five to
16  ten minutes, I think we can kind of take a break and
17  have lunch.
18         Since you were enrolled at UTSA,
19  several complaints were filed against you by students
20  or others, correct?
21    A.  I guess, yes.
22    Q.  Okay.  These were brought to your attention?
23    A.  Some of them were.  Apparently some of them
24  were not.
25    Q.  Okay.  Which student complaints are you

---

98

1 familiar with that were brought to your attention
2 resulting from your time studying at UTSA?
3      A.  Well, it's not like I really kept track, and
4 I would point out that all of the complaints were
5 resolved in my favor and were found to be unfounded.
6           MR. HAGEN:  Objection, nonresponsive.
7           THE WITNESS:  Okay.
8      Q.  (BY MR. HAGEN)  What complaints are you
9 familiar with brought to your attention that were
10 filed by one or more students?
11     A.  There was one I -- I remember where I was
12 accused of cheating on an exam, and I think it was
13 like an art history class or something.  But --
14     Q.  Who made the accusation?
15     A.  Todd Wollenzier.  He's the guy at the
16 Judicial Affairs Office.
17     Q.  Okay.  He was not a student during the time
18 of this class, correct?  He's an official at the
19 UTSA, right?
20     A.  Yes.
21     Q.  Okay.  So who was the student who complained
22 or the teacher, or what brought this to the attention
23 of UTSA?
24     A.  Oh, I don't have that person's name with me
25 right now.

---

99

1      Q.  Okay.  Is the person a student, or is the
2 person that you're thinking of --
3      A.  It was a student.
4      Q.  -- a professor?
5      A.  I've got her name somewhere.
6      Q.  Okay.
7      A.  But I just don't recollect offhand because
8 it's been like, you know, three years ago or
9 something, and I've pretty much forgotten about it.
10     Q.  It's a female student?
11     A.  Yeah.
12     Q.  Okay.  Have you filed a lawsuit against her?
13     A.  No.
14     Q.  Have you taken any legal action or threatened
15 to take any legal action against her?
16     A.  No, because she's an idiot.
17     Q.  And what was the outcome of that complaint?
18     A.  That it was found to be bogus, that, in fact,
19 no cheating had happened and, in fact, the exam that
20 I took was the proper exam, and the teacher said so
21 himself.
22     Q.  What other student complaints have been
23 brought against you at UTSA?
24     A.  That's really the only one that I remember
25 offhand because that was a big deal because

---

100

1 Wollenzier was acting like such a jerk about it and
2 acting like, "Aha," you know, "I got you on those
3 things" --
4      Q.  You --
5      A.  -- when he holds up his test -- test paper in
6 his hand.
7      Q.  You know a student named Zhu Lan, correct,
8 Z-h-u L-a-n?
9      A.  Yeah.
10     Q.  Okay.
11     A.  You're not pronouncing it, correct, though.
12     Q.  How do you pronounce it?
13     A.  Zhu Lan.
14     Q.  Okay.  And what is her English name?
15     A.  Well, she goes by Julie.
16     Q.  Julie.  Okay.  Did she file a grievance or
17 complaint against you?
18     A.  I don't think so.  I think that was -- what's
19 her name -- Kyle Snyder.
20     Q.  And so your contention is that Kyle
21 Snyder and -- only and not this woman that -- whose
22 English name is Julie filed a grievance or complaint
23 against you?
24     A.  No, that's not my contention.
25     Q.  Okay.

---

101

1      A.  I don't know.  I think Julie might have -- I
2 know she had done something with the police
3 department, but as far as Judicial Affairs is
4 concerned, I don't know --
5      Q.  Okay.
6      A.  -- because I'm not privy to their
7 information.
8      Q.  With respect to UTSA police, okay, what
9 grievance or what complaint did Julie bring against
10 you?
11     A.  Well, this was Julie with the assistance of
12 Kyle Snyder and the rest of the folks in the business
13 office, made a harassment complaint.
14     Q.  Okay.  Is -- the student that we're calling
15 Julie, is she here in the U.S. now?
16     A.  No.
17     Q.  Did she return to her home?
18     A.  Yes.
19     Q.  And where is her home?
20     A.  In Beijing.
21     Q.  Okay.  And you filed a lawsuit against her,
22 though, correct?
23     A.  Yes, before she left.
24     Q.  And you took a default judgment against her,
25 correct?

---

Tom Retzlaff   09-24-2008                    Page 27 of 84

---

102

1    A. Yes.
2    Q. And you accomplished that default judgment by
3  serving her apartment; is that right?
4    A. Well, she was there.  And then -- and then
5  when the --
6    Q. Did you serve service --
7    A. I didn't serve --
8    Q. -- or who served service?
9    A. I didn't have anything to do with it.  It was
10 a process server.  You know, he --
11   Q. And who did he serve or she serve?
12   A. He went up to the apartment a couple of
13 times.  He -- he had pictures of her.  So he knew
14 what she looked like, and he had seen her there.
15   Q. Did you provide pictures of her?
16   A. I did, and then I got some from the
17 university.
18   Q. Okay.  And --
19   A. And --
20   Q. -- so you had a private process server
21 attempt to serve her.  And who did he, in fact,
22 served?
23   A. Yes.  A couple of occasions she refused to
24 answer the door.  So then we got a court order
25 authorizing the placement of the service on the door

---

103

1  or to leave it with one of her roommates.
2    Q. In fact, I mean, you went to court, and you
3  made those representations to the Court; and they
4  granted an order allowing the process server to serve
5  the roommates, correct?
6    A. Well, the private process server made an
7  affidavit outlining what it was -- the attempts that
8  he made, the fact that he had seen her there, had
9  knocked on the door and stuff like that.  You know, I
10 don't recall exactly what it was that he said, but he
11 did do an affidavit to that effect.
12   Q. Was that filed in court?
13   A. Yes.
14   Q. Okay.  And on that basis, a default judgment
15 was taken against her?
16   A. No.
17   Q. She did have a default judgment taken against
18 her, correct?
19   A. Yes.
20   Q. Okay.
21   A. But that had nothing to do with it.  That was
22 just regarding the service of the lawsuit.
23   Q. Right.  But connecting the dots here,
24 Mr. Retzlaff -- and I know you've been down this
25 trail dozens of times -- you got the Court to grant

---

104

1  you permission to serve her roommates in place of
2  this Julie, correct, through representations that you
3  and you say a process server made and filed in court,
4  right?
5    A. Yes.
6    Q. That resulted in you taking a default
7  judgment against this Julie, correct?
8    A. Yes.
9    Q. Okay.  You don't know if she was in -- back
10 in China by the time you got that default judgment --
11   A. No.  She --
12   Q. -- before you attempted to serve her or not,
13 do you?
14   A. She didn't leave for China -- let's see --
15 till the 13th or 14th of December.  I forgot what the
16 last -- I'll have to look at my calendar.  But --
17   Q. Okay.  In that same -- and how do you know
18 that?
19   A. She told me.
20   Q. Because why?  How were you in touch?
21   A. I'm taking the Fifth on that.
22   Q. Okay.  In that same lawsuit, you've also
23 taken default judgments against other people or
24 entities, correct?
25   A. No.

---

105

1    Q. In the same lawsuit where you sued Julie?
2    A. Yeah.
3    Q. Okay.  And your contention is, you've taken
4  no other default judgments --
5    A. I'm not sure.
6    Q. -- in relation to that case?
7    A. I'm not sure.
8    Q. Is that the case where you sued Liu Family
9  Foundation or Liu?
10   A. Oh, were they in that one, too?  Okay.  Well,
11 then, I guess, yeah.
12   Q. Did you take default judgments against those
13 entities?
14   A. Yeah, yeah.  He got served in Hong Kong.
15   Q. Okay.  So your contention is that those
16 entities or people got served in Hong Kong, and --
17   A. Uh-huh.
18   Q. -- on that basis, you got a default judgment
19 in that part of the case?
20   A. I -- I can't really say offhand because I
21 hadn't thought about it, and I don't know what the
22 legal reasoning ramifications are.  So, you know --
23 and it's really not relevant to this case, and I'm
24 sort of getting tired of answering questions that
25 aren't relevant to this case.

106

1      MR. HAGEN:  I think we'll just take a
2  break and get some food and stretch our legs and
3  resume at --
4      THE WITNESS:  I mean, I'm planning on
5  leaving.  I got other stuff to do today.
6      MR. HAGEN:  Well, Mr. Retzlaff --
7      THE WITNESS:  You know, if you want to
8  keep going, that's fine.
9      MR. HAGEN:  We do intend to keep going,
10  and as a courtesy to everybody at the table, not --
11  this is not just about you -- we'll break until, say,
12  1:00 o'clock and then resume and hopefully conclude
13  in the afternoon, all right?
14      THE VIDEOGRAPHER:  This is the end of
15  Tape No. 2.  We are off the record at 12:24.
16      (At this time, a brief recess was
17      taken for lunch, after which time an
18      instrument was marked for
19      identification as Exhibit B.)
20      THE VIDEOGRAPHER:  This is the
21  beginning of Tape No. 3.  We are back on the record
22  at 1:13.
23      Q.  (BY MR. HAGEN)  Mr. Retzlaff, we were just
24  having a conversation about the medical release that
25  you've had a chance to further review during lunch;

107

1  is that right?
2      A.  Actually I didn't look at it at all during
3  lunch.
4      Q.  Okay.
5      A.  But I did think about it a bit.
6      Q.  True or false:  We just now were talking
7  about this release of information?
8      A.  Yes.
9      Q.  Okay.  Now, at the tail end of our
10  conversation off the record on this, you made mention
11  of thinking about killing people, did you not?
12      A.  Oh, Mr. Hagen, I make mention about many
13  different things, but if we want to talk about this
14  medical release, let's talk about the medical
15  release.
16      Q.  Mr. Retzlaff, are you denying now on the
17  record that you just made reference --
18      A.  I'm not even discussing it.
19      Q.  -- to thinking about killing people?  Did you
20  not do that?
21      A.  I'm not even discussing it.
22      Q.  So you're not going to answer this question?
23      A.  No, I'm not.
24      Q.  Okay.  Do you want to take a Fifth on that
25  question?

108

1      A.  No.  I'm just not going to discuss it.
2      Q.  Okay.
3      A.  You know, you throw a few zingers out there,
4  and maybe I might, too.
5      Q.  Okay.  Well, we can go ahead and I can
6  subpoena Mr. Martinez who is not your counsel on this
7  lawsuit and have him testify to what was said.  We
8  can take that up if you want to at a different time.
9  Shall we do that?
10      A.  And that's fine.
11      Q.  Okay.
12      A.  And that's fine --
13      Q.  Okay.
14      A.  -- if that's --
15      Q.  Okay.
16      A.  -- what you want to do.
17      Q.  Okay.  I do.
18      A.  Okay.
19      Q.  I think I do, Mr. Retzlaff.
20      A.  Okay.
21      MR. HAGEN:  Are you agreeable to that,
22  Mr. Martinez?
23      MR. MARTINEZ:  Well, if I'm a fact
24  witness, I'm a fact witness.
25      MR. HAGEN:  Okay.  And did you hear the

109

1  threat that was made?
2      MR. MARTINEZ:  I heard a statement.  I
3  don't know what the characterization of it was.
4      MR. HAGEN:  Do you want to go ahead and
5  tell us what the statement was that Mr. Retzlaff
6  made?
7      MR. MARTINEZ:  I don't know that this
8  is the proper venue for this, the proper way to do
9  this, but I'm not under subpoena.  I'm not under
10  oath.
11      MR. HAGEN:  Are you declining to say?
12      MR. MARTINEZ:  I'm declining to say at
13  this point.
14      MR. HAGEN:  Okay.
15      THE WITNESS:  And it certainly wasn't a
16  threat.  No threats were made.
17      Q.  (BY MR. HAGEN)  Okay.  Well, what did you
18  say?
19      A.  I don't know.  I'm not going to discuss it.
20      Q.  Okay.
21      A.  Okay.
22      Q.  Okay.
23      A.  But I'm telling you point-blank no threats
24  were made, Lars.
25      Q.  Okay.  So the conclusion that you were

110

1 talking about in relation to the authorization for
2 release of medical records was what we've now -- what
3 we've talked about and what I've labeled as
4 Exhibit B, and it's just my understanding that you're
5 not wanting to sign this thing as drafted, correct?
6    A.  Right.  I'm -- I'm willing to work on some
7 other type of language for it, but not as you have it
8 drafted right now.  I don't think it's fair.
9    Q.  Okay.  Let's talk about your time at UTSA as
10 a student.  When did you enroll there?
11    A.  The fall of 2004.
12    Q.  And when did you end up expelled from UTSA?
13    A.  This summer.
14    Q.  And what program or department were you a
15 part of?
16    A.  The MBA program.
17    Q.  Was that throughout the entire time, fall
18 2004 to summer 2008?
19    A.  No.
20    Q.  Okay.  What were you doing during part of
21 that time?
22    A.  Finishing my undergraduate degree.
23    Q.  Okay.  So you were enrolled only as an
24 undergraduate student beginning in the fall of 2004?
25    A.  Correct.

111

1    Q.  Okay.  And that was at UTSA?
2    A.  Yes.
3    Q.  Okay.  And when did you finish your undergrad
4 degree?
5    A.  About a year and a half ago.
6    Q.  Okay.  And when did you begin the MBA
7 program?
8    A.  About a year and a half ago.
9    Q.  And for what semester of what year was that?
10    A.  The summer of 2007, I think, yeah.
11    Q.  Okay.  And then you were discharged in 2008,
12 correct?
13    A.  Correct.
14    Q.  So your last semester of enrollment as an MBA
15 student was spring 2008?
16    A.  Yes.
17        (At this time, an instrument was here
18        marked for identification as
19        Exhibit C.)
20    Q.  (BY MR. HAGEN)  Okay.  Real quick, I'm just
21 going to hand you what we're marking as Exhibit C.
22 This is a communication signed -- prepared and signed
23 by Todd Wollenzier who you made reference to earlier
24 in your deposition testimony, is it not?
25    A.  What is the question?

112

1    Q.  Is this a communication signed by as far as
2 you know Todd Wollenzier?
3    A.  It's signed by somebody.
4    Q.  Okay.
5    A.  But I wasn't there when it was signed or --
6    Q.  I'm asking you, as far as you know, is this
7 Todd Wollenzier's communication to you in January of
8 2008?
9    A.  I guess.
10    Q.  Okay.  Did you receive a copy of this?
11    A.  I'm not sure.
12    Q.  Okay.  Let's look at --
13    A.  I didn't really spend any time preparing at
14 all for this deposition.
15        (At this time, an instrument was here
16        marked for identification as
17        Exhibit D.)
18    Q.  (BY MR. HAGEN)  Okay.  Let's look at
19 Exhibit D.  Would you take a quick look at that.
20 This is dated in March, 2008, and, again, it has Todd
21 Wollenzier's name at the end.  Do you see that?
22    A.  Yes.  I see the signature on the back.
23    Q.  Okay.  And did you receive a copy of this in
24 January -- I'm sorry -- in March, 2008?
25    A.  I guess so.

113

1        (At this time, an instrument was here
2        marked for identification as
3        Exhibit E.)
4    Q.  (BY MR. HAGEN)  So this is marked as
5 Exhibit E, and it's a letter with the name Todd
6 Wollenzier on the last page.  Do you see that?
7    A.  Yes.
8    Q.  It's a letter dated March 21, 2008.  Do you
9 remember receiving a copy of this one?
10    A.  I'm not sure.  I think I might have, but I'm
11 not sure.
12    Q.  Okay.
13    A.  You know, there's been so many hundreds of
14 papers exchanged back and forth.  It's hard to recall
15 any individual one.
16    Q.  And that's an association with the
17 discharge -- the disciplinary discharge that happened
18 in 2008?
19    A.  Yes.
20    Q.  You elected under the university rules to
21 receive a hearing, correct, in association with your
22 discharge?
23    A.  Yes, I did.
24    Q.  Okay.  Do I understand correctly there was a
25 hearing officer identified and appointed and you

114

1 moved to refuse that first hearing officer?
2    A. Yes.
3    Q. Okay. Who was that hearing officer? Do you
4 know his name?
5    A. El-Kikhia Mansour. I think that's pronounced
6 correctly. He's a Muslim guy that works over in the
7 Political Science.
8    Q. Okay. Did you -- and he was recused as
9 hearing officer to consider your discharge, correct?
10   A. Well, actually he removed himself.
11   Q. I think also you retained counsel for the
12 purpose of that academic discharge process, correct?
13   A. Yes.
14   Q. Was your counsel for that purpose Louis
15 Martinez?
16   A. Correct.
17   Q. Okay. One or the other or both of you at
18 various times moved to continue the hearing or delay
19 the hearing; is that right?
20   A. I guess, yes.
21   Q. And you did have delays in the hearings to a
22 point, correct?
23   A. Yeah, I think so. There was at least one
24 that I know of, maybe two. And then there was one
25 that was, I think, asked for by the school, but I'm

115

1 not sure.
2    Q. Okay. At some point, do you remember the day
3 you went to see a judge at the court to attempt to
4 get a temporary restraining order to stop what
5 eventually became the hearing that happened in April
6 of 2008? Do you remember that?
7    A. I don't think it was in April. I think it
8 might have been March.
9    Q. Okay. You went and you appeared before --
10 initially appeared before Judge Rios ex parte,
11 correct?
12   A. No.
13   Q. Okay. You didn't --
14   A. No. It wasn't Judge Rios.
15   Q. Okay. You didn't appear before Judge Rios
16 and Judge Rios got on the phone and contacted your
17 attorney and -- Mr. Martinez, and he appeared?
18   A. When I got the TRO? No.
19   Q. No. I'm talking about when you sought a TRO
20 ex parte.
21   A. Yeah, I did. I got one.
22   Q. Okay. I'm talking about when you sought a
23 TRO ex parte.
24   A. Right.
25   Q. Okay. Do you remember that day you went to

116

1 the court?
2    A. Yes.
3    Q. It was in the lead-up to the April, 2008
4 hearing, right?
5    A. No. I think this was in March.
6    Q. Okay. So it was in March in the lead-up to
7 what would have been a hearing --
8    A. Yeah, in March.
9    Q. You went to Judge Rios?
10   A. No.
11   Q. You went to a judge and sought an ex parte
12 hearing with that judge. Do you remember that?
13   A. Yeah. It was a district court judge. I
14 don't remember what the guy's name was, though.
15   Q. Do you remember seeing Gail Jensen when you
16 approached a judge to get a TRO?
17   A. No.
18   Q. No?
19   A. No. I was -- this was a district court. She
20 wasn't there at all.
21   Q. Okay. Mr. Retzlaff, do you have a memory of
22 a hearing that occurred where I was contacted and
23 appeared by telephone when you were seeking a TRO to
24 bar the university for having the disciplinary
25 hearing?

117

1    A. I remember that hearing, but that wasn't from
2 the TRO that I got in a district court.
3    Q. I'm not --
4    A. That's something about different.
5    Q. -- asking about the TRO that you got. I'm
6 asking about the TRO that you sought to forestall or
7 to prohibit a hearing from occurring, okay?
8    A. You mean the second TRO?
9    Q. The TRO that you sought, but that was denied?
10   A. Okay. That's the second TRO.
11   Q. Okay. So --
12   A. I thought you were talking about the first --
13   Q. -- you got a TRO?
14   A. Yes.
15   Q. And then you sought a second TRO --
16   A. Right.
17   Q. -- that was denied you?
18   A. Yes, it was.
19   Q. Okay. So the objective of that second TRO
20 was to put off the hearing that ultimately happened
21 in April of 2008, correct?
22   A. I'm not sure if it was that hearing or not.
23 I can't recall exactly, but it was to put off one of
24 the hearings.
25   Q. It was to put off the disciplinary hearing

118

1  that ultimately happened at some time --
2      A. At some point.
3      Q. -- correct?
4      A. Yes.
5      Q. Okay.
6      A. Yes.
7      Q. So I'm talking about that hearing.
8      A. Okay.
9      Q. You approached Judge Rios in an attempt to
10 get a TRO -- that second TRO put in place ex parte
11 initially, correct?
12     A. I'm not sure if it was Judge Rios or Judge
13 Rodriguez.
14     Q. Okay.
15     A. I'm not sure.
16     Q. Okay. Judge -- do you remember a hearing
17 where --
18     A. Yeah.
19     Q. -- where you appeared, Gail Jensen saw you at
20 the courthouse --
21     A. Yes.
22     Q. -- and, therefore, stepped up and talked to a
23 judge? It was Judge Rios. Do you remember that now?
24     A. Well, I don't remember who it was assigned
25 to, but I remember that you appeared by telephone --

119

1      Q. Okay.
2      A. -- and stuff. I don't remember who exactly
3  was -- the judge was --
4      Q. Then I --
5      A. -- because there's been several hearings in
6  this case.
7      Q. Right. So that then I was called and
8  contacted. And it wasn't the case that we're
9  actually here on deposition about, but it's the chain
10 of events leading to what you're partly complaining
11 about here in your petition. I was contacted -- do
12 you remember that -- and appeared by telephone?
13     A. Yes.
14     Q. Rob Johnson in my office, Assistant Attorney
15 General, was contacted and appeared by telephone. Do
16 you remember that?
17     A. Yes.
18     Q. The judge, Judge Rios, put out word to summon
19 Mr. Martinez to that hearing, your counsel. Do you
20 remember that?
21     A. I think so. I think that might have been the
22 time when he was in probate court or something.
23     Q. He got called, he came and did not appear on
24 your behalf, but was present --
25     A. Right, right.

120

1      Q. -- at that hearing?
2      A. Okay.
3      Q. Do you remember that?
4      A. Yeah, yeah.
5      Q. Okay. So he was there, I was there by
6  telephone, rob Johnson was there by telephone?
7      A. I guess.
8      Q. Gail Jensen was there in person?
9      A. I guess. What does that have to do with --
10     Q. Do you remember that? I'm just
11 chronologically --
12     A. There's been like millions of different
13 hearings and stuff, okay?
14     Q. Yeah, that you have sought. So you might be
15 expected to have some familiarity with it, and
16 because you don't remember, I'm trying to help --
17     A. Well, no. But I --
18     Q. -- right?
19     A. Yeah. I mean, I remember now about the
20 telephone hearing and stuff. I don't -- I thought it
21 was Rodriguez, but I guess it was Judge Rios.
22     Q. Okay. So ultimately the judge --
23     A. Denied the TRO.
24     Q. -- denied what you originally sought out to
25 get as an ex parte TRO --

121

1      A. Yes.
2      Q. -- correct?
3      A. Yes.
4      Q. Okay. So consequently you had in April of
5  2008 a disciplinary hearing, correct?
6      A. Correct.
7      Q. Okay. Can you tell me who was present at the
8  disciplinary hearing? There were actually two days
9  of disciplinary hearing, correct?
10     A. Yeah.
11     Q. A Friday and a Monday?
12     A. Yeah. Of course, myself and Mr. Martinez.
13     Q. And he was your attorney --
14     A. Yes.
15     Q. -- at that disciplinary hearing?
16     A. Yes. And then there was the hearing officer.
17 I forgot what his name is.
18     Q. Was that guy's name Daniel Escobar?
19     A. Yeah. There you go. All right. That's who
20 it was. And then Todd Wollenzier from Judicial
21 Affairs and then this girl from Austin. I think her
22 name -- it was -- I think it might have been
23 Priscilla Lozano.
24     Q. Okay. And she's actually counsel at UT
25 System, correct, or you don't know her name -- her

122

1 exact --
2    A. Well, I know she works for UT or something
3 like that, but I don't know exactly --
4    Q. Okay.
5    A. -- what she does.
6    Q. You said girl. I mean, she's not a college
7 student or high school student. She's, you know,
8 a --
9    A. A female.
10    Q. -- woman attorney, correct?
11    A. Yeah. She's a female.
12    Q. Okay. Were those all the people that were
13 present at this two days of disciplinary hearing?
14    A. Well, there had been some witnesses, but they
15 were in and out.
16    Q. Okay.
17    A. But as far as who was there when the whole
18 thing took place, that's the one, two, three, four --
19 five people that were there.
20    Q. Okay. Now, in relation to -- you mentioned
21 Todd Wollenzier?
22    A. Correct.
23    Q. Do you have any reason to believe Todd
24 Wollenzier wanted to violate any of your
25 constitutional rights in this process?

123

1    A. Yeah.
2    Q. Okay. What?
3    A. Well, he wouldn't allow me to call witnesses
4 that I wanted to have. He wouldn't let me have
5 access to evidence that I wanted to have.
6    Q. Okay. He was the person that -- whose name
7 appears on these three letters and that we've marked
8 as exhibits and who was bringing charges, correct?
9    A. Yes.
10    Q. The code of conduct charges?
11    A. Yes.
12    Q. Okay. So he was not the hearing officer,
13 right?
14    A. No.
15    Q. Okay. Any other reason to believe that he
16 wanted to violate any of your constitutional rights?
17    A. Well, he -- why? I don't know why. He kept
18 bringing all these bogus disciplinary charges against
19 me with Judicial Affairs, probably eight or ten of
20 them, I think, altogether. None of them were ever
21 found to be true until this very last one here where
22 he could jump up and do "Aha!" And, you know, this
23 guy has been chasing me like Captain Ahab has been
24 chasing his white whale.
25    Q. Any other reason why he would want to violate

124

1 your constitutional rights?
2    A. Why? I do not know why. I would have to
3 question him under oath in order to make that
4 determination.
5    Q. No. I'm asking you, do you have any
6 reason -- any other reason to believe that he wanted
7 to violate any of your constitutional rights?
8    A. Well, the fact that he hid relevant evidence
9 from me that I needed during the Judicial Affairs
10 hearing, the fact that he didn't allow me to call
11 certain witnesses that I needed that would have
12 helped in my defense, yeah, because I have a due
13 process right to have a full and fair disciplinary
14 hearing, and he took steps to violate that.
15    Q. Okay. Real quick, what evidence are you
16 alleging that Todd Wollenzier hid from you?
17    A. Well, first off, when I wanted to come in
18 and -- and see my file and see my complaints, he
19 wouldn't let me see them at all. He claimed some
20 kind of a FERPA thing, federal educational student
21 privacy rights act or something like that. And then
22 I filed a complaint with his supervisor and saying
23 that even according to UTSA's regulations I had a
24 right to copies of this stuff.
25    Q. Okay.

125

1    A. And --
2    Q. So what evidence do you believe he hid from
3 you?
4    A. Well, he only showed me evidence that was
5 favorable to their side, not evidence that was
6 favorable to my side.
7    Q. Are you talking about exculpatory evidence?
8    A. Yes.
9    Q. You know the lingo of criminal law?
10    A. I guess, for lack of a better term.
11    Q. So you're -- is it your position or
12 contention that you are somehow entitled to what
13 you're characterizing as exculpatory evidence in the
14 process of the student disciplinary hearing?
15    A. Well, I believe that I'm entitled to access
16 to all of the files, not just part of it, because I
17 had made several requests for certain specific
18 documents that were denied to me.
19    Q. Okay. Well, which documents?
20    A. Listen, I haven't prepared at all for this
21 deposition. All right. I rolled out of bed this
22 morning, and I came here. And that's it.
23    Q. Okay. What witnesses do you believe you were
24 not able to call that you wanted to?
25    A. There was a list of about 30 of them.

126

1    Q.  Now, did the university tell witnesses not to
2  appear for you?
3    A.  Yes.
4    Q.  Who?  Who told witnesses?
5    A.  Well, Lynda De La Vina was told not to
6  appear.
7    Q.  No.  I'm asking -- okay.  Who told Lynda De
8  La Vina not to appear?
9    A.  I think that was said by Priscilla Lozano.  I
10  remember during the hearing --
11    Q.  How do you know that?
12    A.  Because during the hearing I -- I had asked
13  that these people be called and they said that "We're
14  telling them not to appear."
15    Q.  Oh, that's what -- who told you that they
16  were told they're not to appear?
17    A.  I believe it was Priscilla Lozano or Escobar.
18  I'm not sure which.
19    Q.  Okay.  So this is a dispute where you want
20  people to come to a hearing, and your declaration is
21  that one or more of these UT officials directed one
22  or more of those witnesses not to come?
23    A.  None of them came.
24    Q.  I'm asking you --
25    A.  Yes.  That's my position.

127

1    Q.  -- if the position you're taking is that they
2  were given the direction not to come?
3    A.  Exactly.
4    Q.  That their presence is requested by Tom
5  Retzlaff, but you are not to come?
6    A.  Yes.  That's --
7    Q.  Okay.  That's what --
8    A.  Because there was a list of about 30 people
9  that I gave them that I wanted to have come.
10    Q.  So you wanted the university to pull these
11  people before this hearing, was what your request
12  was?
13    A.  Not pull these people.  They are already
14  there on staff at the university themselves.
15    Q.  To invite or to compel them to come to
16  your --
17    A.  Exactly.
18    Q.  30 people that you think should come?
19    A.  Well, I don't know if there was 30, but there
20  was a list.
21    Q.  Okay.  What steps did you take to contact
22  these people to ask them to come?
23    A.  Actually I was told that I couldn't contact
24  them by the chief of police.
25    Q.  Okay.

128

1    A.  And, in fact, you told me as well not to be
2  contacting them because they were all your clients.
3        MR. HAGEN:  Objection, nonresponsive,
4  and not true.  But in any case --
5        THE WITNESS:  You didn't tell me not to
6  talk to these UTSA people.
7    Q.  (BY MR. HAGEN)  If you're filing a lawsuit
8  again my clients that I'm representing and entered
9  into a relationship with them where I'm representing
10  them, my ordinary -- the ordinary practice is that
11  the opposing counsel, or in your case if you're pro
12  se, is not to contact those people?
13    A.  Sure.
14    Q.  Now, did you send me some communication
15  inviting their participation?
16    A.  I think I remember asking you if I could sit
17  down and meet with Kyle Snyder.
18    Q.  No.  I'm talking about in this disciplinary
19  hearing process.
20    A.  Oh, no, not with the disciplinary hearing.
21    Q.  What can you direct me to?  Nothing, right?
22  You never did ask that anybody that I represent in
23  any of these lawsuits participate in your
24  disciplinary hearing process, did you?
25    A.  Well, I did make the request to the

129

1  university, yes.
2    Q.  Okay.  So you're saying you went through
3  other people to ask that people who you were suing
4  come to your hearing -- your disciplinary hearing; is
5  that --
6    A.  Well, I wanted to be able to develop my
7  theory of the case, that this was nothing but B.S.
8  retaliation against me.
9    Q.  Okay.
10    A.  And that, in fact, no harassment took place
11  at all with this Chinese student.
12    Q.  Okay.  Anything else in regard to why you
13  think Tom -- Todd Wollenzier violated your
14  constitutional rights?  Anything else?
15    A.  Yeah.  I think he improperly -- well,
16  constitutional rights I'm not sure, but I believe he
17  also improperly accessed police records regarding
18  myself.
19    Q.  Okay.  Let me ask you about Daniel Escobar,
20  the hearing officer.  Any reason why you think he
21  wanted to violate your rights in this student
22  disciplinary process?
23    A.  Yes.
24    Q.  What?
25    A.  Well, first off, he's a university employee.

---

**130**

1 He's beholden to the university. So he's hardly fair
2 or impartial. In addition, he wouldn't allow me to
3 have testify the people that I wanted to have
4 testify.
5    Q. Okay. And you're referring to the same body
6 of 30 people who you asked the university to make
7 available for you to ask questions of in this
8 disciplinary process?
9    A. I'm not sure if it was 30, but there was a
10 group, at least 10.
11    Q. Okay. Any other reason that you believed
12 Daniel Escobar wanted to -- or did violate your
13 rights?
14    A. I don't know. I haven't thought about Daniel
15 Escobar in a while. So my answer is not complete.
16    Q. Okay. As far as you know as you sit here
17 today, that's the sum total of your complaints
18 against Daniel Escobar?
19    A. Well, my right -- he denied my right to due
20 process.
21    Q. Okay. How did he do that?
22    A. By not allowing me to have evidence and
23 witnesses that I needed to appear on my behalf.
24    Q. Are you referring again to exculpatory
25 evidence?

---

**131**

1    A. Not just exculpatory evidence but certain
2 records that I wanted to have as well that I believed
3 would also help my case.
4    Q. Okay. Now, earlier in your testimony you
5 said that hundreds of pages of material were
6 exchanged in the process of this disciplinary hearing
7 process and its preparation. Do you remember that?
8    A. Yeah, a lot of legal papers.
9    Q. Okay. And a lot of papers concerning the
10 charges against you, correct?
11    A. Well, not really so much that as the legal
12 pleadings, that kind of stuff.
13    Q. Okay. So what in particular was missing from
14 this body of information that you were provided about
15 the charges against you --
16    A. Well --
17    Q. -- from the university point of view?
18    A. -- with regards to the complaints, you know,
19 I wanted -- like police reports were redacted.
20 Witness statements were redacted. You know, a bunch
21 of stuff like that was redacted. Things that were in
22 my student file that Judicial Affairs had that I
23 needed, first they refused to give me any copies of
24 at all. And then when I showed them the rule -- the
25 UTSA rule that says that they're supposed to give me

---

**132**

1 copies, they did, but then they redacted a bunch of
2 stuff from it.
3    Q. Okay. So the redactions and you disagree
4 with that. Anything else?
5    A. Anything else about what?
6    Q. In terms of what you believe that you should
7 have received but did not in this disciplinary
8 process.
9    A. Again, I'd have to think about it.
10    Q. Okay. Now, in terms of the basic charges
11 that were brought against you in the disciplinary
12 process, you misrepresented your -- a personal
13 statement in your application for the MBA program.
14 That was one of them, correct?
15    A. Yes. That was --
16    Q. And you ended up --
17    A. -- what they had accused.
18    Q. -- admitting that, that that
19 misrepresentation occurred?
20    A. Yeah, I guess.
21    Q. With respect to another one of the concerns
22 from the university's point of view, you had a
23 charge -- a grievance filed to the UT Police
24 Department -- UTSA Police Department by the Chinese
25 student who by her English name we're calling Julie,

---

**133**

1 correct?
2    A. Correct.
3    Q. And that was the complaint that I believe you
4 testified that Kyle Snyder also joined in filing; is
5 that right?
6    A. Yes.
7    Q. Okay. And you contend that the harassment
8 that Julie alleged in that complaint was false?
9    A. Bogus.
10    Q. Okay.
11    A. Not just false, but bogus.
12    Q. Okay. Julie is the student that we also
13 talked about you filed a lawsuit against; is that
14 right?
15    A. Yes.
16    Q. Okay. And she's the student who earlier in
17 your deposition you testified had returned to China,
18 correct?
19    A. Yes.
20    Q. And you took a default judgment against her?
21    A. Yes.
22    Q. Okay. I was looking at your complaint here
23 that's pending in federal court under Paragraph 18.
24 It says -- and, again, I'm going to mispronounce
25 this. But Zhu Lan, that's Julie, correct, Z-h-u

---

134

1  L-a-n?
2      A.  Yes, Zhu Lan.
3      Q.  Okay.  That there is resulting a
4  53,750-dollar judgment in plaintiff's favor, do you
5  see that?
6      A.  Yes.
7      Q.  That's the default judgment, correct?
8      A.  Yeah.
9      Q.  Okay.  Going back to the hearing that you had
10  with the university, the hearing officer,
11  Mr. Escobar, took some time after the hearing
12  concluded April 21 to render a decision, correct?
13      A.  Yes.
14      Q.  Do you remember sometime later getting a copy
15  of the decision?
16      A.  Yeah.  I think at the end of May something
17  was emailed to me.
18          (At this time, an instrument was here
19          marked for identification as
20          Exhibit F.)
21      Q.  (BY MR. HAGEN)  This I'm marking as
22  Exhibit F, and it's a decision -- it's called
23  "Decision."  Do you see that?
24      A.  Yes.
25      Q.  Did you get a copy of this?

135

1      A.  Yes.
2      Q.  Okay.  And this is the decision that had the
3  effect of expelling you from the UT -- from UTSA,
4  correct?
5      A.  Yes.
6      Q.  Okay.  So with that history behind us, let me
7  ask you some questions about the Defendants who
8  you're suing in this lawsuit now pending in federal
9  court.  You can set that aside with the other
10  exhibits.  You're suing all of these Defendants who
11  are named here, Dean De La Vina, Diane Baker Walz,
12  Kyle Snyder, and Katherine Pope.  You're suing each
13  one of them for defamation.  Do I have that right?
14      A.  Yes.
15      Q.  Okay.  And you took a minute to, I guess,
16  look at, what, Page 3 of the complaint before
17  answering that question?
18      A.  Yes.
19      Q.  Okay.  And that's where you set out
20  defamation.  Can you help me understand why you're
21  suing Dean De La Vina for defamation?
22      A.  She wrote an email saying I had a gun on
23  campus or brought a gun on campus.  In addition, she
24  had said that to other people as well.
25      Q.  Any other reason you're suing Dean De La Vina

136

1  for defamation?
2      A.  Well, it's not true.  I never had a gun,
3  never brought it on campus.
4      Q.  Okay.  Is there any other defaming
5  declaration or thing that Dean De La Vina did in your
6  opinion?
7      A.  In this lawsuit, no.
8      Q.  Okay.
9      A.  This lawsuit strictly deals with her saying
10  that I had committed the criminal offense of
11  unlawfully carrying a weapon on school grounds.
12      Q.  Okay.  So if I have you right, you're
13  referencing one email, and you're referencing what
14  you said are statements that she made?
15      A.  Oh, it's -- yeah.  It's not just one email.
16      Q.  Okay.  Well, I need to know.  You --
17      A.  This --
18      Q.  Just a second here.  You tell me what you're
19  talking about was defamation --
20      A.  Yes.
21      Q.  -- in particular.
22      A.  Yes.  This email was disseminated through
23  hundreds of people.
24      Q.  Okay.  So if I understand your contention,
25  Dean De La Vina prepared an email, she sent it, and

137

1  it got sent from others onward in your opinion?
2      A.  Yeah.
3      Q.  Okay.
4      A.  And I was called down to the police
5  department about it as well.
6      Q.  Okay.  How do you know that in the first
7  place that this one email that Dean De La Vina sent
8  was disseminated to other people other than the
9  people she sent it to?
10      A.  Because I was told by the chief of police.
11      Q.  Okay.
12      A.  He said he's been getting calls from people
13  all over the university.  And that's when he told me
14  not to be going into any of the administrative
15  offices or anything without checking with him first
16  because people are locking themselves into their
17  office afraid of Tom Retzlaff.
18      Q.  Who is the chief of police that you're
19  talking about?
20      A.  I forgot what the heck his name is.
21      Q.  You're sure he's not a captain or something?
22  He is the chief?
23      A.  No.  I'm not talking about Captain Kiley.
24  I'm talking about the police chief.
25      Q.  Any other reason --

138

1   A. I just forgot --
2   Q. Sure.
3   A. -- his name for some reason.
4   Q. Any other reason you have to believe that --
5   is there any other email that you're talking about
6   Dean De La Vina sent that defamed you in your
7   opinion?
8   A. Well, I'm talking about defamation in just
9   this case. Now, there are perhaps others where she
10  defamed me, but it's not a part of this case. So I
11  can't answer to that. All I can talk is -- and I did
12  see the email where she talks about me with a gun on
13  campus.
14  Q. Okay. So --
15  A. And I did see that email.
16  Q. So there's that email. And I'm asking you,
17  is there any other email?
18  A. I can't say for sure at this time.
19  Q. Okay. Are there any other statements or
20  declarations that you're saying defamed you that were
21  uttered by Dean De La Vina? And if there were, what
22  are they?
23  A. Well, I'm only talking about just this one
24  action of defamation in this one lawsuit. So is
25  Q. And that's what I'm asking you about. So is

139

1   it --
2   A. I'm not talking about other lawsuits --
3   Q. Is it --
4   A. -- and other defamations.
5   Q. Is it the -- well, the way you plead your
6   case is a little bit broad. So I need to understand
7   from you if there are any other emails that you
8   attribute to Dean De La Vina that you say are
9   defaming apart from the one we just talked about?
10  A. Well, I don't see where it's pleaded broad.
11  It says that she stated in the -- that I had
12  committed the unlawfully carrying a weapon.
13  Q. Okay. And that's the one?
14  A. That's the defamation.
15  Q. Anything else?
16  A. If she made other kinds of defamations, it's
17  not a part of this lawsuit and I'm not prepared to
18  talk about them.
19  Q. Well, tell me what they are.
20  A. I haven't fully researched the issue yet.
21  Q. Okay. So as for this lawsuit and why you're
22  suing Dean De La Vina for defamation, do I understand
23  correctly that it has to do with the one email that
24  you say she sent where she in your opinion comments
25  that you have a gun in your car?

140

1   A. Well, I'm only talking about the one email or
2   two --
3   Q. Is that a yes or a no? Is that it?
4   A. No, no.
5   Q. Okay. So there's that email. What else?
6   A. Well, there were a couple of emails that I
7   saw, but there were more that I heard about.
8   Q. Okay. Well, tell me with precision what
9   other emails you're talking about and what you heard
10  about.
11  A. I can't say with precision because I haven't
12  been given access to those emails --
13  Q. Okay.
14  A. -- despite my requests. And I believe your
15  office has been challenging some of my open records
16  requests.
17  Q. With respect to any other statements you
18  attribute to Dean De La Vina that you say are
19  defaming, what are they?
20  A. Again, I haven't fully researched the issue.
21  This lawsuit is just with regards to her saying --
22  oh, yeah. That I'm a dangerous person, you know
23  that --
24  Q. You --
25  A. -- was also repeated.

141

1   Q. In answering that question, you just turned a
2   page of your lawsuit and see a paragraph and comment
3   on it -- read it, right?
4   A. And like I told you earlier, I did absolutely
5   nothing to prepare for this --
6   Q. Okay.
7   A. -- deposition.
8   Q. And that's fine. So --
9   A. I rolled out of bed this morning, and -- and
10  this stuff, I haven't looked at it in several months.
11  Q. Okay. We can come back and continue the
12  deposition --
13  A. Okay.
14  Q. -- another time, too, but since I have you
15  here and we're talking for now --
16  A. Yes.
17  Q. -- I'm asking you, is there -- okay. So
18  you're attributing to her the comment that you're a
19  dangerous person?
20  A. Yes. That's what I --
21  Q. Where did you -- where did she say that?
22  A. Not in an email, at least none that I've
23  seen.
24  Q. Where did she supposedly say that?
25  A. From my conversations with the chief and the

142

1  police in the UTSA Police Department.
2    Q.  Okay.  So is it your allegation that the
3  chief or another police officer at UTSA Police
4  Department said that Dean De La Vina called you to
5  other people a dangerous person?
6    A.  He didn't say Dean De La Vina specifically,
7  but when I saw the email, though, from her -- and I
8  don't have the email here in front of me.
9    Q.  Okay.  Is there anyone that you can think of
10  else who at this time you remember saying -- from
11  your opinion called you a dangerous person?
12    A.  Yeah.  I know Kyle Snyder did.
13    Q.  Okay.
14    A.  She told that to some of the other Chinese
15  students.
16    Q.  Okay.  And how do you -- who did she say that
17  to?
18    A.  The other Chinese students in that Liu
19  program.
20    Q.  Who did she say that to, Mr. Retzlaff?
21    A.  She told that to Julie's roommates.
22    Q.  Okay.  Who -- what were their, and are they
23  still in the country?
24    A.  No.  They're gone.
25    Q.  Okay.

143

1    A.  They're gone.
2    Q.  These are all Chinese exchange students?
3    A.  Yeah.
4    Q.  Okay.
5    A.  Yeah, because one of the girls was saying
6  that -- she said that she wasn't allowed to talk with
7  me because that's what Kyle Snyder told her, that I
8  was a dangerous person and that she should stay away
9  from me.
10    Q.  Okay.  Any other -- do you attribute the
11  comment that you're a dangerous person to any other
12  person in this lawsuit other than Kyle Snyder?
13    A.  Well, discovery hasn't even started in this
14  case.  So --
15    Q.  Well, you had to have --
16    A.  Well, I'm attributing --
17    Q.  Mr. Retzlaff, you had to have a good faith
18  basis for making all these claims.  I'm asking you
19  what the basis of your claims are.  So you don't make
20  your claims and then go try to find evidence to
21  support it.  You have evidence and then you file your
22  lawsuit.  Do you understand that that's the way it
23  works?
24    A.  Right.
25    Q.  Okay.  So you tell me now who else you

144

1  attribute this comment to that you're a dangerous
2  person, having said that.  Who else?
3    A.  Also -- well, she's not even listed on here,
4  but the girl that works with Kyle Snyder, I cannot
5  recall what her name was.
6    Q.  Okay.  Anyone else?  Kyle Snyder is the
7  person that you're saying called you a dangerous
8  person?
9    A.  Yes.  That's what I was told.
10    Q.  And you said she said that to Chinese
11  students who lived with your friend, Julie, and who
12  have since left the country?
13    A.  Yeah.
14    Q.  Okay.
15    A.  And others who were in the program after the
16  fact as well.  And Don Lien also did, too, and, in
17  fact, I believe he -- he gave them like a briefing or
18  something about staying away from me, something along
19  those lines.
20    Q.  Okay.  Anyone else in this lawsuit who you've
21  sued do you attribute the comment "Tom Retzlaff is a
22  dangerous person" to?
23    A.  In this lawsuit here, no.
24    Q.  Okay.  Now, going back to any other
25  communications by any of the Defendants that you've

145

1  sued in this lawsuit, is there anything else that
2  you're saying was defaming against you that gives
3  rise to your lawsuit for defamation?  And I'm going
4  to ask you, you know, in particular what it was and
5  who supposedly said it or wrote it to who.
6    A.  Yeah, I know.  I wish I would have probably
7  prepared for this because there were some emails and
8  stuff from -- I think I even sent you copies of those
9  emails that I was bitching about from Lynda De La
10  Vina that she was saying.  But that's the only
11  defamation that I'm concerned about here in this
12  lawsuit with regards to that.
13    Q.  So it's the email that Dean De La Vina wrote,
14  number one?
15    A.  And the statements that she had made to
16  others about me.
17    Q.  What statements to who and what were those --
18    A.  That she told other people that I had a gun.
19    Q.  Okay.  So you're saying she --
20    A.  And that I had brought a gun on campus and
21  that I was a dangerous person.  This is as was told
22  to me from the police department --
23    Q.  Okay.  So you would --
24    A.  -- when they were telling me not to be going
25  over there to the offices anymore.

146

1    Q.  Just to clarify, you attribute that to Dean
2  De La Vina.  That's why you're suing her in this
3  lawsuit, right?
4    A.  Yes.
5    Q.  You're also saying Kyle Snyder told Chinese
6  students --
7    A.  Yes.
8    Q.  -- who have left for China that you're a
9  dangerous person?
10    A.  Yes.
11    Q.  Okay.
12    A.  In addition, the girl in the other lawsuit,
13  Daniel, said the same words as well.
14    Q.  Okay.  And since you're on the topic of
15  defamation and you've raised the -- another student
16  whose name is Li-Dan Xu --
17    A.  Yi-Dan, Yi-Dan Xu.
18    Q.  Y-i-D-a-n?
19    A.  Yeah.  It's Yi-Dan.  Yi-Dan -- Yi-Dan Xu --
20    Q.  Right.
21    A.  -- is the Chinese pronunciation.
22    Q.  Last name Z-u [sic].  You call her Danielle,
23  right?
24    A.  Yeah.
25    Q.  You attribute to her what as for suing her

147

1  for defamation?
2    A.  Yes.
3    Q.  What do you attribute to her in terms of --
4    A.  That she told all the other Chinese students
5  to stay away from me, that I was a dangerous person.
6    Q.  Okay.  And who is available among these
7  Chinese students that she supposedly said this to?
8    A.  Like who's available now?
9    Q.  Yes.
10    A.  I can't say because I've tried to get records
11  of -- of where these people are and -- and whether or
12  not they've left, and my open records requests have
13  been denied.
14    Q.  Okay.  Who is it that supposedly heard this
15  statement from, for example, Danielle?
16    A.  Oh, I saw her make it myself --
17    Q.  Okay.
18    A.  -- in front of me.
19    Q.  Who did she say it to?
20    A.  She said it to two Chinese girls --
21    Q.  Okay.  And your --
22    A.  -- that were a part of the Liu program.
23    Q.  Your contention now is that she said that
24  standing in front of you?
25    A.  Yeah.

148

1    Q.  Did she say --
2    A.  About 20, 30 feet away from me.
3    Q.  Did she say it in English?
4    A.  Yes.
5    Q.  Oh, she spoke English in your presence to
6  Chinese students who she shares a common language
7  with that defamed you?
8    A.  I'm only telling you --
9    Q.  Is that your contention?
10    A.  I'm only telling you what I heard.
11    Q.  So when Danielle chose to defame you
12  in your opinion, she did it in English in your
13  presence to Chinese students who share with her a
14  common language other than English, right?  Is that
15  your story?
16    A.  I just told you what I saw and heard.
17    Q.  Okay.
18    A.  And she could have been doing it that way to
19  make a point to me.
20    Q.  Okay.  Any -- in regard to Danielle, any
21  other disparate -- any other defaming words she said
22  that you are suing her for?
23    A.  I don't know.  I'd have to look at the
24  petition that I have.
25    Q.  Okay.  With respect to Dean De La Vina, any

149

1  other defaming words or writings that you're
2  attributing to her and the reason you're suing her
3  for defamation other than what we've already talked
4  about?  Anything else?
5    A.  I can't say that because I'm only dealing
6  with just this one issue.
7    Q.  Yes, exactly.
8    A.  Right.
9    Q.  I'm asking if you give me one --
10    A.  And you want to --
11    Q.  Stop.
12        MR. HAGEN:  Objection, nonresponsive.
13    Q.  (BY MR. HAGEN)  I want to know is there any
14  other reason you're suing her for defamation other
15  than what we've just talked about.  Go.
16    A.  The only defamation that I'm suing about her
17  in this case is with regards to -- about the gun at
18  school in Paragraph 11.
19    Q.  Okay.  Is there any reason why -- and we've
20  talked about what you boil Paragraph 11 down to.  Is
21  there any reason why you're suing Diane Walz for
22  defamation, or is she not intended to be included in
23  that claim?
24    A.  No.  She was included, too.  She was also
25  copied on that email.

150

1    Q. So she received the email from Dean De La
2 Vina. So you're suing her for defamation?
3    A. Yes.
4    Q. Okay. Then we have Katherine Pope. We
5 talked about Kyle Snyder. Katherine Pope is being
6 sued by you for defamation. Any reason why she's
7 being sued --
8    A. Yes.
9    Q. -- for defamation?
10    A. Yes.
11    Q. What is it?
12    A. For spreading the same lies around as well.
13    Q. Okay. So your contention is that she said
14 and did exactly what?
15    A. The same thing, spread the email around.
16    Q. And you're talking about the email that came
17 from Dean De La Vina?
18    A. As well as others --
19    Q. Okay.
20    A. -- that I haven't discovered yet but I do
21 believe exist.
22    Q. Okay. And any other reason apart from that?
23    A. Well, also for trying to obtain copies of my
24 confidential criminal history information.
25    Q. No. I'm talking about defamation.

151

1    A. Okay. All right.
2    Q. Any other reason you're suing Katherine Pope
3 for defamation?
4    A. No.
5    Q. Okay. Any other reason apart from what we've
6 already talked about that you're suing Kyle Snyder
7 for defamation?
8    A. Well, only alleged acts in this suit. I
9 don't know if there'll be other actions that I will
10 discover or will sue about later on.
11    Q. Okay. So apart from what we've already
12 talked about, is there any other reason as you sit
13 here today testifying that you've sued Kyle Snyder
14 for defamation? Anything else?
15    A. I'm not sure I understood what you said.
16    Q. Sure. We talked about why you're suing Kyle
17 Snyder for defamation?
18    A. Right.
19    Q. Do you remember that? Apart from that
20 testimony --
21    A. Apart from that, no.
22    Q. -- and your answers, is there any other
23 reason you're suing her for defamation?
24    A. No.
25    Q. I have questions about -- by the way, you've

152

1 touched on the Chinese student, Yi, Y-i-Dan, D-a-n,
2 "Danielle" Xu, who you're suing for defamation, also?
3    A. Yes.
4    Q. Is there apart from what you've already
5 testified to any other reason you're suing her for
6 defamation?
7    A. I'd have to think about it.
8    Q. Well, I'll give you a second to think about
9 it, and let me know if you need a minute so that we
10 don't do this multiple times. We can just get
11 through it now.
12    A. Okay. You want to know why else she was
13 sued?
14    Q. Why you're suing her other than what you've
15 already testified to for defamation.
16    A. Sure.
17    Q. And we're talking about Yi-Dan Xu who you've
18 sued in Bexar County Court of Law, Cause No. 336876.
19 You're looking at that petition now, correct?
20    A. Yeah.
21    Q. Okay. Any other reason why you're suing
22 Danielle for defamation?
23    A. Well, she was involved in that making of the
24 false police report, too, claiming harassment for
25 Julie. And then --

153

1    Q. Are you referring to the UTSA police
2 complaint that the Chinese student who has an English
3 name, Julie, filed along with Kyle Snyder whose name,
4 I think, appears on that complaint? Is that your
5 reference?
6    A. I don't know. There's been -- there's
7 several police documents, some of which I have, some
8 of which I don't. So --
9    Q. Well, I'm trying about the one you're talking
10 about. I'm trying to identify the one you're --
11    A. Well, I'm just talking about --
12    Q. -- putting into issue.
13    A. -- the incident itself --
14    Q. So are you testifying that you're suing the
15 Chinese student with the English name, Danielle,
16 because of somehow your -- you're suing her for
17 defamation because she's somehow involved in the
18 complaint that Kyle Snyder and that Julie filed at
19 the UT Police Department, UTSA?
20    A. Yes.
21    Q. Okay. Any other reason you're suing Danielle
22 for defamation?
23    A. Just things that she said to other students
24 about me.
25    Q. What in particular? Apart from what you've

154

1 already testified to and claimed earlier in your
2 deposition, anything else?
3    A. That's all as far as I know right now.
4    Q. Okay.
5    A. But it was enough.
6       MR. HAGEN:  Let's go ahead and mark
7 this as Exhibit --
8       MS. JENSEN:  G.
9       MR. HAGEN:  -- G.  Thanks.
10      (At this time, an instrument was here
11      marked for identification as
12      Exhibit G.)
13   Q. (BY MR. HAGEN)  Would you please look at
14 this, Mr. Retzlaff?  It's --
15   A. Okay.
16   Q. So I'm showing you here what's marked as
17 Exhibit G, and if you could direct your attention to
18 it rather than the petition that you filed against
19 Danielle in state court, I would appreciate it.  Do
20 you see it?
21   A. Yes, I see it.
22   Q. Okay.  And is this the email that you're
23 referring to that Lynda De La Vina sent out that
24 you're complaining on?
25   A. No.  There was other emails.

155

1    Q. This is not it?
2    A. I said there were other emails.
3    Q. No.  You said there was an email that she --
4    A. No.  I saw a couple --
5    Q. Excuse me.
6    A. -- of emails.
7    Q. Mr. Retzlaff, let me interrupt and interject.
8 Did I misunderstand when you said that there was an
9 email that De La Vina sent out, but that was then
10 later disseminated further?  Did I misunderstand that
11 testimony?
12   A. I don't know, but there was at least two
13 emails.
14   Q. Okay.  So now there were two.  First there
15 was --
16   A. No.
17   Q. -- an email.  Now, there are two.  Do I
18 understand that correctly?
19   A. Well, whatever.
20   Q. Okay, whatever.  So in light of, quote,
21 "whatever," let's look at what's been marked as
22 Exhibit No. G.  And let me ask you, is this one of
23 the emails or the email that you considered to be
24 defamation committed by Lynda De La Vina against you?
25   A. I believe this is one of them, yes.

156

1    Q. Okay.  What is the other one now that there
2 are two?
3    A. I don't recall exactly what it was she said
4 on it.  Like I said, I didn't come prepared for this
5 deposition or anything like that.
6    Q. Okay.
7    A. You know, but I know that there was a
8 different email as well, too, not just this one.
9    Q. Okay.  How did it differ?
10   A. I think she was writing it actually to either
11 the chief of police or somebody else asking if
12 there's something that could be done about it and why
13 haven't the police done something about him having a
14 gun in his car or something along those lines, I
15 believe.
16   Q. Okay.
17   A. I can't recall exactly.
18   Q. Was anybody else a recipient of that email
19 you say exists?
20   A. I -- I can't recall off the top of my head.
21 I don't recollect exactly.
22   Q. Okay.  Since we do have --
23   A. But I remember, though, that in that
24 discipline case -- UTSA disciplinary case I tried to
25 bring that issue up and show those emails.

157

1    Q. Okay.  Respecting the one that we have here,
2 which is G, it says, "Julie reported to Beth that
3 Mr. Retzlaff carried a gun in his glove box which she
4 had seen.  I do not know if this is accurate but
5 thought I should report to you all."  Do you see
6 that?  Did I read that right?
7    A. Yes.  That's what it says.
8    Q. Okay.  Julie is this person who is a Chinese
9 student who you had a relationship with who later
10 complained to you -- or complained about you to the
11 UTSA Police Department; is that right?
12   A. I don't know if that's the same Julie that's
13 being referred to in this email or not.
14   Q. Okay.  But she does go by Julie, that person,
15 correct?
16   A. Yes.
17   Q. Okay.
18   A. But there are a lot of Julies.
19   Q. Now, Beth, do you know who Beth is?
20   A. No.  It doesn't say.
21   Q. Okay.  Do you have any suspicions?
22   A. Well, it might be Beth Guajardo, but I'm not
23 sure.
24   Q. Okay.  Was there any Chinese student who went
25 under the English name Beth?

---

158

1    A.  I don't know.
2    Q.  Okay.  Respecting the people who received
3  this email from Lynda De La Vina on November 20,
4  2007, at least the people under the "To:" line, do
5  you see Diane Walz?
6    A.  Yeah.
7    Q.  Do you see that name?
8    A.  Yeah.
9    Q.  She's a UTSA official; is that right?
10   A.  Yeah.
11   Q.  You're suing her in this lawsuit, right?
12   A.  Yes.
13   Q.  Okay.  Todd Wollenzier, he's a UTSA official,
14  correct?
15   A.  Yes.
16   Q.  Daniel Kiley, he's a captain in the UTSA
17  Police Department, correct?
18   A.  Yes.
19   Q.  Dave Hernandez, he --
20   A.  That's that chief of police.
21   Q.  He's the UTSA police chief, right?
22   A.  Yes.
23   Q.  It's copied to four people, Daniel Hollas, do
24  you know that person?
25   A.  I think he works in the Business building.

---

159

1    Q.  UTSA official, correct?
2    A.  I think so, yes.
3    Q.  Katherine Pope, UTSA official, correct?
4    A.  Yes.
5    Q.  Caron Kiley?
6    A.  Don't know who she is.
7    Q.  Kyle Snyder?
8    A.  Yeah.  I know who she is.
9    Q.  UTSA official, also, correct?
10   A.  Yes.
11   Q.  All right.  Now, are you -- is it your
12  contention that it's not true that you had a gun in
13  your glove box of your car in 2007?
14   A.  Absolutely not true.
15   Q.  Okay.  Do you own firearms?
16   A.  No.
17   Q.  Is that a condition of any kind of --
18   A.  I'm not on patrol or probation.
19   Q.  Okay.
20   A.  But, no, I just don't own any.
21   Q.  Okay.  So this is erroneous in your opinion?
22   A.  It's an absolute lie.
23   Q.  Okay.
24   A.  And for it to be spread around with reckless
25  disregard as to the truth especially in this day and

---

160

1  age with Columbine and all that other nonsense.
2    Q.  Okay.  And you see here the sentence, "I do
3  not know if this is accurate but thought I should
4  report to you all"?  Do you see that?
5    A.  Well, yeah.  And that's a completely
6  disingenuous statement in my position, you know.  Why
7  make such a -- well, I don't really -- somebody
8  reported that a space alien landed on the quad, but I
9  don't really know if it's accurate or not, but I
10  thought I'd report it to you-all.
11   Q.  Do you know -- if Dean De La Vina received
12  this report, do you think it was a reasonable thing
13  for her to do to share it with these officials in the
14  way she did here on this email, G?
15   A.  I don't know how she received the report or
16  exactly how she disseminated.  All I know is, the
17  effects of that report hurt me greatly.
18   Q.  Okay.  Well, let me ask you, backing up,
19  assuming the truth of what she reports in this email,
20  do you think it was reasonable for her to share her
21  communication that she did with the people listed
22  under the "To:" in the copy line?
23   A.  No, I do not think it was reasonable.
24   Q.  You don't?
25   A.  No --

---

161

1    Q.  Okay.
2    A.  -- because it consists of at least triple
3  hearsay, if not double hearsay.
4    Q.  All right.  And that's even in spite of your
5  invocation of Columbine and other nonsense going on
6  in the world today?  Is that the position you're
7  taking?
8    A.  Yes.
9        MR. HAGEN:  Okay.  Let's go ahead and
10  change the tape.
11       THE VIDEOGRAPHER:  This is the end of
12  Tape No. 3.  We are off the record at 2:09.
13       (BRIEF RECESS)
14       THE VIDEOGRAPHER:  This is the
15  beginning of Tape No. 4.  We are back on the record
16  at 2:17.
17       THE WITNESS:  One point I'd like to
18  make --
19       MR. HAGEN:  Sure.
20       THE WITNESS:  -- where we sort of left
21  off --
22       MR. HAGEN:  Okay.
23       THE WITNESS:  -- is that this case in
24  particular, I haven't looked at it in a couple of
25  months.

---

162

1    Q.  (BY MR. HAGEN)  Are you referring to the case
2  now pending in federal court?
3    A.  Yes.
4    Q.  Okay.
5    A.  The federal case as well as the case on
6  Danielle Xu.  You know, when I'm not working on
7  something in front of me, I put it in a drawer
8  somewhere, and I leave it there until it's time to
9  pull it out.  So, you know, I -- I haven't really
10  thought about this case at all, and, you know, that's
11  why my answers aren't specific on a lot of the
12  details.  And sometimes when my memory gets jogged,
13  of course, then I'll remember like what we were
14  talking about earlier with the telephone court
15  hearing in front of Judge Rios.  But this case, you
16  know, I hadn't thought about it in -- in months.
17    Q.  Okay.  Anything else?
18    A.  No.
19    Q.  Respecting -- before we leave off of
20  Danielle Xu and her case where you sued her for
21  defamation and that's pending in the Bexar County
22  Court at Law, did you pay a visit to her apartment
23  earlier this week?
24    A.  No.
25    Q.  Okay.  You didn't go there on Monday night?

163

1    A.  No.
2    Q.  Okay.  You didn't knock on her door for 15
3  minutes --
4    A.  No.
5    Q.  -- and want her to answer the door?
6    A.  No.
7    Q.  Okay.
8    A.  Monday night, I'm trying to figure out what I
9  was doing.  I was watching the football game.
10    Q.  You do know where she lives, though?
11    A.  Wait.  No.  I was watching Heroes.  I wasn't
12  watching the football game.  I was watching Heroes.
13    Q.  Okay.  You do know where she lives, though?
14    A.  Well, I think, but she -- well, actually, no,
15  I don't, because I remember at the place where I
16  thought that she lived at the sheriff's deputy -- I
17  had the sheriff deputy go over there and -- and try
18  to serve her with the lawsuit.  Okay.  And the
19  sheriff deputy came back saying that she didn't live
20  there anymore, that that's what he was told by them,
21  that he didn't -- that she didn't live there anymore.
22  So the only way I could get her served was when I saw
23  her at school.  And I brought a private process
24  server with me, and then when I -- when I saw her at
25  the school, I pointed to her and said, "There she

164

1  is."  And that's how she got served.  So, no, I don't
2  know where she lives at.
3    Q.  So you knew where she used to live?
4    A.  Where she used to live at, yeah.  She -- I
5  don't even remember the name of the apartments, but
6  they're off Huebner Road because that's where I'd
7  sent the sheriff deputy out there to try to serve her
8  with the paper work.
9        (At this time, an instrument was here
10        marked for identification as
11        Exhibit H.)
12        MR. HAGEN:  Okay.  Let me show you
13  Exhibit G.
14        MS. JENSEN:  H.
15        MR. HAGEN:  H.  I'm sorry.
16        THE WITNESS:  Is she complaining that
17  I -- saying that somebody came to her door on Monday
18  and was knocking at the door?
19        MR. HAGEN:  I'm asking the questions
20  here, Mr. Retzlaff.
21        THE WITNESS:  Well, I mean, if --
22        MR. HAGEN:  It's --
23        THE WITNESS:  -- things of defamation
24  are being made, I guess it's --
25        MR. HAGEN:  It's Defendants -- it's --

165

1  I'm sorry.  I didn't want to interrupt your school of
2  thought.
3    Q.  (BY MR. HAGEN)  What gives rise to another
4  defamation claim in your opinion?
5    A.  Well, if she is claiming that I was out there
6  knocking on her door for 15 minutes, as you said, on
7  this Monday night --
8    Q.  That gets her sued by you?
9    A.  Well, yeah, because that would constitute, I
10  guess, harassment maybe or something like that and
11  plus the fact that she's your client.  And if you'll
12  recall, we did have a client where you asked me not
13  to speak with her, and I haven't.
14    Q.  Okay.
15    A.  And so I don't even know where she lives now.
16  I know where she used to live at, and I mentioned to
17  you the problems I had getting her served because
18  she's not living where she's at now.
19    Q.  Okay.
20    A.  So --
21    Q.  So let's -- turn our --
22    A.  But if somebody is making accusations saying
23  I'm doing something when I didn't, then, you know,
24  obviously that's a problem.
25    Q.  That gets them sued, right?

166

1    A.  It certainly could.
2    Q.  Okay.  Let's turn to Exhibit H which is an
3  email exchange.  Do you recognize this as an email
4  that you sent to her and that she responded to you
5  about?
6    A.  Yes.
7    Q.  Okay.  A few questions about this email.
8  Looking at the second paragraph of it, do you see
9  that, "I know that the Chinese students are very
10  poor..."?  Do you see that?
11    A.  Yes.
12    Q.  Okay.  So it would not -- and this is -- I'm
13  sorry.  Strike this.  It reads like this:  "I know
14  that the Chinese students are very poor, so it was
15  not difficult for me to find someone who would agree
16  to give me information in exchange for money."  Do
17  you see that?
18    A.  Yes.
19    Q.  Then you say, "The girl shared with me
20  information that leads me to believe that you have
21  engaged in misconduct against me."  Do you see that
22  sentence?
23    A.  Yes, I see that.
24    Q.  Who is the girl?
25    A.  I'm sorry.  I can't talk about that.

167

1    Q.  You won't divulge who the girl was who shared
2  with you information that led you to believe that
3  you -- that she engaged in misconduct against you.
4  You won't tell me that?
5    A.  I am not going to answer anything about that.
6    Q.  Okay.
7    A.  I'm going to rely on privilege.
8    Q.  Okay.  What privilege?
9    A.  Well, I don't know.  It could certainly be
10  work product privilege.
11    Q.  Okay.  So you're refusing to answer the
12  question about the girl that is mentioned here.  What
13  about the information?  What information was it?
14    A.  Again, I'm not going to answer any questions
15  about that.
16    Q.  Okay.  Then you say that led you to believe
17  that you, meaning Danielle, having engaged in
18  misconduct.  What misconduct?
19    A.  I think that was more of a general statement
20  of misconduct as opposed to a specific claim of
21  misconduct.  I can't recall exactly what my thoughts
22  were behind this because this was seven months ago.
23    Q.  Okay.  So here in February of 2008, a couple
24  of paragraphs later, you say that you want to meet
25  her at a Starbucks or McDonald's, and you give a

168

1  particular location.  Do you see that?
2    A.  Yes.
3    Q.  And you say that would be most convenient for
4  her in your opinion; is that --
5    A.  Yes.
6    Q.  -- right?  That's because you knew where she
7  was living, right?
8    A.  No.  Because it's close to UTSA.
9    Q.  And --
10    A.  That's the closest Starbucks to UTSA that I
11  know of, is the one down there at De Zavala right off
12  I-10.
13    Q.  Okay.
14    A.  There's a Barnes & Noble or there's the
15  McDonald's that's across UTSA.  But I just offered
16  those as areas that I knew that were close by --
17    Q.  Okay.
18    A.  -- to school that were public locations.
19    Q.  In your lawsuit against her filed in Bexar
20  County Court at Law, Cause No. 336876, in Paragraph 3
21  of it, you actually provide her apartment number,
22  don't you?
23    A.  Well --
24    Q.  And the apartment is on Huebner Road, right?
25    A.  On Huebner Road.

169

1    Q.  Huebner?
2    A.  That's what I thought it was, but apparently
3  it's not.
4    Q.  Okay.  So here you are also setting out a
5  location that's between De Zavala and Huebner, right?
6    A.  Well, I gave where the location was at.  And,
7  again, whether it was convenient to the school or
8  convenient where I thought that she lived at, or
9  seemed like a fair spot.  I certainly wasn't going to
10  pick someplace on the east side of town or, you know,
11  New Braunfels or someplace ridiculous like that.
12    Q.  But you wanted to get her to meet you off
13  campus someplace?
14    A.  Well, I didn't want this to be on campus just
15  because of all the different problems that had been
16  going on on campus, but I felt that it was a neutral
17  location, a public location.
18    Q.  Okay.  In the next paragraph, you say -- you
19  make reference to Zhu Lan and that -- do you see
20  that?
21    A.  Yes.
22    Q.  She is Julie, correct?
23    A.  Yes.
24    Q.  All right.  And the final -- or next to last
25  sentence of that paragraph, you say, "How could I

170

1  know this stuff about you but for her and what she
2  said?"  Do you see that?
3     A.  Yeah, I see it.
4     Q.  What stuff are you referring to?
5     A.  Well, that goes into the area that I can't
6  talk about.
7     Q.  Okay.  Refuse to --
8     A.  Well, it's because of a national security
9  nondisclosure agreement.
10    Q.  Okay.  In the next paragraph, you make
11 reference to Julie getting in -- you characterize it
12 as getting into trouble with the university in
13 November --
14    A.  Uh-huh.
15    Q.  -- correct?
16    A.  Yes, correct.
17    Q.  Is that in relationship to the complaint she
18 filed at the UTSA Police Department against you?
19    A.  That is in reference to the fact that it's my
20 position that the university cares more about its
21 programs than it does about its students.  And when
22 two students cause problems for that program,
23 especially two little people, they're likely to get
24 squashed so the university can keep its cash cow
25 coming in.  That's basically what I meant about that.

171

1  This Liu program is the biggest deal at UTSA, the
2  biggest donor, and, you know, when it comes to choose
3  between a student and a donor, of course, the money
4  is always going to win.
5     Q.  Okay.  On Page 2 of this Exhibit H on the
6  first full paragraph that's just two sentences, you
7  tell Danielle, quote, "You should know that a lawsuit
8  has already been prepared with your name on it.  It
9  is ready to be immediately filed with the court this
10 week."  Do you see that?
11    A.  Yes, I see that.
12    Q.  Is that the lawsuit that is now removed to
13 federal court that we're here in connection with, or
14 is that, I guess, the state court lawsuit that we've
15 made reference to and that is numbered Cause No.
16 336876?
17    A.  Yeah.  That would be the state court lawsuit.
18    Q.  Okay.  The one against Danielle --
19    A.  Yes.
20    Q.  -- right?  Okay.  So here you tell her you're
21 going to sue her, but she can do certain things to
22 prevent getting sued; is that right?
23    A.  Well, I said that "If I'm making a mistake,
24 I'd like to give you an opportunity to explain" --
25    Q.  Okay.

172

1     A.  -- just like I gave the same thing with your
2  client, Kyle Snyder, an opportunity to explain.
3     Q.  Okay.  Then in the --
4     A.  I felt that it was only fair.
5     Q.  -- last really big paragraph of your email,
6  you say, "Danielle, I hope that you understand that I
7  cannot allow this kind of thing to go unchecked."  Do
8  you see that?
9     A.  Yes.
10    Q.  What kind of thing are you talking about?
11    A.  People making false statements about me.
12    Q.  Okay.  And are you talking about Danielle
13 making a false statement against you?
14    A.  I think it was just more of my belief in
15 general.
16    Q.  Okay.  That you're going to what?
17    A.  I don't know.  This was, again, seven months
18 ago.  I don't really recall.  And sometimes I'll just
19 type stuff on emails just to type without really
20 paying attention or caring what it is I'm typing
21 about.
22    Q.  Okay.  So you wanted to meet with Danielle,
23 and you believed that she was a poor girl from China.
24 Is that the way that you characterize her?
25    A.  I don't believe I characterize her that way.

173

1  And truly it's not relevant whether she's rich or
2  poor.
3     Q.  Okay.
4     A.  You know, I know that the Chinese exchange
5  students in general are poor.
6     Q.  You tell Danielle that you have a lawsuit
7  here pending against her that you're prepared to
8  file, correct?
9     A.  Yeah.  I think so.
10    Q.  You want her to do certain things, to meet
11 you and so forth, in order to avoid getting sued?
12    A.  Well, I'd like to give her an opportunity to
13 explain her side of it.
14    Q.  Okay.  You -- in reference to this other
15 Chinese student, Julie, who you've sued, you had a
16 sexual relationship with Julie, correct?
17    A.  Yes, we did.
18    Q.  Okay.  Let's go on and actually return to the
19 subject of the lawsuit that's removed to federal
20 court against Dean De La Vina and other UTSA
21 officials.  We've talked about defamation.  Do you
22 remember all that?
23    A.  I don't know.  We've talked about a lot of
24 stuff.
25    Q.  Okay.  But we've kind of covered defamation

174

1 in relationship to this federal lawsuit, right?
2    A. Yeah, I guess.
3    Q. Okay. So I need to ask you about another set
4 of allegations you're making. Those are about
5 privacy. Why have you sued Dean De La Vina for
6 violation of privacy?
7    A. Well, those guys got the UTSA Police
8 Department to give them access to my criminal history
9 information.
10    Q. Okay. And you're making that allegation
11 against all four of them? I'm referring to all four
12 of the Defendants.
13    A. Yeah.
14    Q. Actually -- yeah, four. And what is your
15 particular knowledge that that occurred, that they
16 got the UTSA Police Department to give them access to
17 your history?
18    A. Well, there's email exchange between De La
19 Vina and Walz and a bunch of other people in which
20 the matter is discussed. I think the first email
21 that I saw was -- I remember because it was Veterans
22 Day.
23    Q. Let me ask you how -- you saw before today's
24 deposition Exhibit G, correct, or not? That's the
25 email that Dean De La Vina sent to a handful of UTSA

175

1 officials about what she heard?
2    A. I'm not sure if I have or not.
3    Q. Okay. You may have not ever saw that one?
4    A. I'm not sure.
5    Q. Okay. So in relationship to what you say is
6 your basis for filing the violation of privacy
7 lawsuit, you refer to other emails, right?
8    A. Yeah.
9    Q. What are you referring to?
10    A. I don't know what you mean by that.
11    Q. Well, I'm trying to find out what gives rise
12 to your belief that the Defendants in this case
13 unlawfully got access to your criminal record
14 history?
15    A. Yeah.
16    Q. What -- I mean, what is --
17    A. Oh.
18    Q. -- the basis for that belief that they
19 unlawfully got access to your criminal record
20 history?
21    A. Because I know they did. They made specific
22 references about things. I just remember looking
23 through that pile of emails stuff from Todd
24 Wollenzier that there was some stuff in there.
25    Q. You were aware that in the public domain you

176

1 can find, you know, criminal court opinions where
2 your name is a party to it?
3    A. Yeah.
4    Q. And it discusses your criminal history.
5 You're aware of that, right?
6    A. No, it doesn't discuss my criminal history.
7 It discusses the writ of habeas corpus that I won in
8 the unlawfully carrying a weapons case, and it does
9 make reference to the fact that there was the charge
10 for unlawfully carrying a weapon.
11    Q. And then you --
12    A. But that is it.
13    Q. And there's a publicly available opinion
14 where it documents your tampering with evidence.
15 Were you aware of that?
16    A. I don't think so, but it wouldn't surprise
17 me.
18    Q. Okay. So lots of this stuff is available in
19 the public domain, isn't it?
20    A. But you're not allowed to have the police
21 department run criminal record checks for you.
22    Q. And that's your position as a matter of law,
23 that you can't do --
24    A. Well, I even quoted the state law, the
25 Government Code.

177

1    Q. Okay. Under any circumstance as a matter of
2 law and you think that that prohibition was violated,
3 and you --
4    A. Yes, I do.
5    Q. -- further believe you can sue all four of
6 these women for that?
7    A. Yes.
8    Q. And what is your basis for believing that
9 each one of them did that?
10    A. Because all their names were on the emails.
11    Q. Okay.
12    A. And if your name is on an email, then -- then
13 you're going to get sued because you're all a part of
14 it either as an illegal recipient or as the legal
15 obtainer.
16    Q. Okay. That may bring us to Subparagraph 8 of
17 your petition that's removed to federal court. It's
18 an allegation of civil conspiracy. Do you see that?
19    A. Yes.
20    Q. What is your theory for why these people are
21 being sued for civil conspiracy?
22    A. Well, it's a little bit early yet to -- to
23 really go into these. Discovery is just starting in
24 this case, and my ideas might change as -- as I learn
25 more about what happened.

178

1    Q.  Okay.  So I'm asking you for what your ideas
2  are --
3    A.  So it's too premature.
4    Q.  I'm asking you what your ideas are as we sit
5  here today for why you're alleging civil conspiracy.
6  Do you have anything to say?
7    A.  Well, with regards to them attempting to gain
8  access to my criminal history information.
9    Q.  Okay.  Anything else?
10    A.  I'm not sure.
11    Q.  Anything else as we sit here today?
12    A.  I said I'm not sure.
13    Q.  I mean, you can say -- if there's nothing
14  else that you know of as we sit here today, just tell
15  me so.
16    A.  I could if there was nothing else, but right
17  now I'm saying I'm not sure.
18    Q.  Okay.
19    A.  If you want, I can make something up.
20    Q.  No.  I just want to here exhaustively why
21  you've set out this --
22    A.  Well, I can't give it --
23    Q.  -- claim and --
24    A.  -- to you exhaustively.  This case has just
25  started.

179

1    Q.  I'm asking you exhaustively why it is that
2  you've created this paragraph that runs over Pages 3
3  and 4 of this case that's now in federal court.
4    A.  Well, the paragraph is only eight sentences
5  long.
6    Q.  Right.  So --
7    A.  In any event, I can't list it to you
8  exhaustively.
9    Q.  So have we discussed all the reasons so far
10  as we sit here today that you created this allegation
11  against these four people?
12    A.  No, we haven't, you know.
13    Q.  So what else is it?  What else is it that
14  gave rise to you writing these words on Pages 3 and 4
15  of your complaint?
16    A.  Well --
17    Q.  What else?
18    A.  What else is it?  This case has just started,
19  and discovery hasn't even been going on yet.
20    MR. HAGEN:  Okay.  Objection,
21  nonresponsive.
22    Q.  (BY MR. HAGEN)  Under Count 4, you allegation
23  violation of civil rights, and you make reference to
24  the First, Fifth and Fourteenth Amendments, and those
25  are grounds for suing each of the four Defendants.

180

1  Do you see that?
2    A.  Yes, I do.
3    Q.  Under the First Amendment, why have you sued
4  each of these Defendants?
5    A.  For violating my right to free speech, my
6  right to be able to talk to the FBI about anything I
7  want to talk about or to bring to public attention
8  anything I want to talk about.
9    Q.  Okay.  Tell me what was done to violate your
10  free speech right by Defendant De La Vina?
11    A.  That she started this ball rolling to get me
12  kicked out of school.
13    Q.  And you're alleging that she started the ball
14  rolling in retaliation for what?
15    A.  For the problem with the Chinese exchange
16  program.
17    Q.  Okay.  And can you tell me in particular what
18  it was under the First Amendment that you did that
19  makes that actionable in this lawsuit?
20    A.  Well, first off, my right to association with
21  the female of my choice.
22    Q.  Well, let's start with speech.
23    A.  Speech, right.
24    Q.  So what speech are you talking about that
25  Dean De La Vina retaliated you against by in your

181

1  opinion starting the ball rolling and getting you
2  kicked out of the university?
3    A.  Well, going to and cooperating with the FBI.
4    Q.  How did she do that?
5    A.  How did she do what?
6    Q.  How did she interfere with that or how did
7  she -- or you're saying that she retaliated against
8  you because you talked to the FBI?
9    A.  That's what started this whole disciplinary
10  process --
11    Q.  Okay.  Who --
12    A.  -- is because of that.
13    Q.  Why do you believe that she retaliated
14  against you for talking to the FBI?
15    A.  Because but for the fact of my goings-on with
16  this Chinese girl, none of this would have happened.
17    Q.  So are you talking about Julie, the Chinese
18  girl?
19    A.  Yes.
20    Q.  Okay.  So you had a relationship with Julie?
21    A.  Yeah.
22    Q.  And it --
23    A.  And it turned --
24    Q.  -- went sour?
25    A.  -- turned out she was a commie spy.

182

1    Q.  Okay.  So that relationship went sour.  You
2  created an opinion that she was a spy for Red China?
3    A.  I didn't create the opinion.
4    Q.  I'm just saying, what was going on in your
5  brain?  Did you create the opinion -- did you form
6  the opinion that she was spying for the Republic of
7  China?
8    A.  No.  It was the FBI who came to me.
9    Q.  Okay.  So let's connect this.  You were
10 approached by the FBI after, what, you complained to
11 the FBI?
12   A.  No.  I didn't even talk to anybody from the
13 FBI until they showed up on my doorstep one evening.
14   Q.  Okay.
15   A.  It was like on a Thursday or something, and
16 that's when they called Mr. Martinez up saying, you
17 know, "The FBI is knocking on my door" --
18   Q.  Okay.  So tell --
19   A.  -- "What should I do?"
20   Q.  Tell me when that happened.
21   A.  Well, it was in the early part of November --
22   Q.  Okay.
23   A.  -- of last year.
24   Q.  November of 2007?
25   A.  Yes.

183

1    Q.  Okay.  So you're saying that you never
2  contacted the FBI, that FBI contacted you only?
3    A.  Yes.  They came to me first.
4    Q.  Okay.  Who contacted you?
5    A.  I cannot say.
6    Q.  You can't tell me the name of the FBI agent?
7    A.  I signed a nondisclosure agreement.  I can't
8  talk about it.
9    Q.  Okay.  Did the person give you a, you know,
10 field operation office --
11   A.  There were two persons.
12   Q.  Okay.  Did the people tell you from which
13 office they were operating?
14   A.  A guy came from Washington, D.C., and he met
15 with --
16   Q.  And a San Antonio, also, FBI agent?
17   A.  It was from Washington, D.C., came out --
18   Q.  Okay.  Did you meet with any -- or did --
19 at -- in November of 2007 when they came, you said,
20 to your apartment or where?
21   A.  Well, there was several instances.  The first
22 time -- when I had the very first contact with them
23 was at my apartment.
24   Q.  Okay.
25   A.  And then later on it was at their offices.

184

1    Q.  So you're claiming that the FBI visited you
2  at your home and you visited them at their offices
3  where, in San Antonio?
4    A.  I'm not --
5    Q.  You can tell me where the FBI office was?
6    A.  Well, San Antonio, yes.
7    Q.  Okay.
8    A.  Yes.
9    Q.  Great.
10   A.  Yes.
11   Q.  Thank you.
12   A.  That was where one of the visits took place.
13   Q.  So you're saying that in response to your
14 visiting the FBI, Dean De La Vina took action
15 against you?
16   A.  I'm saying that as a result of the FBI's
17 inquiry into this Chinese exchange program and all
18 this stuff that's been going on about it that that's
19 the only reason why I got kicked out of school.
20   Q.  Okay.  So my question is, as a result of your
21 visiting with the FBI, is that what caused in your
22 theory Dean De La Vina to start a ball rolling from
23 your point of view to result in your --
24   A.  Yes.
25   Q.  -- discharge from the MBA program?

185

1    A.  Yes.
2    Q.  Okay.  And what is the basis for that belief?
3    A.  My education based on experience and what I
4  feel of the situation.
5    Q.  Anything else?
6    A.  I'm not sure what else I can say at this
7  time.  Like I said, I wasn't prepared for this
8  deposition.
9    Q.  Okay.  Any other retaliatory action by Dean
10 De La Vina other than what you've already said?
11   A.  Well, I do know that they tried -- initially
12 Kathy Pope tried to stop my registration for the
13 spring semester in the program, but then when I
14 complained about that, I was allowed to go ahead and
15 register.  She did that on your own.
16   Q.  Okay.  You're talking about Kathy Pope.  I'm
17 talking about Dean De La Vina.
18   A.  Yeah.
19   Q.  We'll get to Kathy Pope.
20   A.  Yeah.  Dean De La Vina, the former United
21 States government official for the Clinton
22 administration, yes.
23   Q.  Okay.
24   A.  Okay.
25   A.  She sounds like, by the way, a perfect

186

1 candidate for someone who would want to retaliate
2 against you for talking to the FBI.
3    A.  Well --
4    Q.  That theory is just marvelous.
5    A.  And --
6    Q.  You know that --
7    A.  Really.
8    Q.  -- Mr. Retzlaff?
9    A.  Well, I do remember a wife of a certain
10 president who retaliated against the White House
11 travel office because of certain people speaking to
12 certain FBI people.  And then if we want to --
13    Q.  Okay.
14    A.  -- talk about --
15    Q.  Okay.
16    A.  -- somebody else who supposedly committed
17 suicide in a -- in a state park, but really didn't
18 perhaps.  We can --
19    Q.  You're talking about Vince Foster now?
20    A.  Sure, of course.
21    Q.  Okay.
22    A.  If we want to throw out all kinds of
23 conspiracies involving Whitewater.
24    Q.  Staged moon landings --
25    A.  Well, no.

187

1    Q.  -- and Hollywood?
2    A.  I'm just saying if we're going to throw out
3 conspiracies, we might as well throw them all out.
4    Q.  Black helicopters?
5    A.  Yeah.  Actually there are Black helicopters.
6    Q.  Going back to this, though, and this theory
7 that you have against Dean De La Vina, seriously I
8 want to understand.
9    A.  Sure.
10    Q.  Your point of view is, she got the ball
11 rolling on your disciplinary discharge, and she did
12 that in retaliation for your visiting with the FBI.
13 Is that kind of what it comes down to?
14    A.  Yeah, basically.  But for you, you know, my
15 goings-on with this Chinese girl and the fallout as a
16 result of that, I would not have been expelled from
17 UTSA.
18    Q.  Okay.
19    A.  And that's -- and that's the thing that's
20 just got me steamed the most --
21    Q.  Okay.
22    A.  -- you know, is before this happened, before
23 this relationship, I was just a normal student just
24 going about UTSA, you know, and -- and stuff like
25 that, you know.  And then this thing comes up with

188

1 the Chinese girl, and then we've got the Liu program
2 involved and the embarrassment that this is the first
3 time in the history of Liu program that anything like
4 this has ever happened, you know.  And, of course,
5 Richard Liu is their big benefactor, and when all of
6 this was taking place is when they were up for review
7 for their grant to determine whether or not there
8 would be future grants from Mr. Liu to continue on
9 with this program.  So any kind of embarrassment, you
10 know, obviously they're going to want to squash, and
11 they're obviously going to want to get rid of the
12 people that caused it.  That's why Julie got kicked
13 out of school, and that's why I got kicked out of
14 school.
15    Q.  So let's go back to why you're suing Dean De
16 La Vina.  Is there any other reason under the First
17 Amendment that you're suing Dean De La Vina?
18    A.  I believe I mentioned it all, my freedom of
19 association --
20    Q.  Actually you didn't detail that.
21    A.  Oh, I thought --
22    Q.  We started with speech.
23    A.  Yeah, speech.
24    Q.  And I think I understand your theory for
25 speech.

189

1    A.  Yeah.
2    Q.  For association, what is the association?
3    A.  Well, for associating with the Chinese girl.
4    Q.  Okay.  So --
5    A.  I just thought I'd throw that in there, too.
6    Q.  -- Dean De La Vina got the ball rolling on --
7 from your point of view on your disciplinary
8 discharge because you associated with Julie, the
9 Chinese student?
10    A.  Well --
11    Q.  Is that what it boils down to?
12    A.  You know, in addition, too, I --
13    Q.  I just --
14        MR. HAGEN:  Objection, nonresponsive.
15    Q.  (BY MR. HAGEN)  I just have to hear from you,
16 is that the association that you're talking about,
17 and is that the retaliation that you're talking
18 about?
19    A.  Well, no.  I was going to say in addition to
20 that.
21    Q.  Yeah.  But is that one thing?
22    A.  That's one thing, yes.
23    Q.  Okay.  What else?
24    A.  All right.  They also wanted to chill my
25 speech.  You know, there was some talk at the time

190

1  that I was going to go to the press about this.
2     Q.  So you're saying that Dean De La Vina,
3  therefore, wanted to get you discharged on
4  disciplinary grounds because of that?
5     A.  To discredit me, yes.
6     Q.  That motivation?
7     A.  Yes.
8     Q.  Anything else under the First Amendment for
9  why you're suing Dean De La Vina?
10    A.  Well -- and because of the lawsuits that I
11 filed against Ms. Snyder and the Chinese girl, Julie.
12    Q.  Okay.
13    A.  She --
14    Q.  So you're saying that --
15    A.  Dean De La Vina was the one who was
16 responsible for initiating the disciplinary
17 proceedings against me --
18    Q.  Okay.
19    A.  -- at UTSA.
20    Q.  But just as far as what your theory is for
21 her motive and whatever role she played in the
22 disciplinary discharge, you're also saying that she
23 was motivated by the fact that you filed a lawsuit
24 against Julie?
25    A.  Yes.

191

1     Q.  Okay.
2     A.  And the Liu foundation.
3     Q.  Any other reason?  I mean, we're talking
4  about the First Amendment now --
5     A.  Yeah.
6     Q.  -- in theory, not about, you know --
7     A.  I know.  And it's tough for me to break it
8  down like that because they're all part of the
9  constitution.  So --
10    Q.  Well -- but we have to break it down.
11    A.  I know that.  And I'm --
12    Q.  So let me exhaust and finish understanding
13 from your point of view why you're suing Dean De La
14 Vina under the First Amendment.  Anything else?
15    A.  Yeah.  I mean, you know, the First Amendment
16 just isn't the right to free speech.  It's the right
17 to petition the courts and the right to have access
18 to courts.
19    Q.  So that's where this --
20    A.  And so --
21    Q.  -- theory comes in --
22    A.  Yes.
23    Q.  -- from your point of view that --
24    A.  Yes.
25    Q.  -- she -- you sued someone and you're

192

1  retaliated against because -- in particular by Dean
2  De La Vina because she started the ball rolling from
3  your point of view at least for the disciplinary
4  discharge?
5     A.  Yes.
6     Q.  Okay.  Anything else under the First
7  Amendment against Dean De La Vina?
8     A.  That's all I can think of at this time.
9     Q.  Okay.  There's Ms. Walz -- Diane Baker Walz.
10 Why have you sued her under the First Amendment?
11    A.  Same things.
12    Q.  Okay.  You --
13    A.  I mean, I look at them as being one and the
14 same individuals because they're all -- they all work
15 out of the same office.  They all do the same things.
16    Q.  Okay.  Any other reason for suing Kyle
17 Snyder --
18    A.  And I --
19    Q.  -- under the First Amendment?
20    A.  Okay.  I was also going to mention Dr. Walz
21 also did say that she did attempt to gain copies of
22 my criminal history from the UTSA Police Department
23 during my student disciplinary hearing.  She did
24 admit to doing that.
25    Q.  Okay.  So here we're skipping back to the

193

1  violation --
2     A.  Yeah.
3     Q.  -- of privacy claim --
4     A.  Yeah.
5     Q.  -- that you're trying to make out?
6     A.  Yeah.
7     Q.  Going back to the First Amendment and your
8  lawsuit against Kyle Snyder, any other reason for
9  suing her under the First Amendment other than what
10 you've stated about why you're suing first Dean De La
11 Vina and in the second place apparently all the
12 Defendants?
13    A.  Yes.
14    Q.  Anything else about her under the First
15 Amendment?
16    A.  Just them using the UTSA Police Department as
17 a tool to harass and retaliate against me.
18    Q.  Okay.
19    A.  So the access --
20    Q.  So that's a claim you're also asserting under
21 the First Amendment?
22    A.  Yes, as they're using them as a tool to
23 engage and harass and retaliation against me.
24    Q.  Who are you suing under that theory under the
25 First Amendment?

194

1    A.  De La Vina and Walz and Snyder.
2    Q.  Okay.  Now, respecting Katherine Pope, why
3  are you suing her under the First Amendment?
4    A.  She was the one who tried to stop me from
5  being able to register for the spring semester.  She
6  just unilaterally on her own and -- you know, and
7  tried to stop me from registering --
8    Q.  Okay.  Let me ask you --
9    A.  -- without any kind of due process from the
10  university regulations or anything.
11    Q.  And now you're talking about due process.
12  What I'm talking about is First Amendment.  So I
13  understand that you complained against Katherine Pope
14  for in your opinion trying to obstruct you from
15  registering for classes in the spring semester of
16  2008, correct?
17    A.  2008, yes.
18    Q.  Okay.  What do you believe was her motivation
19  for doing that under the First Amendment, anything,
20  or is that more of a due process you're claiming?
21    A.  Well, again, because of this thing going on
22  with the Chinese exchange students.
23    Q.  So her motivation was the same motivation
24  that you've attributed in your testimony to Dean De
25  La Vina?

195

1    A.  Yeah.  They wanted me kicked out of school.
2    Q.  Okay.  And in particular do I understand
3  under the First Amendment the body of reasons why you
4  believe they wanted that done?
5    A.  No, I don't think you do, because I'm
6  probably doing a really lousy job of explaining it
7  because I'm really tired and I really haven't thought
8  about this stuff.
9    Q.  Okay.  Well, if you have nothing else to add
10  at this time to the First Amendment issues that you
11  raise, then I'd like to ask you about the Fifth
12  Amendment and your theories for suing each one of the
13  four Defendants under the Fifth Amendment.
14    A.  Yes.
15    Q.  Can I ask you about that now?
16    A.  Sure.
17    Q.  Okay.  Why are you suing the Defendants under
18  the Fifth Amendment?
19    A.  Well, the Fifth Amendment, of course, ties in
20  with the Fourteenth Amendment and the right to due
21  process.  And, you know, by trying to summarily get
22  me kicked out of school, you know, with this decision
23  not to allow me to enroll in the spring semester,
24  that was a violation of my rights.  In addition, by
25  De La Vina trying to exert her influence to direct

196

1  and suggest that this particular punishment be
2  imposed upon me, you know, in the Army we call that
3  undue command influence, and that's what she was
4  involved in.  This complaint is mainly directed at
5  Dean De La Vina -- Lynda De La Vina, you know, by not
6  allowing me to have access to the witnesses I need,
7  to the documents that I need and as well as setting
8  up this hearing in such a fashion that I -- it was
9  designed for failure, that I could not win.  You
10  know, she couldn't have picked a worse hearing
11  officer for me to have than that first hearing
12  officer, that Mansour El-Kikhia guy.
13    Q.  That guy got recused, correct?
14    A.  Well, he did it on his own because I pointed
15  out to him some things, that, you know, saying maybe
16  you don't want to become a part of this because
17  you'll end up getting sued.
18    Q.  So you moved to recuse him; he refused,
19  correct?
20    A.  Yeah.
21    Q.  And then you got Daniel Escobar as your
22  hearing officer?
23    A.  Yeah, which again, though, how can I have a
24  fair hearing and it's the university that's punishing
25  me and the university that's acting in judge, jury

197

1  and executioner and when I can't call witnesses on my
2  half that I want to call and when I can't have access
3  to documents that I need on my behalf.
4    Q.  And --
5    A.  That's simply not fair.
6    Q.  And let's -- let me go back to this
7  Paragraph 14 of your petition where you raise the
8  Fifth Amendment, and you also in concert with the
9  Fifth Amendment invoke the Fourteenth Amendment which
10  is after the Fifth Amendment in that paragraph.  Do
11  you see that?
12    A.  Yes.
13    Q.  Are -- is the basis for your theory for suing
14  under the Fifth and Fourteenth Amendments the same?
15  It's due process?
16    A.  Due process, equal protection, you know, that
17  similarly situated students weren't treated the same
18  way.
19    Q.  Okay.  So let me ask you first about due
20  process.  What other reasons do you have for suing
21  the Defendants in this case for due process
22  violations?
23    A.  I'm sorry.  Could you repeat your question?
24    Q.  Sure.  What other reasons are you suing the
25  Defendants in this case for due process violations?

198

1    A. You mean other than about this disciplinary
2 hearing.
3    Q. Sure, or things --
4    A. Right.
5    Q. -- associated with it that --
6    A. Right.
7    Q. -- you already testified to.
8    A. Right, things associated with the
9 disciplinary hearing.
10    Q. Okay. And apart from what you've detailed
11 about that process, is there any other complaint that
12 you have against these Defendants that gives rise to
13 your due process claims?
14    A. Not that I can think of right now. I may
15 wish to supplement that.
16    Q. There is the equal protection claim that you
17 just made reference to --
18    A. Yes.
19    Q. -- correct?
20    A. Yes.
21    Q. What is your basis for suing the Defendants
22 in this lawsuit under the equal protection claim?
23    A. Well, interestingly enough as I've been able
24 to do a little bit of discovery in some of these
25 lawsuits, I obtained a record of past UTSA

199

1 disciplinary hearings going back for like three,
2 four, five years or something like that. And it's
3 interesting where I find that people committed much
4 worse acts of misconduct than I was accused of, yet
5 were allowed to continue with their education at the
6 school. People involved in drug dealing and burglary
7 of dorm rooms and things like that, you know, were
8 allowed to continue their education at UTSA that
9 weren't expelled like I was.
10    Q. What other instances are you claiming
11 exists --
12    A. Well, I can't give you specifics -- I'm
13 sorry.
14    Q. Sure. What other instances are you claiming
15 existed that were treated differently and that gave
16 rise to your equal protection claim?
17    A. I can't give you that right now because I
18 don't have my notes from that. I've only started to
19 review the CD. I looked at it about a month ago, and
20 then I went on to something else. But I don't have
21 my notes that I have from reviewing the CD with me
22 now.
23    Q. Okay.
24    A. And I haven't finished the review --
25    Q. You --

200

1    A. -- either.
2    Q. Okay. You've sued, you know, people in
3 different situations over years in civil lawsuits,
4 including constitutional lawsuits. Do I have that
5 right?
6    A. Yes.
7    Q. You're not claiming that you're a member of
8 any protected class, correct?
9    A. Well, sure, I am.
10    Q. Okay. What is your protected class under the
11 equal protection clause?
12    A. That protected class could be a protected
13 class of one.
14    Q. Okay. So your claim under the equal
15 protection clause is the class of one theory?
16    A. No. That's not what I'm saying. I --
17    Q. Well, I'm asking you.
18    A. I know that. I'm not prepared to make a
19 legal conclusion at this time.
20    Q. Are you any of -- you're a White male,
21 correct?
22    A. Yes.
23    Q. Okay. You're how old?
24    A. 42.
25    Q. When was your birth date?

201

1    A. '66.
2    Q. You were born in the United States?
3    A. Yeah.
4    Q. You were --
5    A. U.S. citizen.
6    Q. You were born -- you're a U.S. citizen.
7 English is your first language?
8    A. Yeah.
9    Q. You were born in Minnesota --
10    A. Yeah.
11    Q. -- where you're from? Where were you born in
12 Minnesota?
13    A. In Rochester.
14    Q. Okay. So --
15    A. The class that --
16    Q. -- alert me at this time if you have any
17 theory that you're a member of a protected class
18 because I'd like to know that.
19    A. Well, the protected class, I think, and
20 without really researching this a whole lot would be
21 the class of students at UTSA. Okay. And then you
22 have the class of students that are disciplined by
23 UTSA. All right. And discipline at UTSA is not
24 handled on an evenhanded basis. Some students
25 receive very lenient discipline. Some students

202

1  receive very harsh discipline.  And --
2     Q.  So when you're alleging a class under the
3  equal protection, what it boils down to a class of
4  one claim?
5     A.  No.  I'm not making that claim.
6     Q.  Okay.  Well --
7     A.  I just throw that out as an example.
8     Q.  Right.
9     A.  Okay.  I don't know what class I'm alleging
10  right now because I just haven't spent a lot of time
11  thinking about it.
12     Q.  Okay.
13     A.  And so, you know, don't try to pin me in a
14  corner on it because I can't.
15     Q.  Is there any other theories that you're
16  asserting under the Fifth or Fourteenth Amendments
17  apart from what we've talked about, due process and
18  equal protection?
19     A.  I'll have to think about that.
20     Q.  Is there any other theory for due process
21  wrongdoing apart from that associated with what you
22  think the Defendants' role in your disciplinary
23  hearing process was?
24     A.  I'll have to think about that.
25     Q.  And nothing occurs to you at this time --

203

1     A.  I don't know.
2     Q.  -- for why you're suing under these theories?
3     A.  Nothing I can think about right now.
4     Q.  Okay.
5     A.  You know, I'm pretty tired and with the
6  medication and stuff like that.
7     Q.  Okay.  That is the end of -- and bear in
8  mind, Mr. Retzlaff, I asked you to tell me if you
9  ever needed a break or if you couldn't be deposed
10  today because of your medication or for any other
11  reason.  Do you remember me asking you that?
12     A.  Yes.
13     Q.  Okay.  And you haven't asked to interrupt for
14  that purpose during the course of today's deposition,
15  have you?
16     A.  Let's just get this done.
17     Q.  Okay.  You haven't asked me to interrupt for
18  that purpose --
19     A.  No.
20     Q.  -- have you?  No?
21     A.  No.  I mean, if I could go home and take a
22  nap for a few hours, that would be cool.  But --
23     Q.  Well -- and we're near the end.  What I'd
24  like you to do right now is tell me, is there
25  anything that occurs to you that you would testify to

204

1  differently as you sit here today in reflection --
2     A.  I'm sure there would be.
3     Q.  -- as you sit here and reflect back on your
4  answers and given answers to questions that I've
5  asked you?
6     A.  I'm sure there would be.
7     Q.  Let me take --
8     A.  I just can't really think of anything right
9  now, and it probably won't come to me for a few days.
10     Q.  Let me take a break for a few minutes.  I'll
11  talk with my client about this, and we'll finish up,
12  you know, within an hour or so for sure.
13          THE VIDEOGRAPHER:  We are off the
14  record at 2:59.
15          (BRIEF RECESS)
16          THE VIDEOGRAPHER:  We are back on the
17  record at 3:19.
18     Q.  (BY MR. HAGEN)  A couple of follow-up things
19  I wanted to ask you.  You made reference to some
20  confidentiality agreement you entered with the U.S.
21  government or the FBI in particular.  Did you invoke
22  that repeatedly as reasons not to answer questions
23  about certain things I asked you?  Do you remember
24  that?
25     A.  What about it?

205

1     Q.  Do you have a confidentiality agreement that
2  prohibits you in your opinion from answering some
3  questions about things I've asked you?
4     A.  Yeah.
5     Q.  Is it with the FBI?
6     A.  Yeah.
7     Q.  Okay.  When -- I'm not going to ask you what
8  the terms of this confidential agreement are.  But
9  how long has it been in place?
10     A.  About 10 months.
11     Q.  Okay.  So that's November of 2007?
12     A.  Yes.
13     Q.  That was put to you, I guess, by the San
14  Antonio based agent -- D.C. based agent that you
15  mentioned, or who gave you this?
16     A.  I'm not going to talk about it.
17     Q.  And you won't tell me the names of
18  these agents that you say presented you with a
19  confidentiality agreement?
20     A.  I'm not sure if I can.  I don't know.  I
21  would -- if I were to ask to stop to ask somebody,
22  you'd probably throw a fit just like this morning
23  when I wanted to stop and --
24     Q.  No.
25     A.  -- ask a question of somebody.

206

1    Q.  No.  What we can do is, you can supplement
2  your answer with information about, you know, if you
3  want -- maybe we'll make a request for the
4  confidentiality agreement and --
5    A.  Well, I think --
6        THE WITNESS:  Did they get a copy of
7  it?  Okay.
8    Q.  (BY MR. HAGEN)  I mean, if you're saying UTSA
9  has been provided a copy of this thing --
10    A.  I'm not sure.  So one of the guys -- well,
11  the guy who signed it, his name is Konkle -- Paul
12  Konkle.  I'm just seeing if I got a copy of it here.
13  I thought I had a copy of it here, but maybe now.
14    Q.  Tell me what -- I mean, can you tell me what
15  it's your understanding it prohibits you from doing?
16    A.  Basically talking -- let's see.
17    Q.  And as you review it if you have it in front
18  of you -- and you seem to have it right in front of
19  you now -- you know, alert me if it says that it
20  can't be disclosed to anybody else, that this
21  agreement that the United States government and Tom
22  Retzlaff have entered into restricts it and makes it
23  somehow super secret and private as just an
24  agreement.
25    A.  It -- the first paragraph says, "Intending to

207

1  be legally bound, I hereby accept the obligations
2  contained in this agreement in consideration of my
3  being granted access to sensitive information from
4  FBI investigations as required to perform my duties."
5    Q.  And it's in reference to your duties?
6    A.  That's -- I just read to you what the
7  language says, okay?
8    Q.  Yeah.  And I don't know who the author of
9  that is or, you know, how it's being constructed
10  since I haven't reviewed it myself, but in any case,
11  go ahead and tell me.  I mean, in other words, is
12  there any place in that thing that says you cannot
13  even show that to other people, the agreement such as
14  it is?
15    A.  "Unless and until I am released in writing by
16  an authorized representative by the FBI, I understand
17  that all conditions and obligations imposed upon me
18  by this agreement apply during the time I am granted
19  access to the sensitive information and at all times
20  thereafter," and that the United States government
21  may seek remedy -- any remedy available to enforce
22  it, including putting me in jail.
23    Q.  Okay.  So there's nothing that says that the
24  agreement itself is somehow secret, right, or
25  confidential?

208

1    A.  I don't know.
2    Q.  Okay.
3    A.  I'm not an attorney.
4    Q.  Well, I'm asking because you raise it
5  repeatedly for the basis of why you would answer or
6  not answer something --
7    A.  Well, I can't answer certain questions, yes.
8    Q.  Yes.  That's why I'm asking, well, is the
9  agreement that you say you're reading from right
10  there itself something that must be kept
11  confidential.  I haven't heard anything from you so
12  far that says the agreement itself must be kept that
13  way, but it's a bridge we don't have to cross right
14  now.  We can cross it later.
15    A.  Yeah.
16    Q.  If you want to read it and re-read it, we may
17  make a discovery request for this thing, and we can
18  cross that bridge at that time.
19    A.  I think by the language of the agreement --
20  well, I'm not sure.  Again, I'm not an attorney, and
21  I'm not a federal judge.  So I can't -- just better
22  safe than sorry.  I guess.
23    Q.  Okay.  So we can take that up with the Court,
24  also?
25    A.  Yes.  One thing I'd like to mention is, it

209

1  kind of makes me a little bit upset that it seems
2  like every time something goes bump in the night you
3  people automatically want to come running to me
4  thinking that, you know, somebody has a knock on
5  their door that it's Tom Retzlaff doing it, and
6  that's sort of upsetting to me.  And if that kind of
7  stuff is going on, that's exactly what this lawsuit
8  is about, is about that kind of nonsense --
9    Q.  Okay.
10    A.  -- you know.  And I'm just really -- I'm not
11  mad at you about it.  I'm just mad at them for
12  creating this culture of fear, for lack of a better
13  term, within their staff or students that I'm some
14  sort of bogeyman when I'm not, you know, and, you
15  know, thinking that I got -- I got better things to
16  do than knock on somebody's door for 15 minutes.  For
17  what purpose, you know?  It just -- anytime that
18  something goes bump in the night, they're
19  automatically going to, you know, come to Tom
20  Retzlaff.  That's just pretty upsetting, and I'm not
21  going to be a scapegoat.
22    Q.  Are you done with your declaration?
23    A.  More of a soliloquy, but go ahead.
24    Q.  With regard to social security number
25  or numbers, you refused to provide that to me?

210

1    A.  Yes.
2    Q.  You have more than one social security
3 number, correct?
4    A.  No.
5    Q.  You only have one?
6    A.  Well, yeah.
7    Q.  You haven't provided the UTSA police with a
8 different number --
9    A.  I don't think --
10   Q.  -- from the one they had on file?
11   A.  I don't think I provided them with anything.
12   Q.  Okay.
13   A.  Not that I recall.
14   Q.  Your position is, you've always just had one
15 social security number?
16   A.  I don't know what I recall saying to the UTSA
17 Police Department about anything.
18   Q.  Do you have any other names that you've gone
19 by in your history?
20   A.  Tom.
21   Q.  Other than Tom, Thomas Retzlaff?
22   A.  Hey, you.
23   Q.  Any names, aliases that you've used?
24   A.  Dickhead.
25   Q.  Any other aliases that you've used?

212

1    A.  Yeah.
2    Q.  When did he last do that, and how much was
3 it?
4    A.  I'm not sure.  It's been a while.
5    Q.  Okay.  Well, what do you estimate?
6    A.  I don't have a clue.  I don't know.
7    Q.  Well --
8    A.  I'm not going to speculate.
9    Q.  -- you said it's been a while?
10   A.  Yes.
11   Q.  Okay.
12   A.  It's been a while.
13   Q.  So a while, do you mean '07, '06, '05?
14   A.  Maybe '04 --
15   Q.  So --
16   A.  -- I think, or thereabouts.  I'm not sure.
17   Q.  And he's given you money since 2004?
18   A.  Occasionally, yes --
19   Q.  Okay.
20   A.  -- especially when I first got out of prison.
21 He had to help me out.
22   Q.  So back in '04 what did he say you owed him?
23   A.  I don't know.
24   Q.  No clue?  How much have you gotten from him
25 since '04?

211

1    A.  No.
2    Q.  You mention that your dad keeps track of how
3 much money you owe him because of money he gives you.
4 Do you remember that?
5    A.  Yeah.
6    Q.  How much has he reported you owe him?
7    A.  I'm not sure.  I remember signing a
8 promissory note 10, 15 years ago for.
9         MR. HAGEN:  Objection, nonresponsive.
10        THE WITNESS:  Okay.  Well, then I'm
11 just going to say I don't know.  I don't know.
12   Q.  (BY MR. HAGEN)  So -- but are you relating
13 the promissory note to which you owe him?  Is that
14 responsive?
15   A.  I'm just going to say I don't know.
16   Q.  Okay.  You earlier in your testimony said
17 that you signed a promissory note, right?
18   A.  Yeah.
19   Q.  Was that in connection with money that he
20 tried to secure basically against you so that you'd
21 give it back to him?
22   A.  I'm not sure what you mean.
23   Q.  Okay.  Has he ever told you, "Hey, this is
24 how much you're up to.  You owe me this much money"?
25 Has he done that?

213

1    A.  I don't know.
2    Q.  Can't estimate, $100?
3    A.  No.
4    Q.  $10,000, $100,000?
5    A.  No; can't speculate.
6    Q.  You have no idea?
7    A.  I haven't really been keeping all that track.
8    Q.  Well, if you tally it in your head right
9 now --
10   A.  You know, and stuff that I get for birthdays
11 or Christmases, you know, I don't know.
12   Q.  How much on average do you get for an
13 occasion like a birthday or Christmas?
14   A.  I think last birthday I think he gave me a
15 couple hundred bucks, but I can't recollect.  I'm not
16 sure.
17   Q.  Okay.  That sounds like you will not make a
18 statement about how much money you've --
19   A.  I'm not sure.
20   Q.  -- been given by family since '04?
21   A.  I'm not sure.
22   Q.  And you will not estimate that amount either?
23   A.  No.
24   Q.  Okay.
25   A.  And it certainly doesn't have anything to do

214

1  with these lawsuits.
2          MR. HAGEN:  Okay.  I think at this time
3  we'll end the lawsuit, but leave the -- in light of
4  the -- some of the statements that the Plaintiff has
5  said in this, we will not pass the witness.  We'll,
6  you know, conclude this portion of this lawsuit at
7  this time.
8          MS. JENSEN:  The deposition.
9          THE WITNESS:  What do you mean by that?
10         MR. HAGEN:  Or this deposition at this
11  time.  And that's all.
12         THE WITNESS:  Well, what do you mean by
13  that?
14         MR. HAGEN:  We're off the record.
15         THE WITNESS:  Well, I thought --
16         THE VIDEOGRAPHER:  This is the end of
17  Tape No. 4.  We are off the record at 3:30.
18         (Whereupon the deposition concluded at
19         3:30 p.m., Wednesday, September 24,
20         2008.)
21
22
23
24
25

216

1  PAGE _____ LINE _____
2  CHANGE
3  _____
4  REASON
5  _____
6  * * * * * * * * * * * *
7  PAGE _____ LINE _____
8  CHANGE
9  _____
10  REASON
11  _____
12  * * * * * * * * * * * *
13  PAGE _____ LINE _____
14  CHANGE
15  _____
16  REASON
17  _____
18  * * * * * * * * * * * *
19  PAGE _____ LINE _____
20  CHANGE
21  _____
22  REASON
23  _____
24  * * * * * * * * * * * *
25

215

1          DEPOSITION AMENDMENT SHEET
2  PAGE _____ LINE _____
3  CHANGE
4  _____
5  REASON
6  _____
7  * * * * * * * * * * * *
8  PAGE _____ LINE _____
9  CHANGE
10  _____
11  REASON
12  _____
13  * * * * * * * * * * * *
14  PAGE _____ LINE _____
15  CHANGE
16  _____
17  REASON
18  _____
19  * * * * * * * * * * * *
20  PAGE _____ LINE _____
21  CHANGE
22  _____
23  REASON
24  _____
25  * * * * * * * * * * * *

217

1  PAGE _____ LINE _____
2  CHANGE
3  _____
4  REASON
5  _____
6  * * * * * * * * * * * *
7  PAGE _____ LINE _____
8  CHANGE
9  _____
10  REASON
11  _____
12  * * * * * * * * * * * *
13  PAGE _____ LINE _____
14  CHANGE
15  _____
16  REASON
17  _____
18  * * * * * * * * * * * *
19  PAGE _____ LINE _____
20  CHANGE
21  _____
22  REASON
23  _____
24
25

218

```
1   PAGE _____ LINE _____
2   CHANGE
3   _____
4   REASON
5   _____
6   * * * * * * * * * * * * *
7   PAGE _____ LINE _____
8   CHANGE
9   _____
10  REASON
11  _____
12  * * * * * * * * * * * * *
13  PAGE _____ LINE _____
14  CHANGE
15  _____
16  REASON
17  _____
18  * * * * * * * * * * * * *
19  PAGE _____ LINE _____
20  CHANGE
21  _____
22  REASON
23  _____
24
25
```

220

```
1         UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF TEXAS
2             SAN ANTONIO DIVISION
3   TOM RETZLAFF            )
         Plaintiff,         )
4                           )
    v.                      )  NO. 5:08-CV-00170-OLG
5                           )
    LYNDA YVONNE DE LA VINA, )
6   DIANE BAKER WALZ, KYLE  )
    MERLETTE SNYDER,        )
7   KATHERINE ANNE POPE,    )
         Defendants.        )
8
    * * * * * * * * * * * * * * * * * *
9
         REPORTER'S CERTIFICATION
10   VIDEOTAPED DEPOSITION OF TOM RETZLAFF
         TAKEN ON SEPTEMBER 24, 2008
11
    * * * * * * * * * * * * * * * *
12  *
13
        I, LYDIA L. EDWARDS, CERTIFIED SHORTHAND
14  REPORTER in and for the State of Texas, do hereby
15  certify to the following:
16      That the witness, TOM RETZLAFF, was duly
17  sworn by me and that this deposition transcript is a
18  true record of the testimony given by said witness;
19      That the amount of charges for my
20  preparation of the completed deposition transcript
21  and any copies of exhibits is $_____, charged to
22  Lars Hagen;
23      That the original deposition transcript was
24  submitted on _____ to the Witness for
25  examination, signature and return to the custodial
```

219

```
1        WITNESS' SIGNATURE
2
3   STATE OF TEXAS    )
4   COUNTY OF TRAVIS  )
5
6       I, Tom Retzlaff, have
7   read the foregoing deposition and hereby affix my
8   signature that same is true and correct, except as
9   noted on Pages 215-218.
10
11
12  _____
        TOM RETZLAFF
13
14  THE STATE OF TEXAS )
15  COUNTY OF TRAVIS   )
        Before me, _____, on this
16  day personally appeared Tom Retzlaff, known to me (or
    proved to me under oath or through
17  _____) to be the person whose
    name is subscribed to the foregoing instrument and
18  acknowledged to me that they executed the same for
    the purposes and consideration therein expressed.
19
        GIVEN UNDER MY HAND AND SEAL OF OFFICE this
20  the _____ day of _____, 2008.
21
22           Notary Public in and for
             The State of _____
23
24
25
```

221

```
1   attorney by _____;
2       That the amount of time used by each party
3   at the deposition is as follows:
4       Lars Hagen   - 3 hours, 44 minutes
5       That pursuant to information made a part of
6   the record at the time said testimony was taken, the
7   following includes all parties of record:
8   TOM RETZLAFF
      PRO SE
9   LARS HAGEN
      Attorney for DEFENDANTS
10
11      That I am neither counsel for, related to
    nor employed by any of the parties or attorneys in
12  the action in which this proceeding was taken and,
13  further, that I am not financially or otherwise
14  interested in the outcome of the action;
15      CERTIFIED TO BY ME this _____ day of
16  October, 2008.
17
18
19  _____
        LYDIA L. EDWARDS, CSR
20      Certified Shorthand Reporter
        For the State of Texas
21      Certification No. 2567
        Commission Expires: 12/31/08
22
23
24
25
```